**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>NOBILIS HEALTH CORP., *et al.*,<br><br>Debtors.[1] | Chapter 7<br><br>Case No. 19-12264 (CSS)<br>(Jointly Administered) |
| ALFRED T. GIULIANO, in his capacity as Chapter 7 Trustee for the jointly administered bankruptcy estates of Nobilis Health Corp., *et al.*,<br><br>Plaintiff,<br><br>v.<br><br>HARRY J. FLEMING; P. DAVID YOUNG; BRANDON MORENO; KENNETH EFIRD; JAMES SPRINGFIELD; DONALD KRAMER; STEVE OZONIAN; SUSAN WATT; TOM FOSTER; PETER HORAN; SAMUEL PALERMO; AND MARCOS RODRIGUEZ,<br><br>Defendants. | Adv. No. ________________________<br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

[1] Debtors are: Northstar Healthcare Holdings, Inc., Case No. 19-12262; Northstar Healthcare Acquisitions, L.L.C., Case No. 19-12263; and Nobilis Health Corp., Case No. 19-12264.

## I. INTRODUCTION

1. Plaintiff Alfred T. Giuliano, Chapter 7 Trustee (the "Trustee") for the jointly administered Chapter 7 bankruptcy estates of Nobilis Health Corp. ("NHC"), Northstar Healthcare Holdings, Inc. ("HoldCo"), and Northstar Healthcare Acquisitions, L.L.C. ("Acquisitions") (collectively, "Nobilis," the "Company," or "Debtors"), by and through his counsel, brings this action, *inter alia,* to recover more than $50 million for the damages inflicted upon Nobilis—a now defunct but previously publicly-traded healthcare firm—by the breaches of fiduciary duty and other wrongdoing of its former directors and officers who are Defendants herein.

2. Before its collapse, Nobilis owned and operated surgical facilities and clinics. Typically, Nobilis was an out-of-network provider for its patients, which significantly heightened the importance of proper billing and collections procedures. Commencing in or around 2017 and continuing thereafter, Defendants abdicated their responsibilities to ensure that the Company had such procedures in place and concealed the deficiencies for two years while Nobilis's billing practices violated industry standards and were likely illegal, and its collection practices were marred by chronically-missed appeal deadlines, insufficient operational support or staff training, and inadequate procedures, controls, and monitoring. These deficiencies—of which Defendants were aware, encouraged, failed to correct and ultimately concealed from lenders, auditors and other stakeholders—caused more than $72 million dollars' of Nobilis's accounts receivable to become uncollectable, to the substantial detriment of the Company and its creditors.

3. With Defendants' knowledge and under their direction and control, the Company's books were materially misstated, and its financial condition and viability misrepresented to lenders and others—as the Company continued to carry uncollectable accounts receivable on its books, concealed collection problems and incurred substantial debt it could never hope to repay. Simply

stated, Defendants realized that Debtors' expansion strategy was a bust, yet cooked the books to present the company as viable when it was not, as it continued to lose money and incur debts it could never repay. In October 2019, Debtors filed for bankruptcy, and their non-Debtor operating subsidiaries were placed into receivership.

## II. JURISDICTION & VENUE

4. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1334, since the litigation arises under Title 11 of the United States Code (the "Bankruptcy Code"), or in or related to cases under the Bankruptcy Code.

5. The Trustee demands a jury trial before an Article III judge in connection with all claims to which he is entitled to a jury trial under the Constitution and applicable law, and the Trustee does not consent to the entry of final judgment or adjudication by a bankruptcy judge as to jury-triable claims.

6. Venue is appropriate in this District pursuant to 28 U.S.C. § 1409(a).

## III. PARTIES

### A. Plaintiff

7. Plaintiff Alfred T. Giuliano is the duly-appointed Chapter 7 Trustee of Debtors' bankruptcy estates.

8. On October 21, 2019 (the "Petition Date"), Debtors each filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, and the cases are being jointly administered under the caption *In re Nobilis Health Corp., et al.*, U.S.B.C. D. Del. Case No. 19-12264 (CSS).

9. On or about the Petition Date, Plaintiff was appointed Chapter 7 Trustee of Debtors' estates, and he continues to serve in that capacity.

10. Debtor NHC is a corporation organized under the laws of British Columbia, Canada. NHC is the ultimate parent for the Nobilis group of companies, which consists of Debtors HoldCo and Acquisitions as well as numerous non-Debtor entities. Prior to the Company's collapse, NHC's common stock traded on the NYSE American exchange under the symbol "HLTH."

11. Debtor HoldCo is a Delaware corporation. NHC owns 100% of the stock of HoldCo.

12. Debtor Acquisitions is a Delaware limited liability company. HoldCo owns 100% of the membership units in Acquisitions. Most of the non-Debtor operating entities in the Nobilis corporate structure are owned directly or indirectly by Acquisitions.

