# EXHIBIT "A"

3 CIT/ ESERVE

FILED
5/29/2020 1:03 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
JAVIER HERNANDEZ DEPUTY

**CAUSE NO. DC-20-07462**

| | | |
|---|---|---|
| **BBVA USA, in its capacity as Administrative Agent,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **DALLAS COUNTY, TEXAS** |
| | § | |
| **HARRY J. FLEMING, P. DAVID YOUNG and BRANDON MORENO,** | § | |
| | § | |
| **Defendants.** | § | **160th JUDICIAL DISTRICT** |

---

**PLAINTIFF'S ORIGINAL PETITION AND REQUEST FOR DISCLOSURE**

---

Eric D. Madden (Bar No. 24013079)
Ben A. Barnes (Bar No. 24092085)
REID COLLINS & TSAI LLP
1601 Elm Street, Suite 4200
Dallas, Texas 75201
T: (214) 420-8900
F: (214) 420-8909
emadden@reidcollins.com
bbarnes@reidcollins.com

William T. Reid, IV (Bar No. 00788817)
Nathaniel J. Palmer (Bar No. 24065864)
Keith Y. Cohan (Bar No. 24096183)
Morgan M. Menchaca (Bar No. 24103877)
REID COLLINS & TSAI LLP
1301 S. Capital of Texas Hwy
Building C, Suite 300
Austin, Texas 78746
T: (512) 647-6100
F: (512) 647-6129
wreid@reidcollins.com
npalmer@reidcollins.com
kcohan@reidcollins.com
mmenchaca@reidcollins.com

COUNSEL FOR PLAINTIFF,
BBVA USA, AS AGENT

**TABLE OF CONTENTS**


NATURE OF THE CASE ..... 1

PARTIES ..... 6

JURISDICTION AND VENUE ..... 7

DISCOVERY CONTROL PLAN ..... 7

STATEMENT OF FACTS ..... 7

A. In October 2016, Nobilis Enters into a Revolving Credit Facility and Term Loan with the Agent and Lenders. ..... 7

B. In Mid-2017, Nobilis Secretly Changes Its Accounting Policy for 365+ AR. ..... 11

C. In November 2017, Nobilis Obtains an Additional $50 Million Term B Loan from the Agent and Lenders Without Disclosing Its New Accounting Policy. ..... 19

D. Nobilis Fails to Disclose Its New Accounting Policy to Its Auditors Until Early 2018 and Fails to Provide a Factually and Legally Based Analysis to Justify the Change. ..... 23

E. Nobilis Conceals Its New Accounting Policy and Collections Problems Until Late 2018, When Nobilis Writes Down Its 365+ AR. ..... 24

CAUSES OF ACTION ..... 27

Count 1: Negligent Misrepresentation ..... 27

Count 2: Common Law Fraud – Reckless Misrepresentation ..... 30

REQUEST FOR DISCLOSURE ..... 33

DEMAND FOR JURY TRIAL ..... 33

PRAYER FOR RELIEF ..... 33

## PLAINTIFF'S ORIGINAL PETITION AND REQUEST FOR DISCLOSURE

Plaintiff BBVA USA f/k/a Compass Bank ("BBVA"), as administrative agent (in such capacity, the "Agent") under that certain Credit Agreement dated October 28, 2016 (as amended, supplemented, or otherwise modified, the "Credit Agreement"), on behalf of itself and the other lenders party thereto from time to time (the "Lenders"), hereby files this Original Petition and Request for Disclosure against Defendants Harry J. Fleming ("Fleming"), P. David Young ("Young") and Brandon Moreno ("Moreno") (collectively, "Defendants"), and respectfully states as follows:[1]

## NATURE OF THE CASE

1. This case arises out of an incremental $50 million term loan (the "Term B Loan") that the Agent arranged for, and the Lenders made to, Northstar Healthcare Acquisitions, L.L.C. and its various direct and indirect parent entities and subsidiaries (collectively, "Nobilis" or the "Company") in November 2017. Defendants were high-ranking officers at Nobilis—the chief executive officer, chief financial officer, and senior vice president of finance—who were responsible for and directed the Company's operations and collections practices, accounting policies, and financial reporting, among other things. In those capacities, Defendants also were responsible for communications with the Agent and Lenders and made numerous representations concerning the Company's financial health (through presentations, financial statements and officer certificates, among other things) to the Agent and Lenders in connection with the Term B Loan. Most critically, Defendants made representations about the value of Nobilis's accounts

[1] Pursuant to Local Rule 1.08, the Agent hereby discloses the following "related case" which involves the same transaction or occurrence: *BBVA USA v. Northstar Healthcare Acquisitions, L.L.C., et al.*, Cause No. 19-15508, pending in the 44th Judicial District Court of Dallas County, Texas.

receivable (which reportedly totaled over $112 million as of September 2017) and its ability to collect those accounts from third-party insurance payors.

2. The Defendants' representations proved to be grossly overstated. By no later than January 2019, Nobilis wrote down $72 million of its reported accounts receivable. Within two years, Nobilis collapsed into receivership and bankruptcy.[2] Moreover, as the Agent and Lenders have since learned, hundreds of millions of dollars in Nobilis's accounts receivable that served as collateral for the Term B Loan were worthless. In the end, Defendants did not exercise reasonable care or competence in their communications with the Agent and Lenders or, alternatively, acted recklessly without knowledge of the truth and their negligent and/or reckless actions destroyed the value of the collateral that secured the Term B Loan.

3. Before its collapse, Nobilis was a publicly traded healthcare firm that owned and operated mostly out-of-network specialty surgical hospitals and ambulatory surgical centers in Texas and Arizona. Nobilis derived most of its revenue from its patients' out-of-network insurance benefits, from which reimbursement rates can vary considerably. For financial reporting purposes, Nobilis recognized revenue on the date the services were provided "at the estimated net realizable amount"—that is, at the amounts Nobilis expected to collect from patients and third-party payors, not what it charged for any given service or procedure. Nobilis claimed that the "net realizable amounts" that it reported reflected the Company's "actual experience," taking into account "historical payment data, payor mix, and current economic conditions."

[2] On October 21, 2019, the following entities filed voluntary bankruptcy petitions under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware: (i) Nobilis Health Corp., Case No. 19-12264-CSS, (ii) Northstar Healthcare Holdings, Inc., Case No. 19-12262-CSS, and (iii) Northstar Healthcare Acquisitions, L.L.C., Case No. 19-12263-CSS (collectively, the "Nobilis Debtors").

4. Because Nobilis recognized revenue before it actually collected money from third-party payors, Nobilis recorded a corresponding account receivable on its balance sheet. Nobilis's ability to collect those accounts receivable and generate cash flow was critical to the Company's success and its ability to service its debt. And despite its aggressive expansion and uncertain stream of revenue, Defendants represented to the Agent and Lenders that Nobilis had a strong track record of collecting from third-party payors—a fact Defendants also communicated publicly and privately to investors, the Agent, and the Lenders.

5. Prior to 2017, Nobilis had very few accounts receivable over 365 days old ("365+ AR"). What 365+ AR it did have, the Company "eliminated" from its accounts receivable. That changed in 2017, however, as Nobilis's acquisitions of new facilities outpaced Defendants' ability to manage and integrate the facilities' respective billings and collections processes. The Company's accounts receivable aged significantly as a result; by the third quarter of 2017, the Company's 365+ AR swelled to nearly 10% of the Company's total accounts receivable (and nearly 20% by the end of 2017). As the Company's 365+ AR ballooned, Defendants decided to change how Nobilis accounted for those accounts receivable. Instead of writing off 365+ AR, as the Company had done historically, Defendants chose to maintain 365+ AR on Nobilis's books and records at a 25% discount to the gross charge amount—without disclosing the change to the Company's auditors or to the Agent and Lenders.