**B. Defendants**

13. Defendant Harry J. Fleming is an individual with an address of 507 Ramblewood Rd., Houston, Texas 77079. Fleming served as Chief Executive Officer ("CEO") of Nobilis from January 2016 until December 31, 2018. Prior to his role as CEO, Fleming had been Executive Chairman from April 2015 to January 2016, President from July 2014 to April 2015, and CFO from March 2013 to July 2014. Fleming was a member of Nobilis's Board of Directors from 2010 until June 28, 2016, and then was again a member, as well as Chairman of the Board, from November 16, 2017, until the Petition Date.

14. Defendant P. David Young is an individual with an address of 1601 Resaca Blvd., Austin, Texas 78738. Young served as Chief Financial Officer ("CFO") of Nobilis from February 2017 until September 2018.

15. Defendant Brandon Moreno is an individual with an address of 6363 San Felipe Street, Apt. 126 No. 513, Houston, Texas 77057. Moreno served as Associate Vice President of

Finance of Nobilis from September 2014 until January 2016, as Senior Vice President of Finance from January 2016 until January 2019, and then as CFO from January 2019 until September 6, 2019.

16. Defendant Kenneth Efird is an individual with an address of 4120 Southwest Freeway, Houston, Texas 77027. Efird served as Nobilis's President from July 2016 until September 13, 2019. Efird had previously served as Executive Vice President and Chief Operating Officer since January 2016, and in various other roles before that.

17. Defendant James Springfield is an individual with an address of 81 Tall Trail, Missouri City, Texas 77459. Springfield served as Nobilis's CEO from January 1, 2019 until his resignation effective May 7, 2019.

18. Defendant Donald Kramer is an individual with an address of 3330 Chevy Chase Drive, Houston, Texas 77019. Kramer was appointed as a member of Nobilis's Board of Directors in May 2016, and as its Chairman in June 2016. Kramer resigned from the Board and as Chairman on November 16, 2017. Kramer had previously been Nobilis's CEO from 2010 under 2014, and a member of the Board of Directors from 2010 until 2015.

19. Defendant Steve Ozonian is an individual with an address of 50 Vista Del Sol, Laguna Beach, California 92651. Ozonian was a member of Nobilis's Board of Directors from April 2015 until September 30, 2019 and served on the Company's Audit Committee.

20. Defendant Susan Watt is an individual with an address of 11 Kingsway Crescent, Toronto, Ontario M8X 2P9. Watt was a member of Nobilis's Board of Directors from January 19, 2018, until the Petition Date.

21. Defendant Tom Foster is an individual with an address of 4017 Piping Rock Lane, Houston, Texas 77027. Foster was a member of Nobilis's Board of Directors from June 2016 until the Petition Date.

22. Defendant Peter Horan is an individual with an address of 3503 SW Gale Avenue, Portland, Oregon 97239. Horan was a member of Nobilis's Board of Directors from June 2016 until June 12, 2017.

23. Defendant Samuel Palermo is an individual with an address of 11219 St. Laurent Lane, Houston, Texas 77082. Palermo was Nobilis's Chief Compliance Officer from June 2015 until July 2019.

24. Defendant Marcos Rodriguez is an individual with an address of 5032 Cooperglen Circle, Colleyville, Texas 76034. Rodriguez was Nobilis's Chief Accounting Officer from May 9, 2016, until his resignation on May 18, 2018.

## IV. FACTS

25. Nobilis was a publicly-traded healthcare firm based in Houston, Texas. Through a complex corporate structure, the Company owned and operated more than 30 specialty surgical hospitals, ambulatory surgical centers, and clinics across Texas and Arizona. Nobilis also partnered with more than 30 other facilities across the United States and purported to use a unique direct-to-consumer marketing strategy to attract patients, which included marketing specific surgical procedures directly to consumers.

26. In 2014, Nobilis's management embarked on an aggressive expansion strategy through the acquisition of additional healthcare facilities.

27. Nobilis engaged BBVA USA ("BBVA"): (a) in 2016 to arrange an $82.5 million credit facility through BBVA and a number of lenders (collectively, the "Lenders") to fund

Nobilis's purchase of additional facilities and refinance debt; and (b) again in November 2017 to provide an additional $50 million term loan.

28. Nobilis derived most of its revenue (approximately 87% of its revenue in the first half of 2016, for example) from patients' out-of-network insurance benefits, which have reimbursement rates that can vary widely depending on the payor, facility, and procedure. Because third-party payors can deny coverage for out-of-network procedures for a variety of reasons, this leaves out-of-network providers with the difficult task of collecting outstanding amounts from patients.

29. Nobilis generally recognized revenue on the date it provided service to a patient at, according to an October 2016 Lender Presentation prepared by Nobilis, the "[e]stimated net realizable amounts from third-party payors [and] patients"—meaning that revenue was reported not based on what patients were charged, but on the amount Nobilis ultimately expected to collect (net of any discounts or other adjustments), as purportedly estimated by evaluating "payor mix, historical settlement and payment data for a given payor and type of medical procedure, and current economic conditions."