6. Defendants' valuation of the 365+ AR (*i.e.*, that Nobilis would collect 75% of the charged amounts) was deeply flawed from the start, as the Agent and Lenders only came to learn much later. Defendants assumed that all accounts receivable were collectable indefinitely, when they knew or should have known that many insurance payors have strict time limits for appeals of denied claims. Further, Defendants decided that *all* 365+ AR would only be discounted by

25%, even though they knew that the value of aged claims continues to decrease over time. And as Defendant Moreno and Nobilis's other employees and accountants observed after the fact, Defendants had no historical data and insufficient experience to support the 25% discount that they chose. That was particularly so given Nobilis's practice of overbilling insurers and, even after having received full payment, continuing to report the inflated balances as outstanding accounts receivable. Because Nobilis allowed those accounts receivable to continue aging, and it had no legal right to further payment, a 25% discount was woefully inadequate. Simply put, Defendants' estimate was little more than a blind guess that grossly overvalued the 365+ AR—a guess made worse by the fact that Nobilis engaged in a litany of questionable billing practices that had already inflated its accounts receivable.

7. Nobilis retained BBVA in 2016 to help arrange an $82.5 million credit facility to fund Nobilis's acquisition of additional facilities and refinance its debt (the "Credit Facility") and tapped the Agent and Lenders again in November 2017 to provide an additional $50 million term loan (*i.e.*, the Term B Loan). In the months leading up to the funding of the Term B Loan in November 2017, Defendants told the Agent and Lenders nothing about Nobilis's growing collections problems, their decision to change Nobilis's accounting policy with respect to 365+ AR, or how they had "valued" the 365+ AR. Instead, Defendants provided the Agent and Lenders with financial statements, officer compliance certificates, and other financial information that subsumed the inflated 365+ AR.

8. The Defendants had a good reason for doing so. Had Nobilis not changed its accounting policy for 365+ AR in the third quarter of 2017, Nobilis would have had to record a bad debt expense of nearly $12 million (or 10% of its accounts receivable) in the financial statements that Defendants delivered to the Lenders prior to closing the Term B Loan. A write

down of that magnitude not only would have raised concerns amongst the Agent and Lenders about Nobilis's ability to service the Term B Loan, but would have also resulted in the Company having to disclose that it had violated its financial covenants under the existing Credit Agreement. The result would have been an immediate event of default under the Credit Agreement, which in turn, would have meant that Nobilis could not satisfy the conditions precedent to the closing of the Term B Loan.

9. Nobilis's collections problems went from bad to worse after the Term B Loan closed. Through the first three quarters of 2018, collections plummeted at the Company and 365+ AR skyrocketed as efforts to move collections in-house backfired and insurance payors expectedly denied reimbursement for aged claims. Nonetheless, Defendants kept the Agent and Lenders in the dark, continuing to provide financials and compliance certificates that included materially inflated 365+ AR amounts. All the while, Defendants' negligent and/or reckless conduct continued to materially diminish the value of the rest of the Company's accounts receivable, effectively destroying the collateral securing the Term B Loan.

10. It was not until July 2018 when, desperate for additional liquidity, Defendants told the Agent and Lenders about the accounting policy change that Defendants implemented in the third quarter of 2017. And it was not until October 2018 that Defendants admitted to the Agent and Lenders that they were having trouble collecting due to insurance payors denying reimbursement requests (although Defendants said just the opposite a few weeks later). Finally, by late 2018, Nobilis had incurred approximately $72 million in bad debt expenses related to those receivables. With the financial reality finally exposed, Nobilis defaulted under the terms of the Credit Agreement. Ultimately, Nobilis's endemic problems proved impossible to fix, and the Nobilis Debtors filed for bankruptcy on October 21, 2019.

11. The Agent and Lenders suffered more than $63.6 million in damages due to the negligent and/or reckless misrepresentations that Defendants made about the value and collectability of the Company's 365+ AR and other accounts receivable, and relatedly, the material harm that Defendants' actions inflicted on the Agent and Lenders' collateral.

## PARTIES

12. Plaintiff BBVA USA is an Alabama banking corporation, and is the principal subsidiary of BBVA USA Bancshares, Inc., a Texas corporation. Plaintiff is authorized to transact business in Texas and carried out its administrative agent duties under the Credit Agreement at its offices at 8080 N. Central Expressway, Suite 400, Dallas, Texas 75206.

13. Defendant Harry Fleming is citizen of Harris County, Texas. He served as the Chief Executive Officer of Nobilis from January 2016 to December 2018, when he resigned. He also served as Chairman of the Nobilis board of directors throughout that time period and remained Chairman following his resignation as Chief Executive Officer. Fleming may be served with process at 507 Ramblewood Rd., Houston, Texas 77079 or at his current place of employment, APG Capital Group, 825 Town and Country Lane, Floor 12, Houston, Texas 77024.

14. Defendant P. David Young is a citizen of Travis County, Texas and works in Dallas County, Texas. He served as Chief Financial Officer of Nobilis from February 2017 until September 2018, when he resigned. Young may be served with process at 1601 Resaca Blvd., Austin, Texas 78738 or his current place of employment, Mockingbird Pharma, 6060 N. Central Expressway, Suite 770, Dallas, Texas 75206.

15. Defendant Brandon Moreno is a citizen of Harris County, Texas. He served as Senior Vice President of Finance from September 2014 until January 2019, and then as Chief

Financial Officer until September 2019, when he resigned. Moreno may be served with process at 6363 San Felipe Street, Apt. 126 No. 513, Houston, Texas 77057.

## JURISDICTION AND VENUE

16. Defendants, as citizens and residents of Texas, are subject to the personal jurisdiction of this Court.

17. Venue is proper in Dallas County pursuant to TEX. CIV. PRAC. & REM. CODE § 15.002(a)(1), where a substantial part of the events or omissions giving rise to this claim occurred. Among other things, Defendants delivered the financial statements and compliance certificates that form the basis of this action to the Agent, which carried out its duties as administrative agent at its offices in Dallas County. Moreover, certain BBVA and Lender employees with whom Defendants and Nobilis negotiated the Term B Loan—and who relied on Defendants' misrepresentations in participating in the Term B Loan—are located in Dallas County.

## DISCOVERY CONTROL PLAN

18. The Agent respectfully requests that discovery in this action be conducted pursuant to Discovery Control Plan Level 3.

## STATEMENT OF FACTS

### A. In October 2016, Nobilis Enters into a Revolving Credit Facility and Term Loan with the Agent and Lenders.

19. Nobilis was a publicly traded healthcare development and management firm based in Houston, Texas, that owned, operated, and managed specialty surgical hospitals, ambulatory surgical centers, and multi-specialty clinics in Texas and Arizona, among other things. Beginning in 2014, Nobilis's management embarked on an aggressive expansion strategy

through the acquisition of additional healthcare facilities (or ownership interests in those facilities).

20. In 2016, Nobilis retained BBVA to arrange the Credit Facility to fund one such acquisition—the Arizona Vein & Vascular Clinic—and to refinance the Company's existing debt. The Credit Facility consisted of a $52.5 million original term loan and a $30 million revolving credit facility.