30. Due to Nobilis's recognition of revenue before it collected money from third-party payors, Nobilis would record a corresponding account receivable on its balance sheet. The ability to collect these accounts receivable and generate cash flow was critical to the Company's success and ability to service its debt. These accounts receivable also served as primary collateral for Nobilis's loans with BBVA and the other Lenders, the servicing of which depended on the ability to fully collect reported accounts receivable.

31. Prior to 2017, Nobilis appears to have been successful at collecting nearly 100% of its accounts receivable, and in some instances reportedly collected over 100% of these amounts

(in situations where the Company had underestimated what it would ultimately receive). During that time, Nobilis had very little 365+ AR (*i.e.*, accounts receivable over 365 days old) and, what little it did have, was reportedly "eliminated" from the Company's accounts receivable (and reported as bad debt expense) even though collection efforts continued.

32. In mid-2017, however, this situation changed. During the latter half of 2017, Nobilis's 365+ AR skyrocketed—to $11,568,877 by September 30, 2017 (more than 10% of the Company's total accounts receivable), and to $20,892,234 by December 31, 2017 (nearly 20% of the Company's total accounts receivable). According to the Company's management, these dramatic increases were caused by problems with "the operating environment of [Nobilis's] facilities and [Nobilis's] revenue cycle department."

33. In reality, Nobilis's growth strategy was spiraling out of control and Defendants had a leadership choice to make – change course to stabilize the company or engage in financial chicanery to conceal the true state of the Company's financial condition. Defendants chose the latter.

34. While 365+ AR was increasing, the Company, at the direction of Defendants, moved most of its collection activities in-house, which it had never done before. The Company, at the direction of Defendants, also secretly changed its accounting policy with respect to 365+ AR—instead of "eliminating" it as had been done historically, the Company continued carrying 365+ AR on its books at a 25% discount to the gross charge amount.

35. As Defendants knew, there was no basis for valuing the 365+ AR at a 25% discount to gross charges for at least three reasons: *first*, there were deadlines for the timely appeal of denied claims which, if not observed (as was the case here), materially impacted Nobilis's ability to collect on aged claims; *second*, the Company and its management were inexperienced in collecting 365+

AR and unprepared for handling such collections in-house; and *third*, the Company and its management used questionable billing practices that did not accord with industry standards. Each of these reasons is discussed in greater detail below.

**1. Defendants' Failure to Implement Proper Procedures for the Timely Filing of Appeals**

36. Nobilis sought reimbursements under an assignment of benefits from its patients and was therefore required to comply with time deadlines set forth in its patients' health plans, including deadlines to file appeals. For example, Aetna required that appeals be filed within 180 days from claim denial, and United Healthcare required that such appeals be filed within 12 months. Aetna and United Healthcare together accounted for approximately 54% of Nobilis's payor mix.

37. The appeal policies of payors, including Aetna and United Healthcare, were published online and were known (or should have been known) to the Company and its management. Nonetheless, a February 2018 memorandum prepared by Defendant Moreno falsely stated that there were "no other time-bound guidelines" beyond the initial filing of the claim that could result in the denial of aged claims.

38. Because the core of Nobilis's business depended on seeking reimbursement for out-of-network claims from insurers, Defendants were grossly negligent in either ignoring or not being aware of these key policies.

39. According to allegations in a shareholder class action filed in January 2019 against NHC, Fleming, and Young,[2] Nobilis's management had been repeatedly informed by members of

[2] *Yang v. Nobilis Health Corp.*, No. 4:19-cv-00145 (S.D. Tex.) (the "Class Action").

the collections team that claims were no longer appealable because the deadline for filing had passed. The pleadings in the Class Action further alleged that:

a. "According to [Confidential Witness 1, a former Collections Supervisor], in June 2018, senior managers at Nobilis pressured CW1's collections team to recover on claims that were several years old at an impossible rate. CW1 stated that many claims that Nobilis sought to collect had been denied by the insurance companies, and they were not appealable. CW1's team urged senior managers to write off these claims as uncollectible, but senior managers made the decision to keep the uncollectible claims on the Company's books.";

b. "According to CW1, Moreno, then Senior Vice President of Finance and the current CFO of the Company, decided to 'put back millions that we had told them was not realizable income.' [. . .] CW1 explained that Moreno had the authority to make adjustments to the Company's accounts receivables, but Moreno refused to do so despite knowing that millions of dollars in uncollected claims were required to be written off.";

c. "According to [Confidential Witness 2, a collections specialist], Nobilis had, at least, $5 million in questionable, dated claims that the Company knew it could not ultimately collect."; and

d. "[Confidential Witness 3, a financial clearance specialist] further stated that a significant number of claims involved denials that Nobilis failed to appeal. According to CW3, some collections specialists submitted false information into the system stating that a follow-up for denied claims had occurred when in fact no appeal had been filed. CW3 corroborated the accounts of CW1 and CW2, and affirmed that most of the uncollected invoices dated back to, at least, 2016."