21. At the time, Nobilis derived most of its revenue from facility and professional fees charged to its patients' out-of-network insurance benefits ("OON"). In fact, according to an October 2016 Confidential Information Memorandum ("CIM") that Defendants provided to the Agent and Lenders, approximately 87% of Nobilis's revenues for the twelve-month period ending June 30, 2016, were from OON charges. Although OON providers often can collect higher fees than in-network providers, the actual reimbursement rates can vary significantly from payor to payor, facility to facility, and procedure to procedure. Moreover, third-party payors can deny coverage for OON procedures for a variety of reasons, leaving OON providers with the difficult task of collecting the outstanding amounts from patients.

22. For financial reporting purposes, according to an October 2016 Lender Presentation ("Lender Presentation") that the Defendants provided to the Agent and Lenders, Nobilis recognized revenue on the date it provided services to a patient at the "[e]stimated net realizable amounts from third-party payors [and] patients." That is, Nobilis reported revenue not based on what it "charged" patients, but "at the ultimate amounts expected to be collected (net of any patient discounts and contractual adjustments)." The Lender Presentation also explained that Nobilis arrived at such estimates by evaluating "payor mix, historical settlement and payment data for a given payor and type of medical procedure, and current economic conditions." BBVA

employees similarly recalled Nobilis executives describing to the Agent and Lenders the granular nature of the Company's analysis, which evaluated collections on a doctor-by-doctor, procedure-by-procedure, and location-by-location basis.

23. Nobilis's Form 10-K for the fiscal year 2015 likewise emphasized the purportedly historical, data-driven nature of the Company's revenue recognition policy:

> Patient service revenue reported in our consolidated statements of earnings is presented net of applicable discounts, contractual adjustments (in respect to services provided on in-network basis) and, for out-of-network services, other third-party payor adjustments necessary to state revenues at the net realizable amount (such as adjustments to reflect negotiated settlements with or allowable charges of third-party payors). Because allowable charges for procedures performed on out-of-network basis are not contractually specified, we estimate settlement and other adjustments to our established rates to ensure our revenues are appropriately stated at their net realizable amount. <u>These estimates include analysis of our historical settlement and collection experience for each third-party payor for a given medical procedure. Our actual realization rates for out-of-network billings (relative to our internally established rates) are closely monitored for each payor, by medical procedure, and such actual experience is reflected in estimates of net realizable revenues and accounts receivable.</u> In addition, we analyze the ultimate collectability of revenue and accounts receivable after certain stages of the collection cycle using a look-back analysis to determine the amount of receivables subsequently collected. (Emphasis added).

24. Because Nobilis recognized revenue before it collected money from third-party payors, Nobilis recorded a corresponding account receivable on its balance sheet. Nobilis's ability to collect those accounts receivable and generate cash flow was critical to the Company's success and its ability to service its debt. Even with its aggressive expansion strategy and uncertain stream of revenue, Nobilis claimed to have a strong track record of collecting from third-party payors. The CIM, provided by the Defendants to the Agent and the Lenders, touted the Company's "conservative revenue recognition policies and strong billing and collections," which resulted in Nobilis "consistently collect[ing] approximately 100% of accounts receivable each year with little to no bad debt expense historically."

25. Indeed, as of October 2016, the CIM reported that Nobilis had collected over 100% of revenue reported in 2014 and over 97% of its revenue reported in 2015:




26. BBVA employees who worked with Nobilis to arrange the Credit Facility similarly recalled Nobilis executives, including Defendants Fleming and Young, emphasizing the Company's success collecting over 100% of accounts receivable as a validation of their revenue recognition process. In other words, Defendants' claim was that Nobilis's process was so good at estimating what third-party payors would ultimately pay that Nobilis routinely collected 100% of those estimated amounts—and sometimes ***more*** because the Company had actually underestimated what it would receive. These representations were of critical importance to the Agent and Lenders: Nobilis's accounts receivable served as primary collateral for the loans, and Nobilis's ability to service the loans depended on Defendants' ability to fully collect its reported accounts receivable.

**B. In Mid-2017, Nobilis Secretly Changes Its Accounting Policy for 365+ AR.**

27. Prior to 2017, Nobilis appears to have had little 365+ AR. What 365+ AR it did have, according to internal memoranda, Nobilis "eliminated" from its accounts receivable (and presumably recorded a corresponding bad debt expense or downward adjustment to net revenue) even though the Company continued its collections efforts.

28. In the latter half of 2017, however, the Company's 365+ AR increased significantly due to a variety of problems that Nobilis encountered with "the operating environment of our facilities and our revenue cycle department." These breakdowns resulted in 365+ AR skyrocketing to $11,568,877 by September 30, 2017, or more than 10% of the Company's accounts receivable, and $20,892,234 by December 31, 2017, or nearly 20% of the Company's total accounts receivable.

29. As its 365+ AR increased, Defendants decided to: (a) move most of the Company's collection activities in-house for the first time; and (b) change the Company's accounting policy with respect to 365+ AR. Specifically, instead of "eliminating" 365+ AR as it had done historically,[3] Defendants chose to continue carrying 365+ AR on the Company's books at a 25% discount to the gross charge amount, as the following table prepared by Defendant Moreno reflects:

[3] Nobilis was required to report any 365+ AR that it "eliminated" as bad debt expense. As noted above, the Company's financial statements reported little bad debt expense, suggesting that Nobilis had very little 365+ AR.

| Month of Service | Aging | Total | | | |
|---|---|---|---|---|---|
| | | Gross | Deduction | Net | Discount Rate |
| | 361+ | 20,892,234 | (5,206,858) | 15,685,376 | 25% |
| 1/31/2017 | 331-360 Days | 3,770,405 | (841,983) | 3,105,572 | 22% |
| 2/28/2017 | 301-330 Days | 3,805,944 | (887,024) | 3,087,639 | 23% |
| 3/31/2017 | 271-300 Days | 5,464,471 | (1,242,003) | 4,413,225 | 23% |
| 4/30/2017 | 241-270 Days | 4,545,264 | (1,041,906) | 3,594,278 | 23% |
| 5/31/2017 | 211-240 Days | 5,554,710 | (1,161,010) | 4,614,673 | 21% |
| 6/30/2017 | 181-210 Days | 6,220,610 | (1,297,040) | 5,167,054 | 21% |
| 7/31/2017 | 151-180 Days | 5,714,685 | (1,134,498) | 4,802,403 | 20% |
| 8/31/2017 | 121-150 Days | 6,350,017 | (1,275,549) | 5,284,560 | 20% |
| 9/30/2017 | 91-120 Days | 6,946,682 | (1,263,249) | 5,902,634 | 18% |
| 10/31/2017 | 61-90 Days | 7,735,281 | (1,430,465) | 7,028,566 | 18% |
| 11/30/2017 | 31-60 Days | 14,150,384 | (2,162,515) | 12,776,000 | 15% |
| 12/31/2017 | 0-30 Days | 16,826,298 | (2,264,554) | 16,589,528 | 13% |
| | | | | | |
| | Total Facility AR | 107,976,985 | (21,208,653) | 92,051,508 | 20% |

30. As the Agent and Lenders now know, Defendants lacked any basis to value 365+ AR at a 25% discount to gross charges. *First*, according to a February 2018 memorandum (the "February 2018 Memo") that Defendant Moreno prepared, the Company claimed that so long as a claim was timely filed, "there are no other time-bound guidelines" that could result in the denial of aged claims. This core assumption was flat wrong. Because Nobilis sought reimbursement under an assignment of benefits from its patients, the Company was required to timely comply with the deadlines set forth in its patients' health plans—including deadlines to file appeals—in order to be entitled to reimbursement. For example, contrary to Defendants' assumption, third-party payors do impose deadlines for appealing denied claims: Aetna (one of Nobilis's insurance payors) requires that appeals be filed within 180 days from the date a claim is denied, and United Healthcare (another one of Nobilis's insurance payors) requires that such appeals be filed within 12 months.[4] Those two payors alone accounted for 54% of Nobilis's "payor mix," meaning that failing to timely appeal denials for those two payors could (and did) materially impact the Company's ability to collect aged accounts receivable.