40. Nobilis's corporate records reflect numerous instances where members of the Company's collections team forwarded claims to management for adjustment because the "timely filing limit" or "TFL" for an appeal had passed. Examples include:

a. "WAS UPHELD ON 06/27/2017 AS PROCESSED CORRECTLY. WE PAST THE TFL TO SEND THE NEXT APPEAL. HENCE NEED TO ADJUST THE CLAIM. PENDING FOR ACTION/ RESPONSE.KW";

b. "WORKING PSH AR 120+ AETNA DOS 110716 CLAIM# ENYO4NXQL00, REV NOTES INDICATE APPEAL WAS UPHELD TFL HAS EXPIRED, COLLECTIONS EFFORT EXHAUSETED, PREPARED ADJ FORM AND FRWD TO MGMT FOR APPROVAL";

c. "THE TFL IS 180 DAYS FROM THE DENIED DATE (03/25/2017), SINCE WE PAST THE TFL WE CANT ABLE TO SENT THE APPEAL. NEED TO ADJUST THE AMOUNT $241215.52. THEREFORE PLACED THE ACCOUNT IN DCI FOR ADJUSTMENT.KW";

d. "WORKING PSH AR 120+BCBS DOS 120916 CLAIM# 825603008340C , PREV NOTES INDICATE TFL FOR APPEAL HAS EXPIRED, PREPARED ADJ FORM AND FRWD TO MGMT FOR APPROVAL";

e. "WE HAVE EXCEEDED THE APPEAL LIMIT OF 180 DAYS FROM THE PROCESSED DATE, THEREFORE NEED TO ADJUST THE CLAIM. SJ"; and

f. "RESPONSE. APPEAL TIMELY FILING IS 180 DAYS FROM LAST PROCESSING DATE (PFD081620178) PAST TIMELY. ACCOUNT WAS LOCATED ON THE ADJUSTMENT LOG- PRINTED COPY OF EOB - FILL OUT ADJUSTMENT FORM-FORWARD TO MANAGER FOR APPROVAL"

41. Missed appeals deadlines were a major problem and were caused by the Company's weak internal controls and processes. Nobilis, under the direction of Defendants, had no dedicated appeals team, no established procedures for handling appeals, no medical specialist on staff to respond to inquiries or draft appeals, no automated process in place, and insufficient staff that could be or were properly trained to handle appeals in a timely manner. Due to this abject failure in proper procedures and internal controls, hundreds of claims that should have been appealed were not. The Company hid these facts from its Lenders and other stakeholders.

42. Indeed, a spreadsheet prepared by the Company in November 2018 revealed that over $100 million in accounts receivable from major insurance payors—including Aetna, United Healthcare, BCBS, and CIGNA—were uncollectable because "any appeal attempts are denied as past timely filing."

43. Defendants knew that, in addition to limiting the number of appeals allowed, insurance payors also required the Company to timely file appeals and, in some situations, to

timely pursue legal action in order to preserve the right to reimbursement. Nobilis's failure to do so for more than $100 million in accounts receivable meant that it lacked legal recourse to seek further payment. Nobilis's books and records (and representations to Lenders and others), however, did not properly recognize that these amounts were uncollectable and, by discounting at only 25%, instead provided inflated assessments of Nobilis's accounts receivable and financial condition.

44. Defendants, particularly those in charge of Nobilis's financial operations, knew that claim collectability decreases over time, which is why Nobilis applied increasing discount rates as time passed for claims that were less than one year old. Yet, Nobilis's 365+ AR figures unrealistically assumed that 75% could be collected regardless of the increasing age of the claims (*i.e.*, 12 months, 18 months, or even 24 months).

**2. Defendants' Failure to Ensure Nobilis Had the Operational Capability to Handle Collections**

45. The Company and its management were inexperienced in collecting 365+ AR and unprepared for handling such collection in-house.

46. In internal memoranda, Moreno acknowledged that Nobilis had "limited" experience and "lacked adequate history to establish well-formed estimates" when valuing 365+ AR.

47. An outside accountant hired by Nobilis reached a similar conclusion, explaining in a memorandum that "[m]anagement did not have an adequate history of collections of accounts > 365 days to use as a basis to develop a reasonable estimate of the net realizable value of the AR > 365 days," that the Company lacked "quantitative history/experience" in collections, that management's incorrect valuation of 365+ AR had caused a "misapplication of revenue



LEGAL\54692356\2 00600.9698.000/464741.000

recognition . . . which resulted in an error in the financial statements," and that collection of the 365+ AR "could not be reasonably assured at December 31, 2017."

48. Indeed, in another memorandum, Nobilis's own financial team agreed that they had failed to "appropriately consider" valuation of aged receivables, that they "did not design the [collection] process appropriately to consider the change in risk characteristics of aged accounts receivable," and that "[i]f properly evaluated, the Company would not have recognized revenue on accounts receivable that were greater than a year old."