[4] *See* https://www.aetna.com/individuals-families/member-rights-resources/claim-denials.html; https://www.uhcprovider.com/en/admin-guides/administrative-guides-manuals-2019/ch9-our-claims-process-2019/claim-rec-pro-res-dis-ch9-guide-2019.html.

31. Not only are such policies available online, but the core of Nobilis's business depended on seeking reimbursement for OON claims from insurers making it exceedingly unlikely that Defendants were unaware of such policies. In fact, confidential witnesses cited in a class action complaint filed against Nobilis (the "Class Action")[5] claim that they repeatedly informed various members of management (including Defendant Moreno) that claims were no longer appealable since the "timely filing limit" or "TFL" had passed. Those claims are corroborated by Nobilis's corporate records in which the Company's collections team (supervised and led by Defendants) repeatedly noted that the time for filing an appeal had passed and forwarded those claims to management for adjustment:

> WAS UPHELD ON 06/27/2017 AS PROCESSED CORRECTLY. WE PAST THE TFL TO SEND THE NEXT APPEAL. HENCE NEED TO ADJUST THE CLAIM. PENDING FOR ACTION/ RESPONSE.KW
>
> WORKING PSH AR 120+ AETNA DOS 110716 CLAIM# ENY04NXQL00, REV NOTES INDICATE APPEAL WAS UPHELD TFL HAS EXPIRED, COLLECTIONS EFFORT EXHAUSETED, PREPARED ADJ FORM AND FRWD TO MGMT FOR APPROVAL
>
> THE TFL IS 180 DAYS FROM THE DENIED DATE (03/25/2017), SINCE WE PAST THE TFL WE CANT ABLE TO SENT THE APPEAL. NEED TO ADJUST THE AMOUNT $241215.52. THEREFORE PLACED THE ACCOUNT IN DCI FOR ADJUSTMENT.KW
>
> WORKING PSH AR 120+BCBS DOS 120916 CLAIM# 825603008340C , PREV NOTES INDICATE TFL FOR APPEAL HAS EXPIRED, PREPARED ADJ FORM AND FRWD TO MGMT FOR APPROVAL
>
> WE HAVE EXCEEDED THE APPEAL LIMIT OF 180 DAYS FROM THE PROCESSED DATE, THEREFORE NEED TO ADJUST THE CLAIM. SJ
>
> RESPONSE. APPEAL TIMELY FILING IS 180 DAYS FROM LAST PROCESSING DATE (PFD081620178) PAST TIMELY. ACCOUNT WAS LOCATED ON THE ADJUSTMENT LOG- PRINTED COPY OF EOB - FILL OUT ADJUSTMENT FORM-FORWARD TO MANAGER FOR APPROVAL

[5] *See Yang v. Nobilis Health Corp.*, No. 4:19-cv-00145 (S.D. Tex.).

(emphasis added).

32. Members of Nobilis's billing and collections team likewise have confirmed that missed appeals deadlines were a significant problem and resulted from the Company's weak internal controls and processes. Nobilis had no dedicated appeals team, no appeals team procedure, no medical specialist on staff to respond to inquiries or draft appeals, and no automated process in place. As a result, hundreds of claims piled up that the Nobilis's collection staff was unable to timely handle. In fact, a November 2018 spreadsheet prepared by the Company revealed that over $100 million in accounts receivable from major insurance payors—including Aetna, UnitedHealthcare, BCBS, and CIGNA—were uncollectable because "any appeal attempts are denied as past timely filing."

33. Simply put, Defendants knew (or should have known) that in addition to a limit on the number of appeals allowed, insurance payors also required the Company to timely file appeals and, in some cases, take legal action in order to preserve its right to reimbursement. The failure to do so meant that Nobilis lacked legal recourse to seek further payment. But Defendants failed to disclose this fact to Crowe—instead adopting the position that no such time limits or constraints existed—resulting in an inflated assessment of Nobilis's 365+ AR.

34. *Second*, Defendants well understood that the collectability of a claim decreases over time, which is why, as the table above demonstrates, Nobilis applied increasing discount rates as time passed for claims that were less than a year old. Inexplicably, however, the Company's 365+ AR analysis assumed that it could collect 75% regardless of whether accounts were 12 months, 18 months, or even 24 months old.

35. *Third*, as the Agent and Lenders only came to learn in late 2018, Nobilis had very little historic experience collecting 365+ AR, much less experience that supported applying a

25% discount rate to all 365+ AR. The February 2018 internal Company memorandum prepared by Defendant Moreno noted that a mere 360 out of the 7,200 claims paid in 2017 related to 365+ AR (or just 5% of total claims). That same memorandum noted that by February 2018, Nobilis had collected just 12% of the *discounted* 365+ AR at four of its facilities (or a mere 8.8% of gross 365+ AR):

| **2016 DOS AR as of 12/31/17** | **Sub-cash at 2-19.2018** | **AR at 12-31-17** | **Remaining** | **Percent Collected** |
|---|---|---|---|---|
| BSH | $ 675,534 | $ 4,891,613 | $ 4,216,079 | 14% |
| PSH | 1,111,031 | 6,176,869 | 5,065,838 | 18% |
| SLH | 8,163 | 2,351,290 | 2,343,128 | 0% |
| NHSC-S | 49,681 | 2,265,604 | 2,215,923 | 2% |
| **Total** | **$ 1,844,409** | **$ 15,685,376** | **$ 13,840,967** | **12%** |

36. Similarly, an early 2017 accounting memorandum of the Company noted that Nobilis had collected just 45% of accounts receivable with balances over 180 days as of December 31, 2015. In short, as the Agent and Lenders have since learned, Nobilis had very little experience with—much less success—collecting 365+ AR as of February 2018, and even less experience by the third quarter of 2017 when it decided to change its accounting policy.

37. The pace of 365+ AR collections throughout 2018 proved that a 25% discount was far from realistic. A July 19, 2018 memorandum that Defendant Moreno prepared—a full 10 months after Defendants added 365+ AR to the Company's financial statements—indicated the Company had collected just 19.7% of the $20.89 million in outstanding 365+ AR as of December 31, 2017. Simply put, the Company failed to even approach collecting 75% of the outstanding 365+ AR over a period of 10 months, all while the collectability of those claims continued to plummet as they aged past 22 months.

38. Indeed, in later internal Company memoranda, Defendant Moreno acknowledged that the Company had "limited" experience and that it "lacked adequate history to establish well-formed estimates" when valuing 365+ AR. In December 2018, after the problems with

Defendants' implementation of collection and accounting practices became apparent more than a year after the Term B Loan, an outside accountant hired by Nobilis reached similar conclusions in its memorandum, observing that "[m]anagement did not have an adequate history of collections of accounts > 365 days to use as a basis to develop a reasonable estimate of the net realizable value of the AR > 365 days." That memorandum went on to explain:

> Besides a lack of quantitative history/experience, the Company, at December 31, 2017, did not factor the significant aging of receivables into the determination of the adjustment to net realizable value under the new policy. Generally, as claims get older, they are more difficult to collect, including working denials or finding data needed to clear denials with third-party payors. . . . Management at the time used collection rates on accounts receivable less than 365 days to estimate the net realizable value of the accounts receivable >365 days. Based on the information evaluated by Nobilis (quantitative and qualitative), collection of the >365 could not be reasonably assured at December 31, 2017. Therefore, there was a misapplication of revenue recognition by Nobilis at December 31, 2017 which resulted in an error in the financial statements.