49. Consistent with its inability to value and collect aged receivables, as of December 31, 2017, Nobilis had only collected 19.7% of the $20.89 million in outstanding 365+ AR—far below the 75% collection estimates reflected in the Company's financials.

50. Defendants also failed to properly consider the operational and financial impacts of moving the collections process in-house (rather than using third-party vendors, as had been the case historically) or the associated delays that the transition would cause to the ability to collect 365+ AR with impending appeals deadlines. The Company lacked experience in these areas and was unprepared to handle the transition or the collections process going forward.

51. Nobilis's outside accountant found that "there was *no consideration* related to issues or delays caused by the transition, which are encountered with such a significant change" (emphasis added).

52. Because Defendants failed to ensure either that Nobilis's in-house staff had the appropriate experience, training, and support to handle collections or that Nobilis engaged appropriate outside collections support, millions of dollars in accounts receivable owed to the Company went uncollected, to the detriment of the Company and its creditors.

**3. Defendants' Implementation of Questionable Billing Practices In Violation of Industry Standards and Proper Compliance Procedures**

53. Nobilis, under the direction and control of Defendants, failed to adhere to industry standards in connection with its billing practices, which were apparently intended to serve as short-term moneymaking schemes but ended up causing many of Nobilis's accounts receivable to become uncollectable and further exposed the Company to legal and compliance risks.

54. Nobilis, under the direction and control of Defendants, did not use industry-standard practices for setting charges. For example, rather than basing charges on a multiple of Medicare fee schedule rates or a percentage of charges reported by FAIR Health, instead the Nobilis sales team drove the process, setting charges that were unconnected to any mathematical formula and three to four times the industry standard.

55. These inflated charges were a short-term moneymaker because insurance payors would sometimes automatically pay a percentage of charges for out-of-network services. As payors began to catch on, however, they began paying lower reimbursement amounts under the terms of patients' plans (which typically base payments on a usual-and-customary standard or a multiple of Medicare rates) and, in some instances, even sought recoupment for prior overpayments.

56. Nobilis, under the direction and control of Defendants, also engaged in a practice called "split-billing," which involves creating separate claims for incidental procedures and is widely recognized as improper, a compliance risk, and likely illegal.

57. When Nobilis knew that insurance payors would deny claims for procedures incidental to uncovered services, Nobilis would create a separate claim for the incidental procedure to submit to third party payors.

58. In this regard, the Class Action alleged:

> According to CW1, Nobilis's sales representatives convinced physicians to offer patients additional procedures that were unrelated

> to the initial reason for their visit. For example, CW1 explained that if a patient came in to be operated for a hiatal hernia, the physician would offer a breast augmentation surgery to the patient as well, which allowed Nobilis to bill the insurer for two separate claims. CW1 described this practice as fairly common at Nobilis. CW1 also stated that Nobilis crafted a work around the requirement for spinal surgeries to be performed at an in- network facility by admitting patients in the emergency room at out-of-network hospitals. According to CW1, this practice as well as split billing ultimately resulted in the denial of insurance claims, which made it difficult for Nobilis to collect on invoices.
>
> [. . .]
>
> CW2 corroborated CW1's account regarding split billing, and explained that a significant number of claims were denied because Nobilis billed for procedures unrelated to the initial approved operation. CW2 affirmed that insurers ceased to pay for the additional operations that Nobilis's partner physicians encouraged patients to receive, and the insurers paid only for the operation that had been initially approved for payment.

59. Defendants were aware of and either supported or ignored these split-billing practices, despite knowing they were risky, unethical, likely illegal, and harmful to Nobilis and its creditors.

60. The AAPC (formerly known as the American Academy of Professional Coders), which provides training and certification for medical coders, medical billers, and other healthcare administration professionals, describes split-billing as "dangerous," "ill-advised," and a "risky business." Crowe LLP likewise identifies split billing as a "compliance risk" for its clients.

61. These practices also failed to adhere to the revenue recognition standards promulgated by the FASB (including but not limited to ASC 606) and U.S. GAAP standards.

62. Nobilis employees informed management that these practices were inappropriate, and one physician partner even informed Defendant Moreno that his attorney considered such practices illegal. And, according to a confidential witness in the Class Action, various nurses and

other medical professionals had left the Company over the years because of these compliance issues.

63. For Nobilis, the goal of split-billing was to increase its reported revenue and, in turn, its accounts receivable—yet this practice jeopardized its ability to collect from insurance payors.

64. In addition to split-billing, Nobilis encouraged patients to seek care from Nobilis instead of an in-network provider by promising to waive all or a portion of a patient's financial responsibility under his or her plan. These "fee-forgiveness" agreements bordered on fraud and impaired Nobilis's right to reimbursement. Indeed, due to this practice, CIGNA (a major insurance payor) asserted a claim against Nobilis to recoup millions of dollars.