39. Another memorandum reviewed by Nobilis's finance team similarly observed that:

- "[T]he process to evaluate this estimate **did not appropriately consider** the valuation assertion as it relates to estimating the net realizable value of accounts receivable > 365 days."
- "Nobilis utilized the same process it used for accounts receivable < 365 days and **did not design the process appropriately to consider the change in risk characteristics of aged accounts receivable**."

The memorandum then concluded that "[i]f properly evaluated, the Company **would not have recognized revenue on accounts receivable that were greater than a year old**." That is, Nobilis's own finance team concluded that it lacked a valid basis to include 365+ AR in the first instance and should not have changed its accounting policy from the start.

40. *Fourth*, Defendants did not consider the impact that moving the Company's collections process in-house (instead of using third-party vendors, as was the case historically) and the associated delay that change could have on its ability to collect 365+ AR with impending

appeals deadlines.[6] As Defendant Fleming later admitted to the Agent, Defendants lacked experience in this area, too, and were simply "winging it." Nevertheless, in the words of Nobilis's outside accountant, "there was no consideration related to issues or delays caused by the transition, which are encountered with such a significant change."

41. *Finally*, Defendants failed to account for the impact that Nobilis's questionable billing practices would have when valuing its overall accounts receivable, including 365+ AR. To start, Defendants did not use industry-standard practices for setting charges, such as using a multiple of Medicare fee schedule rates or a percentage of charges reported by FAIR Health. Instead, Defendants allowed Nobilis's sales team to drive the process, which resulted in charges that were three to four times the industry standard but not actually tied to any mathematical formula. The inflated charges served as a short-term moneymaker for Nobilis because insurance payors would sometimes automatically pay a percentage of charges for OON services. But the ploy was bound to fail as payors caught on and paid lower reimbursement amounts under the terms of patients' plans (which tie payments to a usual-and-customary standard or a multiple of Medicare rates, for example) or even seek recoupment for prior overpayments.

42. Despite not having a legal basis to seek further payment—because the insurers had fully paid in accordance with the terms of the patients' plans—Nobilis often did not write-off the unpaid balances. Nobilis instead continued to report the inflated amounts as open accounts receivable; in fact, in a review of the 5,000 largest unpaid claims from major insurance providers that were included in Nobilis's accounts receivable, approximately 3,062 of those

---

[6] Similarly, Defendants failed to give any consideration to any delays or disruptions that would also result from Hurricane Harvey, which made landfall in the Houston area in August 2017—*i.e.*, ***before*** Defendants implemented their changed accounting policy for 365+ AR.

claims (61%) totaling hundreds of millions of dollars were uncollectable because insurers had paid all that was owed under the patients' plans.

43. Nobilis also engaged in a variety of schemes that served to increase its reported revenue (and, in turn, its accounts receivable) but at the same time jeopardized its ability to collect from insurance payors. For example, when Nobilis knew that insurance payors would deny claims for procedures incidental to uncovered services, Nobilis would create a separate claim for the incidental procedure to submit to third party payors. Known as "split billing," this process was commonplace at Nobilis and supported by Defendants, despite employees repeatedly informing Defendants that such practices were inappropriate and one physician partner informing Defendant Moreno that his attorney considered such practices were illegal. Those concerns were well founded: the American Academy of Professional Coders, the world's largest training and credentialing organization for the healthcare business, describes split billing as "dangerous," "ill-advised," and "risky business, and even Crowe has identified split billing as a "compliance risk" for its clients. Nobilis nonetheless continued to engage in split billing and, according to a confidential witness cited in the Class Action, the 365+ AR included tens of millions of dollars of claims that insurers denied because of such practices.

44. Similarly, to encourage patients to seek care from Nobilis instead of an in-network provider, Nobilis routinely promised to waive all or a portion of a patient's financial responsibility under his or her plan. Known as "fee-forgiveness," these agreements potentially amounted to fraud and impaired Nobilis's right to reimbursement. In fact, Nobilis's fee-forgiveness practices resulted in CIGNA (another one of Nobilis's insurance payors) asserting a claim against Nobilis to recoup millions of dollars.

45. In short, Defendants' chosen 25% discount rate for 365+ AR was not founded on "actual experience" or an "analysis of historical settlement and collection experience." To the contrary, the Company utterly lacked experience collecting 365+ AR, and its practices and procedures (under Defendants' direction and control) made it exceedingly unlikely that they could ever collect anywhere near that amount. Consequently, the Company's financial statements drastically overstated its accounts receivable.

**C. In November 2017, Nobilis Obtains an Additional $50 Million Term B Loan from the Agent and Lenders Without Disclosing Its New Accounting Policy.**

46. Leading up to November 2017, Defendants sought additional funds from the Agent and Lenders to acquire interests in several ambulatory surgical centers, a surgical hospital, and a management company referred to as "Elite." Despite the billing and accounting practices that led to Nobilis's overstated accounts receivable, Defendants made many of the same representations that they made in the October 2016 CIM and Lender Presentation concerning Nobilis's revenue recognition policies and the Company's success collecting accounts receivable.

47. These representations were of key importance to the Agent and Lenders. Other out-of-network providers were experiencing difficulties collecting from third-party payors at the time, making many Lenders hesitant to increase their exposure within the same segment. But Defendants assured the Agent and Lenders that Nobilis's "conservative revenue recognition policies" and "strong billing and collections processes" set the Company apart from its peers.

48. In a June 2017 CIM and Lender Presentation that Defendants provided to the Agent and Lenders, for example, Defendants again stated that Nobilis's patient and net professional fees were "[s]tated at the ultimate amounts expected to be collected" and that "[m]anagement evaluates payor mix, historical settlement and payment data for a given payor

and type of medical procedure, and current economic conditions and revises its revenue estimates as necessary."

49. Defendants also reiterated in the June 2017 CIM that they "employ[ed] conservative revenue recognition policies and strong billing and collections processes resulting in consistent collections of approximately 100% of accounts receivable each year." In fact, according to the Lender Presentation given to the Agent and Lenders by Defendants Fleming and Young, "100% of 2015 revenue was collected by end of 2016." Defendants also represented to the Agent and Lenders that Nobilis had collected approximately 89% of its 2016 revenue:




50. Although the June 2017 CIM and Lender Presentation appear to have predated the Company's decision to change its accounting policy for 365+ AR, Defendants were already aware of issues impacting collections and began the process of hiring key personnel to assist with moving collections in-house shortly thereafter. Those issues were not disclosed to the Agent and Lenders, however.

51. On November 15, 2017, Defendants succeeded in securing for Nobilis an amendment to the Credit Agreement adding a $50 million incremental term loan (*i.e.*, the Term B Loan). The amendment executed in connection with the Term B Loan required Nobilis to

deliver its interim unaudited consolidated financial statements for the third quarter to the Agent and Lenders prior to closing, which Defendants Young and Moreno did by email on November 10, 2017, and November 14, 2017. Pursuant to that same amendment, which Defendant Young signed, Nobilis represented and warranted that those financials "were prepared in accordance with GAAP *consistently applied throughout the period covered thereby*" and "fairly present the financial condition of Parent and Subsidiaries as of the date thereof."[7] The amendment also required Nobilis to deliver a certificate (the "Officer's Certificate") signed by a senior officer, here Defendant Young, that certified that the Company's representations and warranties, including those concerning the financial statements, were "true and correct in all material respects."