**4. Defendants' Efforts to Conceal the Company's Accounting Chicanery**

65. Beginning in the latter half of 2017, Nobilis's 365+ AR increased significantly allegedly due to "the operating environment of our facilities and our revenue cycle department." The 365+ AR, which was almost nonexistent prior to 2017, grew to more than $20 million by the end of 2017, comprising nearly 20% of Nobilis' total accounts receivable.

66. As its 365+ AR increased, Defendants began to take steps to conceal Nobilis' financial troubles from the outside world. For the first time in the Company's history it moved its collection activities – the very heart of its business – in-house and changed the Company's long standing accounting policy with respect to 365+ AR. Instead of eliminating 365+ AR as it had done historically, Defendants chose to continue carrying 365+ AR on the Company's books to inflate its revenue numbers to give a false picture of the Company's financial health.

67. During that period, Nobilis sought an amendment to its Credit Agreement to take on more debt despite the Company's troubled finances. In order to secure the additional funding,

Defendants, and in particular Fleming, Young and Moreno, repeatedly represented that the Company was in good financial health and relatedly, never disclosed its change in accounting policy to its lenders.

68. Defendants also concealed its change in accounting policy from the Company's auditors, Crowe Horvath ("Crowe"). Crowe unilaterally discovered the changes in late February 2018, which prompted it to investigate the reasons for the policy changes and their effects on the Company's finances.

69. The Company's response to Crowe's inquiries was to further conceal the Company's collection issues surrounding its 365+ AR. Among other things, the Company's responses, outlined in a February 2018 memorandum, misrepresented that there were timing restrictions that could result in the denial of aged claims; hid that the Company lacked the historical basis to establish accurate estimates of the value of 365+ AR; and failed to disclose other billing practices that hampered the Company's ability to collect aged accounts receivables. By wholly misrepresenting the Company's ability to collect 365+ AR, Defendants convinced an unsuspecting auditor to sign off on the Company's Form 10-K for fiscal year 2017, filed March 2018.

70. Aside from concealing the Company's troubled financial state from its Lenders and auditors, Defendants also misled its investors as to the accuracy of its accounting. During a quarterly earnings call in 2018, the Company reported that it "expect[ed] to collect everything that's on the balance sheet," knowing that was a false statement.

71. By the fall of 2018, Nobilis had no choice but to disclose its collection problems. In October 2018, BBVA was informed of Nobilis's intention to write down $25 million of its 365+ AR. Then, in mid-November 2018—a few days after announcing that it could not timely file its Form 10-Q for the third quarter because the Company and its auditor needed "additional time" to

review the financial statements—Defendants Young and Moreno informed BBVA that the amount the Company expected to write down had increased to approximately $32.2 million. By the end of the month, the write-down had more than doubled, to more than $72 million.

**5. Nobilis's Collapse Into Bankruptcy**

72. Collections were dismal throughout 2018 and into 2019, and 365+ AR increased.

73. Given Defendants' failure to ensure that Nobilis had appropriate practices and procedures in place for billing and collections, Nobilis had tens of millions of dollars in outstanding accounts receivable which Defendants knew the Company would not collect.

74. Despite having known of these problems since early 2017, Defendants caused the Company to take on significant debt (which the Company could never hope to repay) based on false representations concerning the Company's accounting practices and financial health.

75. Last-ditch efforts to get Nobilis back on track were futile due to, among other things, the continued billing and collection problems and the Company's crushing debt load.

76. On November 15, 2018, NHC received a notice from the NYSE American LLC ("NYSE") that the Company was not in compliance with NYSE's continued listing standards due to the failure to timely file its Form 10-Q Quarterly Report and had six months to correct the filing deficiency and submit a plan to regain compliance with the continued listing standards.

77. Although NYSE accepted NHC's plan to regain compliance and granted an extension of the cure period through August 31, 2019, NHC did not correct its filing deficiencies.

78. As a result, on September 3, 2019, NYSE notified NHC that its common shares were subject to delisting proceedings.

79. In a Form 8-K dated September 3, 2019, NHC disclosed that it had elected not to seek review or otherwise appeal NYSE's determination and that "[t]rading in the Company's common shares was suspended following the close of the NYSE market on September 3, 2019."

80. By that time, NHC had also received a notice from NYSE stating that NHC was not in compliance due to low selling price issues. According to a Form 8-K dated May 30, 2019, NYSE had determined "that the Company's common shares have been selling for a low per share price for a substantial period of time and . . . the Company's continued listing is predicated on it effecting a reverse stock split of its common shares or otherwise demonstrating a sustained price improvement" by November 30, 2019.

81. Several of the Company's surgical centers and hospitals were closed around this time. On September 13, 2019, the Company closed its Surgeons' Premier Medical Center facility in Sugar Land, Texas, and its Scottsdale Liberty Hospital facility in Scottsdale, Arizona. On September 27, 2019 (after a Receiver had been appointed, as set forth below), the Kirby Surgical Center in Houston, Texas, the Plano Surgical Hospital in Plano, Texas, the Uptown Surgery Center in Dallas, Texas, and the Company's Peak intraoperative neuromonitoring service business were also closed.