52. Without mentioning the changed accounting policy, the unaudited interim financials that Defendants Young and Moreno delivered stated that Nobilis's accounts receivable totaled $112 million, including $11,568,877 of 365+ AR based on Defendants' inflated valuations. By inflating its 365+ AR, the Company avoided recording a significant bad debt expense, which would have negatively impacted the Company's net income and EBITDA for the period, and concealed the fact that it was suffering the same collections problems that were plaguing the rest of the industry.

53. Defendant Moreno also delivered a Compliance Certificate dated September 30, 2017 (the "September 2017 Compliance Certificate"), signed by Defendant Young, to the Agent and Lenders. In the September 2017 Compliance Certificate, Defendant Young represented that

[7] Defendant Young also signed an Officer's Certificate in which he individually represented that the Company's representations and warranties, including those concerning the financial statements, were "true and correct in all material respects."

the third quarter 2017 financial statements, which included the 365+ AR, "fairly present in all material respects the financial condition of Parent and its Subsidiaries as of the dates indicated."

54. Defendant Young also represented that he made, "or caused to be made under [his] supervision, a review in reasonable detail of the transactions and condition of Parent and its Subsidiaries during the accounting period covered by the financial statements," and that "[s]uch review has not disclosed the existence during or at the end of such accounting period of any condition or event that constitutes a Default or an Event of Default, nor does either Officer have any knowledge of the existence of any such condition or event as at the date of this certificate."

55. Schedule 1 to the September 2017 Compliance Certificate further represented that Nobilis was in compliance with the Credit Agreement's Maximum Consolidated Leverage Ratio and Minimum Consolidated Fixed Charge Ratio for the quarter ended September 30, 2017. However, had Nobilis not included 365+ AR in its third quarter financials as it historically had done—and assuming that those accounts receivable were recorded as a bad debt expense or a downward adjustment to net revenue—Nobilis would have violated both covenants, resulting in an immediate event of default under the Credit Agreement and meaning that the Company could not have satisfied the conditions precedent to closing the Term B Loan.

56. According to the September 2017 Compliance Certificate, the applicable minimum Fixed Charge Coverage Ratio was 1.25x, and the maximum Consolidated Leverage Ratio was 3.75x. Had Nobilis deducted its entire 365+ AR as a bad debt expense or an adjustment to net revenue, the Fixed Charge Coverage Ratio and the Consolidated Leverage Ratio would have been 1.01x (which would be below the minimum 1.25x Fixed Charge Coverage Ratio requirement) and 4.1x (which would be above the maximum 3.75x Consolidated Leverage requirement). Assuming that Nobilis's 365+ AR had some value, even an optimistic

40% discount rate (far better than what Nobilis was actually able to collect)[8] results in a Fixed Charge Coverage Ratio of 1.23x, which would still be a violation of the Consolidated Fixed Charge Coverage Ratio Covenant of 1.25x and have resulted in an immediate event of default under the Credit Agreement.

57. Regardless, the timing of Nobilis's decision to change its accounting policy for 365+ AR suggests that Defendants knew (or should have known) that Nobilis was in danger of violating its financial covenants and made the change to the Company's accounting policies to ensure that: (a) no event of default would need to be disclosed to the Agent and Lenders under the Credit Agreement; and (b) the Agent and Lenders would move forward with approving and funding the Term B Loan. But for Defendants' continued representations that Nobilis's collection percentages were at or above 100% (unlike the Company's peers), their failure to disclose the change in Nobilis's accounting policy for 365+ AR, and their misrepresentations concerning the value of Nobilis's accounts receivable, the Agent and Lenders would not have agreed to the Term B Loan.

### D. Nobilis Fails to Disclose Its New Accounting Policy to Its Auditors Until Early 2018 and Fails to Provide a Factually and Legally Based Analysis to Justify the Change.

58. Defendants not only failed to disclose their changed accounting treatment for 365+ AR to the Agent and Lenders in connection with the Term B Loan, but Defendants also failed to inform the Company's auditors, Crowe Horwath ("Crowe"), or disclose the change in the Company's Form 10-Q for the third quarter of 2017. In fact, Crowe only found out about the changes in late February 2018, prompting one of Crowe's auditors to email Defendants: "We

---

[8] The Company's actual collections of the 365+ AR included on the third quarter 2017 financial statements proved to be far less. A 40% discount rate assumes that the Company could collect 60% of the outstanding 365+ AR. But according to a November 2018 memorandum that Defendant Moreno helped prepare, "[c]ollections on outstanding AR with a Date of Service (DOS) of 2016 has been poor, with the highest at 52% and the lowest at 9%."

need to discuss why the policy change and the impact wasn't disclosed in Q3 [2017] and also that these items should be disclosed in the 10K." The same Crowe auditor asked Defendants to prepare a memorandum to explain the "change in policy/change in estimate that took place in Q2 2017." Defendant Moreno prepared the February 2018 Memo per Crowe's request, attempting to justify Defendants' change after the fact and convince Crowe to accept Defendants' valuation.

59. The February 2018 Memo was factually misleading and legally baseless for the reasons discussed above. Among other things, the February 2018 Memo wrongly claimed that "there are no other time-bound guidelines" that could result in the denial of aged claims; concealed the fact that the Company "lacked adequate history to establish well-formed estimates" to appropriately value the 365+ AR; and failed to disclose the problematic billing practices that plagued the Company's ability to collect aged accounts receivable. Because Defendants failed to disclose these facts to Crowe—and made misleading statements concerning the Company's ability to collect 365+ AR—Defendants were able to convince Crowe to sign off on the Company's Form 10-K for fiscal year 2017, which was filed in March 2018. Defendants also refused Crowe's request that the Company disclose the changed accounting treatment for 365+ AR in the Form 10-K.[9] As a result, like its Form 10-Q for the third quarter of 2017, the Company's Form 10-K for fiscal year 2017 once again failed to inform the Agent, Lenders or investors that Nobilis had drastically altered its accounting treatment for 365+ AR.

### E. Nobilis Conceals Its New Accounting Policy and Collections Problems Until Late 2018, When Nobilis Writes Down Its 365+ AR.

60. The Company continued to experience a significant increase in 365+ AR throughout 2018. During that time period, Nobilis's in-house collections team informed

[9] Even so, Crowe did not provide a ringing endorsement of Nobilis's change. In a letter to management and the Company's audit committee, Crowe identified "accounts receivable-allowance for doubtful accounts" as a "material weakness" due the Company's inept controls for monitoring aging receivables.

management, including Defendants, that much of the 365+ AR was not collectable because the claims were no longer appealable, were paid in full under the terms of the patient's plan, or were denied due to Nobilis's other questionable billing practices. If the Defendants did not already know that the financial statements that they provided to the Lenders in November 2017 overstated the Company's accounts receivable, they certainly knew as much by the end of the first quarter in 2018.

61. Nevertheless, Defendants continued to prepare and provide financial statements and Compliance Certificates to the Agent and Lenders that included 365+ AR at grossly inflated values, even telling investors during quarterly earnings calls that the Company "expect[ed] to collect everything that's on the balance sheet." And as with the financial statements and Compliance Certificate submitted just before the Agent and Lenders funded the Term B Loan, had Nobilis continued its prior treatment of 365+ AR (or applied a more realistic discount rate), Nobilis likely would have breached its financial covenants for each of those quarters.