82. The Company had defaulted under its credit facility, which ultimately resulted in the appointment of a Receiver over, *inter alia*, the Company's operating subsidiaries.

83. The Company had entered into a series of forbearance agreements with respect to the credit facility, with the forbearance period under the Fourth Forbearance Agreement expiring as of August 30, 2019. Shortly after, on September 24, 2019, BBVA delivered a notice of acceleration to the Company declaring that, as a result of various defaults under the credit agreement and the termination of the forbearance period, all of the obligations under the

Company's credit facility were immediately due and payable—amounting to $123,206,250, plus interest, fees, and other obligations under the relevant agreements.

84. The same day, the 44th Judicial District Court of Dallas County, Texas, entered an order appointing Howard Marc Spector as the temporary Receiver for all of the assets of NHC, Acquisitions, and certain subsidiaries of the Company, as guarantors, under the Company's Credit Agreement dated October 28, 2016 (as amended) and the Company's Super Priority Credit Agreement dated May 22, 2019, with BBVA and other lenders. The non-Debtor operating subsidiaries remain in receivership.

85. Debtors filed for bankruptcy on October 21, 2019.

86. In May 2020, BBVA brought an action against Fleming, Young, and Moreno in state court in Dallas, Texas for alleged negligent and reckless misrepresentations made concerning the value and collectability of Nobilis's accounts receivable. The BBVA petition, a copy of which is attached to this Complaint as Exhibit A, alleges, *inter alia*:

a. Nobilis's financial statements drastically overstated its accounts receivable;

b. Fleming, Young, and Moreno were aware of issues impacting Nobilis's collections by at least June 2017, but did not disclose those issues to BBVA;

c. Nobilis received an additional $50 million incremental term loan in November 2017, based on false Compliance Certificates and other statements and without disclosing Nobilis's recently-changed accounting policy (i.e., to continue carrying 365+ AR on the books rather than eliminating it);

d. "By inflating its 365+ AR, the Company avoided recording a significant bad debt expense, which would have negatively impacted the Company's net income and EBITDA for the period, and concealed the fact that it was suffering the same collections problems that were plaguing the rest of the industry";

e. "[T]he timing of Nobilis's decision to change its accounting policy for 365+ AR suggests that Defendants knew (or should have known) that Nobilis was in danger of violating its financial covenants";

f. Defendants changed the Company's accounting policies in order to conceal that the Company was in default under the credit facility, and to make sure BBVA and the lenders would move forward with approving and funding the additional debt; and

g. The in-house collections team informed Nobilis's management during 2018 that "much of the 365+ AR was not collectable because the claims were no longer appealable, were paid in full under the terms of the patient's plan, or were denied due to Nobilis's other questionable billing practices," but these issues were not disclosed to BBVA.

87. The conduct of the Defendants, as aforesaid, was intentional, reckless and sufficiently outrageous as to justify the imposition of punitive damages.

## V. CLAIMS

### COUNT ONE - BREACH OF FIDUCIARY DUTY
**(Against All Defendants)**

88. Paragraphs 1 through 87 above are incorporated herein by reference, as if restated in their entirety.

89. By virtue of their role as directors and officers of the Debtors, Defendants owed fiduciary duties to Debtors and, when insolvent, their creditors, including duties of care, loyalty and good faith.

90. The duty of loyalty obligates corporate fiduciaries to commit themselves to the business of the corporation with the attitude of promoting the interests of the corporation and not themselves.

91. The duty of loyalty is breached, *inter alia*, (a) when officers or directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities; (b) when officers or directors "abdicate" their responsibilities; and/or (c) when officers or directors act in bad faith.

92. The duty of due care is breached, *inter alia:* (a) when officers or directors engage in an irrational decision-making process; and (b) when the conduct of officers or directors arises to the level of "gross negligence."

93. Moreover, each of the director Defendants on the Nobilis Audit Committee had the further responsibility to ensure that adequate internal controls and reporting systems were in place and properly utilized to increase the likelihood that wrongdoing by management and others would be discovered in time to inform fellow board members and to initiate corrective action.

94. To discharge their fiduciary duties, each Defendant was required, *inter alia*: (a) to exercise reasonable control and supervision over the officers, employees, agents, business, and operations of Debtors; (b) to be and remain informed as to how Debtors were operating and, upon receiving notice or information of an imprudent, questionable, or unsound business decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts; and (c) ensure that Debtors were operating in a sound manner and in compliance with all applicable laws, industry standards, accounting standards, and other guidelines.