62. In late July or early August 2018, Nobilis executives approached the Agent and Lenders to discuss increasing the Credit Facility and Term B Loan to provide additional liquidity for the Company. During those conversations, Defendant Young disclosed to the Agent for the first time that Nobilis had changed how it treated 365+ AR. He explained that the Company made the change because "there was/is evidence that the claims are still valid and that age alone is not reason enough to write off the claims."

63. Yet the pace of 365+ AR collections throughout 2018 proved that a 25% discount was far from realistic. A July 19, 2018 memorandum that Defendant Moreno prepared—a full 10 months after Defendants added 365+ AR to the Company's financial statements—indicated the Company had collected just 19.7% of the $20.89 million in outstanding 365+ AR as of

December 31, 2017. Simply put, the Company failed to even approach collecting 75% of the outstanding 365+ AR over a period of 10 months, all while the collectability of those claims continued to plummet as they aged past 22 months.

64. Not once, however, did Defendants or anyone at Nobilis disclose to the Agent and Lenders that the Company lacked a sufficient factual basis to value the 365+ AR, that third-party payors were denying those claims as untimely or improper, or that the financial statements that Defendants had previously provided to the Agent and Lenders grossly overstated the value of the 365+ AR. Defendant Young instead claimed that the increase in aged accounts receivable was due to "inadequate performance from the collections department," which they claimed was "fixable." He also actively concealed from the Agent and Lenders the fact that insurance payors were refusing to pay 365+ AR, telling the Agent and Lenders instead that "Nobilis has not seen any indication that Insurance providers have changed their reimbursement policies."

65. Finally, in October 2018, the first cracks in Nobilis's story started to appear. Defendant Young had resigned as CFO a month earlier, and the interim CFO informed the Agent that the Company intended to write down its 365+ AR by $25 million, apparently letting it slip for the first time that payors were "refusing reimbursement requests." Until this disclosure, the Agent and Lenders had no way of knowing through the exercise of due diligence that the Company had overstated the value of its 365+ AR or that Nobilis was in default under the Credit Agreement (and had been prior to the Term B Loan). Even then, the Agent and Lenders still had no way of knowing that Defendants had lacked a factual basis for valuing its 365+ AR from the start.

66. Then on November 9, 2018, the Company announced that it could not timely file its Form 10-Q for the third quarter, explaining that "additional time is required for the Company

and the auditor to complete their review of the Company's financial statements." The Company also stated that it was "re-evaluating the Net Realizable Value on its Accounts Receivable and intends to make a significant adjustment to the carrying value of accounts receivable, primarily on out of network claims greater than 365 days old." A few days later, Defendants Young and Moreno gave a presentation to the Agent and Lenders explaining that the Company expected to write down approximately $32.2 million in 365+ AR. In that presentation, however, Defendants Fleming and Moreno backed away from the interim CFO's statements, telling the lenders that they had "not seen any indication that insurance providers have changed their reimbursement policies" and continued to blame its lackluster collections on the performance of its CBO team. This narrative (once again) proved false when Nobilis then increased its write-down of 365+ AR to a whopping $72 million by the end of November 2018—more than half of all of the Company's accounts receivable at the time.

67. By that point, it was far too late for Nobilis to recover. Last-ditch efforts to get Nobilis back on track were futile, and the Nobilis Debtors collapsed into bankruptcy on October 21, 2019.

## CAUSES OF ACTION

### Count 1:
### Negligent Misrepresentation

68. The Agent repeats and re-alleges the allegations set forth in all preceding paragraphs of this Original Petition as if fully set forth herein.

69. In the course of business, Defendants supplied false information to the Agent and Lenders, including:

a. Defendants' statements in CIMs, Lender Presentations, and securities filings that the Company's calculation of net realizable revenues and accounts receivable were based on "actual experience," including "historical settlement data and payment data."

b. Nobilis's interim financial statements dated as of September 30, 2017, which included over $11 million in 365+ AR for the first time. Because Nobilis maintained an inflated valuation of its 365+AR—which should have been recorded as a bad debt expense—the interim financial statements also overstated net income and EBITDA.

c. The Officer Certificate dated November 15, 2017, in which Defendant Young affirmed that all representations and warranties in the Credit Agreement were "true and correct in all material respects," including the representations that: (a) the interim financial statements were prepared in accordance with GAAP consistently applied throughout the period covered thereby" and "fairly present the financial condition of Parent and Subsidiaries as of the date thereof;" and (b) "[n]o default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement."

d. The Officer Certificate dated November 15, 2017, in which Defendant Young represented that: (a) "no Default exists immediately prior to, or will exist immediately after, giving effect to the Transactions;" and (b) "after giving effect to the Transactions, there has been no event or circumstance since December 31, 2016 that has or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect."

e. The September 2017 Compliance Certificate's representations that: (a) the third quarter 2017 financial statements, which included the 365+ AR, "fairly present in all material respects the financial condition of Parent and its Subsidiaries as of the dates indicated;" (b) Defendant Young made, "or caused to be made under [his] supervision, a review in reasonable detail of the transactions and condition of Parent and its Subsidiaries during the accounting period covered by the financial statements," and that "[s]uch review has not disclosed the existence during or at the end of such accounting period of any condition or event that constitutes a Default or an Event of Default, nor does either Officer have any knowledge of the existence of any such condition or event as at the date of this certificate;" and (c) Nobilis was in compliance with the Credit Agreement's Maximum Consolidated Leverage Ratio and Minimum Consolidated Fixed Charge Ratio for the quarter ended September 30, 2017.

70. These representations were false. As explained above, Nobilis inflated the value of its accounts receivable by: (a) including 365+ AR at a mere 25% discount to gross charges; and (b) refusing to write off receivables where insurance payors had paid all amounts due under a patient's plan. That overstatement cascaded into other areas of the Company's financial statements: it allowed the Company to avoid recording a significant bad debt expense, which in

turn inflated the Company's net income and EBITDA. Defendants also provided the Agent and Lenders with the Compliance and Officer Certificates ("Certificates") in September 2017 and November 2017 (as well as covenant calculation worksheets) that used the same false financial information and concealed the Company's breach of the Credit Agreement's financial covenants and the resulting events of default under the Credit Agreement.

71. Defendants did not exercise reasonable care or competence in obtaining or communicating the information to the Agent and Lenders. Defendants based their inclusion of 365+ AR in Nobilis's financial statements on sparse "historical collections" data, did not properly factor in time constraints and deadlines applicable to each insurance payor's appeals process for denied claims, failed to write down accounts receivable for which the Company had been paid in full and had no further basis to seek reimbursement, and explained away collections issues with incomplete information about the problems with the Company's CBO while still maintaining publicly that the 365+ AR reflected on the Company's balance sheet remained collectable.

72. The Agent and Lenders justifiably relied on Defendants' representations as to the financial statements provided to the Agent and Lenders, which Defendant Young certified "fairly present[ed]" Nobilis's financial condition in both (a) the September 2017 Compliance Certificate and (b) the Officer Certificate delivered in November 2017 in connection with the closing of the Term B Loan (in which he reaffirmed that the representations and warranties contained in the Credit Agreement, including those related to the financial statements, were "true and correct in all material respects").