95. By failing to do so, each Defendant breached his or her fiduciary duties.

96. In particular, Defendants:

a. Failed to implement reporting or information systems or controls to fully and accurately report and effectively monitor Debtors' financial condition;

b. Failed to provide accurate and complete financial statements reflecting Debtors' true financial condition and instead engaged in accounting chicanery to create the illusion of a more profitable and solvent company;

c. Failed to ensure that Debtors' financial statements properly reserved for uncollectable receivables and fully and accurately disclosed the collectability and net realizable value of accounts receivable;

d. Failed to ensure that Debtors engaged in appropriate and lawful billing, collection, and accounting practices;

e. Failed to ensure Debtors and their staff had the operational capability and training to handle collections and appeals, or that appropriate industry standards, practices, and procedures were implemented;

f. Failed to put in place appropriate internal controls and to detect and address chronic issues with questionable billing practices, missed appeal deadlines, and other collections concerns; and

g. Caused the Company to make misrepresentations to the Lenders and others concerning the Company's true financial condition, collections, and accounts receivable.

97. Defendants' breaches of fiduciary duty caused the Company to have tens of millions of dollars in uncollectable accounts receivable, to incur substantial debt well beyond the Company's ability to pay, to have heightened legal and compliance risks, and ultimately to collapse.

98. The director Defendants' intentional ignorance, abdication of their roles as directors, and/or willful blindness toward the Debtors' improper transactions, system failures and accounting misrepresentations constituted breaches of the director Defendants' fiduciary duties to Nobilis and its creditors.

99. Defendants acted in bad faith, consciously disregarded their duties to Debtors, and behaved in a manner that was grossly negligent, reckless, and egregious. Defendants knew or

should have known of improprieties and other questionable practices but either caused Debtors to engage in them in the first place, encouraged Debtors to continue engaging in them, or utterly failed to stop them.

100. As a result of Defendants' breaches of fiduciary duties, Nobilis has suffered damages which have yet to be fully determined and quantified, but which exceed the sum of $50 million.

**COUNT TWO - CORPORATE WASTE**
**(Against Director Defendants)**

101. Paragraphs 1 through 100 above are incorporated herein by reference, as if restated in their entirety.

102. Accounts receivable constituted valuable assets of Debtors which, if properly handled and collected upon, could have brought in significant revenue for the Company.

103. By implementing questionable billing practices and failing to enact appropriate collection and appeal procedures for Debtors' accounts receivable, the director Defendants squandered away Debtors' ability to collect on these valuable assets and caused tens of millions of dollars' worth of Debtors' accounts receivable to become worthless.

104. The director Defendants' waste of Debtors' assets was commercially unreasonable and served no rational business purpose.

105. As a result of the waste of Debtors' assets, the director Defendants are liable for their respective roles and the damages associated therewith.

**COUNT THREE – COMMON LAW FRAUD**
**(Against All Defendants)**

106. Paragraphs 1 through 105 above are incorporated herein by reference, as if restated in their entirety.

107. Defendants engaged in the wrongdoing alleged above with the intent to defraud and deceive Nobilis and its creditors, for their own pecuniary benefit.

108. Defendants "cooked the books" of Nobilis to prolong the Company's existence at the expense of Nobilis and its creditors.

109. Among other things, Defendants:

a. Falsely represented to third-parties dealing with the Company that Nobilis' rapid growth strategy was being successfully implemented;

b. Engaged in fraudulent billing practices;

c. Misrepresented the true state of accounts receivables to create and maintain the illusion that the Company was in good financial health;

d. Facilitated the booking of false and inflated revenues; and,

e. Facilitated the accounting chicanery and other misrepresentations identified above.

110. The conduct of the Defendants as alleged above constituted fraud and deceit.

111. As a result of the fraud and deceit of Defendants, Debtors suffered damages which have yet to be fully determined and quantified, but which exceed the sum of $50 million.

## VI. RELIEF REQUESTED

WHEREFORE, Plaintiff Alfred T. Giuliano, Chapter 7 Trustee for the jointly administered estates of Debtors, demands judgment in his favor and against Defendants, jointly and severally where appropriate, for:

(a) Compensatory damages in the excess of $50 million;

(b) Punitive damages in the amount to be determined by the jury;

(c) Pre-judgment interest, reasonable attorneys' fees, and costs; and

(d) Such additional relief as this Court deems just.

## VII. JURY DEMAND

The Trustee demands a jury trial before an Article III Judge on all claims asserted in this Complaint that are triable to a jury under the Constitution and applicable law.

Date: October 18, 2021

COZEN O'CONNOR

By: */s/ John T. Carroll*

John T. Carroll, III (DE No. 4060)
1201 North Market Street
Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2028
Fax: (302) 295-2013
Email: jcarroll@cozen.com

KAUFMAN, COREN & RESS, P.C.
Steven M. Coren, Esq.
(*Pro Hac Vice* Admission Pending)
Benjamin M. Mather, Esq.
(*Pro Hac Vice* Admission Pending)
Two Commerce Square
2001 Market Street
Suite 3900
Philadelphia, PA 19103
Tel: (215) 735-8700
Fax: (215) 735-5170
E-mail: scoren@kcr-law.com
bmather@kcr-law.com

*Counsel for Alfred T. Giuliano, Chapter 7 Trustee*