73. The Agent and Lenders did not know, nor could they through the exercise of reasonable diligence have known, of the facts giving rise to their claims until at least October

2018. Because of the nature of Nobilis's financial reporting, the facts giving rise to the claims were unlikely to be discovered within the prescribed limitations period despite due diligence. Moreover, the fact that Defendants lacked a sufficient basis to value the Company's 365+ AR is objectively verifiable, as their own subsequent admissions in internal Company memoranda make clear. Defendants also learned that their prior representations to the Agent and Lenders were false in early 2018, yet they purposefully concealed those facts from the Agent and Lenders. Indeed, Defendants made additional misrepresentations precisely to conceal the fact that they had overvalued the 365+ AR in September 2017 and had made misrepresentations with respect to the same in September and November of 2017. As a result, the statute of limitations applicable to negligent misrepresentation claims by the Agent and Lenders was tolled until October 2018 at the earliest.

74. As a direct and proximate result of their negligent misrepresentations, Defendants caused the Agent and Lenders to suffer significant pecuniary losses exceeding $56.1 million, including, but not limited to, approximately $46.1 million in unpaid principal balance under the Term B Loan and more than $10 million in additional fees and expenses that the Agent and Lenders have incurred and are incurring as a result of Defendants' misrepresentations. The Agent seeks monetary relief over $56,100,000.

**Count 2:**
**Common Law Fraud – Reckless Misrepresentation**

75. The Agent repeats and re-alleges the allegations set forth in paragraphs 1 through 58 of this Original Petition as if fully set forth herein.

76. Defendants made materially false representations to the Agent and Lenders, including:

a. Defendants' statements in CIMs, Lender Presentations, and securities filings that the Company's calculation of net realizable revenues and accounts

receivable were based on "actual experience," including "historical settlement data and payment data."

b. Nobilis's interim financial statements dated as of September 30, 2017, which included over $11 million in 365+ AR for the first time. Because Nobilis maintained an inflated valuation of its 365+AR—which should have been recorded as a bad debt expense—the interim financial statements also overstated net income and EBITDA.

c. The Officer Certificate dated November 15, 2017, in which Defendant Young affirmed that all representations and warranties in the Credit Agreement were "true and correct in all material respects," including the representations that: (a) the interim financial statements were prepared in accordance with GAAP consistently applied throughout the period covered thereby" and "fairly present the financial condition of Parent and Subsidiaries as of the date thereof;" and (b) "[n]o default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement."

d. The Officer Certificate dated November 15, 2017, in which Defendant Young represented that: (a) "no Default exists immediately prior to, or will exist immediately after, giving effect to the Transactions;" and (b) "after giving effect to the Transactions, there has been no event or circumstance since December 31, 2016 that has or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect."

e. The September 2017 Compliance Certificate's representations that: (a) the third quarter 2017 financial statements, which included the 365+ AR, "fairly present in all material respects the financial condition of Parent and its Subsidiaries as of the dates indicated;" (b) Defendant Young made, "or caused to be made under [his] supervision, a review in reasonable detail of the transactions and condition of Parent and its Subsidiaries during the accounting period covered by the financial statements," and that "[s]uch review has not disclosed the existence during or at the end of such accounting period of any condition or event that constitutes a Default or an Event of Default, nor does either Officer have any knowledge of the existence of any such condition or event as at the date of this certificate;" and (c) Nobilis was in compliance with the Credit Agreement's Maximum Consolidated Leverage Ratio and Minimum Consolidated Fixed Charge Ratio for the quarter ended September 30, 2017.

77. These representations were false. As explained above, Nobilis inflated the value of its accounts receivable by: (a) including 365+ AR at a mere 25% discount to gross charges; and (b) refusing to write off receivables where insurance payors had paid all amounts due under a patient's plan. That overstatement cascaded into other areas of the Company's financial

statements: it allowed the Company to avoid recording a significant bad debt expense, which in turn inflated the Company's net income and EBITDA. Defendants also provided the Agent and Lenders with the Certificates in September 2017 and November 2017 (as well as covenant calculation worksheets) that used the same false financial information and concealed the Company's breach of the Credit Agreement's financial covenants and the resulting events of default under the Credit Agreement.

78. Defendants made these statements, certifications, and representations recklessly, knowing that their assumed value of the Company's 365+ AR had no basis in fact or historic experience. Indeed, Defendant Moreno admitted as much after the fact in his November 2018 internal Company memorandum, which conceded that "December 31, 2017 was the first time in the Company's history when there has been substantial AR greater than 365, and, therefore, our experience history has been limited" and that the Company "lacked adequate history to establish well-formed estimates."

79. Defendants intended for the Agent and Lenders to rely on the information they provided and the representations that they made, and the Agent and Lenders did justifiably rely on that information. Defendants made the foregoing representations in connection with Nobilis's request for an additional $50 million in funding; in fact, Nobilis expressly acknowledged that its representations were made "[t]o induce the Administrative Agent and the other Lenders to enter into this agreement" and the delivery of the Company's interim financial statements and the Officer Certificate were conditions precedent to closing the Term B Loan. Thus, Defendants well understood that the Agent and Lenders would rely on Defendants' representations and the materials that they delivered in deciding to make the Term B Loan.

80. Within a year of closing the Term B Loan, Nobilis was forced to write down a substantial portion of its 365+ AR, reflecting the reality that the Company had vastly overstated its accounts receivable all along and resulting in significant losses for the Agent and Lenders. As a direct and proximate result of their reckless misrepresentations, Defendants caused the Agent and Lenders to suffer significant losses exceeding $63.6 million, including, but not limited to, approximately $46.1 million in unpaid principal balance under the Term B Loan, accrued and unpaid interest exceeding $7.5 million, and more than $10 million in additional fees and expenses that the Agent and Lenders have incurred and are incurring as a result of Defendants' misrepresentations. The Agent seeks monetary relief over $63,600,000.

## REQUEST FOR DISCLOSURE

Under Texas Rule of Civil Procedure 194, the Agent requests that Defendants disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## DEMAND FOR JURY TRIAL

The Agent demands a jury trial and tenders the appropriate fee with this Original Petition.

## PRAYER FOR RELIEF

For all of the foregoing reasons, the Agent respectfully prays that Defendants be cited to appear and answer herein, and that upon trial of this cause, judgment be entered in its favor, and against Defendants for the following:

a. monetary relief over $63,600,000;

b. actual, compensatory, rescissory, restitutionary, consequential, and all other damages in an amount that exceeds the minimum jurisdictional limit of this court; compensatory, consequential, and/or monetary damages in an amount to be determined at trial;

b. exemplary damages under Texas Civil Practices and Remedies Code § 41.003;

c. pre-judgment and post-judgment interest at the highest rate allowed by law;

d. costs of court; and

e. all such further relief to which the Agent is entitled at law and in equity.

Dated: May 29, 2020

Respectfully submitted,

REID COLLINS & TSAI LLP

/s/ Eric D. Madden
Eric D. Madden (Bar No. 24013079)
Ben A. Barnes (Bar No. 24092085)
REID COLLINS & TSAI LLP
1601 Elm Street, Suite 4200
Dallas, Texas 75201
T: (214) 420-8900
F: (214) 420-8909
emadden@reidcollins.com
bbarnes@reidcollins.com

William T. Reid, IV (Bar No. 00788817)
Nathaniel J. Palmer (Bar No. 24065864)
Keith Y. Cohan (Bar No. 24096183)
Morgan M. Menchaca (Bar No. 24103877)
REID COLLINS & TSAI LLP
1301 S. Capital of Texas Hwy
Building C, Suite 300
Austin, Texas 78746
T: (512) 647-6100
F: (512) 647-6129
wreid@reidcollins.com
npalmer@reidcollins.com
kcohan@reidcollins.com
mmenchaca@reidcollins.com

COUNSEL FOR PLAINTIFF,
BBVA USA, AS AGENT