## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| NOBILIS HEALTH CORP., *et al.*,[1] | Case No. 19-12264-CTG |
| *Debtors.* | Jointly Administered |
| ALFRED T. GIULIANO, in his capacity as Chapter 7 Trustee for the jointly administered bankruptcy estates of Nobilis Health Corp., *et al.*, | Adv. Pro. No. 21-51183-CTG |
| *Plaintiff,* | Related Doc. Nos. 181, 201, 203, 207 |
| v. | **FILED UNDER SEAL** |
| HARRY J. FLEMING, *et al.*, | |
| *Defendants.* | |

### PLAINTIFF'S OMNIBUS MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**COZEN O'CONNOR**
John T. Carroll, III
1201 North Market Street
Suite 1001
Wilmington, Delaware 19801
Telephone: (302) 295-2028
jcarroll@cozen.com

**COREN & RESS, P.C.**
Steven M. Coren, Esq. (*pro hac vice*)
Benjamin M. Mather, Esq. (*pro hac vice*)
Janice D. Felix, Esq. (*pro hac vice*)
Two Commerce Square
2001 Market Street, Suite 3900
Philadelphia, PA 19103
(215) 735-8700
scoren@kcr-law.com
bmather@kcr-law.com
jfelix@kcr-law.com

*Counsel for Plaintiff Alfred T. Giuliano, Ch. 7 Trustee*

Date:  November 6, 2023

---

[1]      Debtors are: Northstar Healthcare Holdings, Inc., Case No. 19-12262; Northstar Healthcare Acquisitions, L.L.C., Case No. 19-12263; and Nobilis Health Corp., Case No. 19-12264.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

I.  INTRODUCTION ............................................................................................... 1

II.  COUNTERSTATEMENT OF THE FACTS ....................................................... 2

    A.  Nobilis Was a Publicly Traded Healthcare Company That Experienced Substantial Growth Through Acquisitions .......................................................................... 2

    B.  Defendants' Roles Within the Company ........................................................ 3

    C.  The Nobilis—BBVA Lending Relationship ................................................... 5

    D.  Nobilis's Financial Reporting and Critical Accounting Policies ................... 6

        1.  Sarbanes-Oxley (SOX) Act of 2002 – Nobilis's SOX Initiatives ........... 6

        2.  The Company's Policy of Writing Down to $0 365+ AR ......................... 9

        3.  Nobilis's Policy of Writing Down to $0 365+ AR Was Well-Known to Nobilis's Auditor and Management ........................................................................ 10

    E.  Defendant Fleming Formed a Revenue Recognition Committee to Manage a Critical Accounting Function, yet Defendants Abdicated Their Collective Responsibilities to Implement and Monitor That Function ........................................................ 15

    F.  In the Face of Poor 2017 Q2 Financial Results, Defendants Cook the Books to Avoid Reporting a Loss Before Closing the Term B Loan ................................................ 19

    G.  Material Misstatements and False Certifications Made In Connection With Nobilis's Financial Statements ........................................................................................ 30

        1.  Third Quarter 2017 Form 10-Q ............................................................. 31

        2.  2017 Form 10-K .................................................................................... 33

        3.  First Quarter 2018 Form 10-Q ............................................................... 34

        4.  Second Quarter 2018 Form 10-Q .......................................................... 35

        5.  False SOX Certifications Provided By Fleming and Young ..................... 36

    H.  Deficiencies in Crowe's Quarterly Review Procedures and Audits ............... 37

    I.  The Company's Collapse ............................................................................... 41

    J.  By Cooking the Books, Defendants Caused the Company's Demise ............... 46

        1.  Consequences of the 365+ AR Policy Change and Adjustment ............... 46

        2.  Damages Suffered By Nobilis ................................................................. 47

        3.  Hurricane Harvey Did Not Cause the Company's Collapse ..................... 48

III.  LEGAL STANDARDS ....................................................................................... 50

IV.  ARGUMENT ...................................................................................................... 50

A.   There Are Genuine Issues of Material Fact Concerning Whether Defendants Moreno, Young, Fleming, Efird, and Rodriguez Breached Their Fiduciary Duties In Relation to Material Misstatements ........................................................................................................ 52

   1.   The "Extensive and Thorough" Analysis the Officer Defendants Rely On Is a Sham .. 54

   2.   Summary Judgment Is Not Warranted Based On Crowe's Audit and Interim Reviews 57

   3.   The So-Called "Layers of Review" Trumpeted By Fleming Were Illusory And Belie Summary Judgment ............................................................................................................. 60

   4.   The Breaches At Issue Fell Within The Scope of Efird and Rodriguez's Fiduciary Duties ................................................................................................................................... 62

   5.   The Evidence Demonstrates "Red Flags" and *Caremark* Violations ............................ 64

B.   There Are Genuine Issues of Material Fact Concerning Whether Defendants Fleming, Efird, Moreno, and Young Breached Their Fiduciary Duties In Relation To The RRC ......... 68

   1.   Fleming Violated His *Caremark* Duties By Failing to Monitor or Oversee the RRC ... 68

   2.   Efird, Moreno, and Young Abdicated Their Responsibilities as Members of the RRC .................................................................................................................................. 70

C.   There Are Genuine Issues of Material Fact Concerning Whether Defendant Ozonian Violated His *Caremark* Duties By Failing to Monitor the Company's Compliance With The 365+ AR Policy ...................................................................................................................... 72

D.   Plaintiff Has Presented Substantial Evidence of Causation and Damages, About Which There Are Disputed Issues of Material Fact .............................................................................. 77

   1.   Plaintiff Can Prove Causation and Damages ................................................................. 77

   2.   Fleming's Trivial Criticisms of Devor's Opinions Are Meritless .................................. 79

   3.   Defendants' Arguments Concerning Supposed Alternative Causes for Nobilis's Demise Are Not a Basis For Summary Judgment ........................................................................... 81

V.   CONCLUSION ...................................................................................................................... 84

# TABLE OF AUTHORITIES

**Cases**

*Allscripts Healthcare, LLC v. Andor Health, LLC,*
    2022 WL 3021560 (D. Del. July 29, 2022) ..................................................... 80

*AmSouth Bancorp. v. Ritter,*
    911 A.2d 362 (Del. 2006) ............................................................................. 51

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ..................................................................................... 50

*Behrmann v. Brandt,*
    2020 WL 4432536 (D. Del. July 31, 2020) ..................................................... 53

*Brehm v. Eisner,*
    746 A.2d 244 (Del. 2000) ....................................................................... 58, 76

*Butorin v. Blount,*
    2018 WL 4700217 (D. Del. Sept. 30, 2018) .................................................. 67

*Cede & Co. v. Technicolor, Inc.,*
    634 A.2d 345 (Del. 1993) ............................................................................. 51

*Cirillo Fam. Tr. v. Moezinia,*
    2018 WL 3388398 (Del. Ch. July 11, 2018), *aff'd*, 220 A.3d 912 (Del. 2019) ............... 58

*Del. Display Group LLC v. VIZIO, Inc.,*
    2017 WL 784988 (D. Del. Mar. 1, 2017) ....................................................... 80

*Dorman Prod., Inc. v. Paccar, Inc.,*
    201 F. Supp. 3d 663 (E.D. Pa. 2016) ............................................................ 79

*Gantler v. Stephens,*
    965 A.2d 695 (Del. 2009) ............................................................................. 50

*Hughes v. Xiaoming Hu,*
    No. CV 2019-0112-JTL, 2020 WL 1987029 (Del. Ch. Apr. 27, 2020) ..................... 72, 75

*In re Bridgeport Holdings, Inc.,*
    388 B.R. 548 (Bankr. D. Del. 2008) .............................................................. 56

*In re Caremark Intern. Inc. Derivative Litig.,*
    698 A.2d 959 (Del. Ch. 1996) ................................................................. 51, 75

*In re Citigroup Inc. S'holder Derivative Litig.,*

964 A.2d 106 (Del. Ch. 2009) ........................................................................... 71

*In re DSI Renal Holdings, LLC*,

574 B.R. 446 (Bankr. D. Del. 2017) ............................................ 51

*In re Fedders N. Am., Inc.*,

405 B.R. 527 (Bankr. D. Del. 2009) ............................................ 57

*In re Maxus Energy Corp.*,

615 B.R. 62 (Bankr. D. Del. 2020) .............................................. 50

*In re McDonald's Corp. S'holder Derivative Litig.*,

289 A.3d 343 (Del. Ch. 2023) ................................................ 51, 58, 65, 68

*In re Orchard Enters., Inc. Stockholder Litig.*,

88 A.3d 1 (Del. Ch. 2014) ........................................................... 51, 54

*In re PMTS Liquidating Corp.*,

526 B.R. 536 (D. Del. 2014) ........................................................ 78

*In re Refco Inc. Sec. Litig.*,

2014 WL 2514719 (S.D.N.Y. May 2, 2014), *report and recommendation adopted* 2014 WL 2465261 (S.D.N.Y. June 2, 2014) ................................ 78

*In re Scott Acquisition Corp.*,

344 B.R. 283 (Bankr. D. Del. 2006) ............................................ 78

*In re Walt Disney Co. Deriv. Litig.*,

907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) ....................... 50

*In re Walt Disney Co. Derivative Litig.*,

907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) ....................... 56

*Kaucher v. County of Bucks*,

455 F.3d 418 (3d Cir. 2006) ........................................................ 50

*Malone v. Brincat*,

722 A.2d 5 (Del. 1998) ............................................................... 54

*McMullin v. Beran*,

765 A.2d 910 (Del. 2000) ............................................................ 56

*Metro Storage Int'l LLC v. Harron*,

275 A.3d 810 (Del. Ch. 2022) ...................................................... 77

*Milbank, Tweed, Hadley & McCloy v. Boon*,

13 F.3d 537 (2d Cir. 1994) .......................................................... 78

*Off. Comm. of Unsecured Creditors of Allegheny Health Educ. & Rsch. Found. v. PriceWaterhouseCoopers, LLP*,

    989 A.2d 313 (Pa. 2010) ............................................................................... 83

*Off. Comm. of Unsecured of Allegheny Health, Educ. & Rsch. Found. v. PricewaterhouseCoopers, LLP*,

    607 F.3d 346 (3d Cir. 2010)......................................................................... 83

*Palmer v. Reali*,

    21 F. Supp. 3d 655 (D. Del. 2016)................................................................. 54

*Stone v. Ritter*,

    911 A.2d 362 (Del. 2006) ....................................................................... 51, 54

*Thorpe by Castleman v. CERBCO, Inc.*,

    676 A.2d 436 (Del. 1996) ....................................................................... 77, 78

*U.S. Accu-Measurements, LLC v. Ruby Tuesday, Inc.*,

    2013 WL 1792463 (D.N.J. Apr. 26, 2013) .................................................... 79

*Valeant Pharms. Int'l v. Jerney*,

    921 A.2d 732 (Del. Ch. 2007)....................................................................... 58

*Weaver v. Mobile Diagnostech, Inc.*,

    2007 WL 1830712 (W.D. Pa. June 25, 2007)................................................ 66

*Wolfe v. McNeil-PPC, Inc.*,

    881 F. Supp. 2d 650 (E.D. Pa. 2012) ............................................................ 80

*Zimmer Surgical, Inc. v. Stryker Corp.*,

    365 F. Sup. 3d 466 (D. Del. 2019)................................................................. 80

## Rules

Fed. R. Bankr. P. 7056 ..................................................................................... 50

Fed. R. Civ. P. 56............................................................................................. 50

Plaintiff, Alfred T. Giuliano, in his capacity as Chapter 7 Trustee for the jointly administered bankruptcy estates of Nobilis Health Corp., *et al.* (the "<u>Trustee</u>"), submits this omnibus memorandum in opposition to the motions for summary judgment filed by Defendants Harry J. Fleming ("<u>Fleming</u>"), P. David Young ("<u>Young</u>"), Brandon Moreno ("<u>Moreno</u>"), Kenneth Efird ("<u>Efird</u>"), Steve Ozonian ("<u>Ozonian</u>"), and Marcos Rodriguez ("<u>Rodriguez</u>") (collectively, "<u>Defendants</u>"): (1) Fleming Motion, Opening Brief, and Appendix filed 7/13/2023 [D.I. Nos. 181-184] and Supplemental Motion and Supplemental Brief filed 10/6/2023 [D.I. Nos. 201-202]; (2) Ozonian Motion, Opening Brief, and Declaration filed 10/6/2023 [D.I. Nos. 203-205, 212-213]; (3) Young, Moreno, Efird, and Rodriguez Motion, Opening Brief, and Appendix filed 10/6/2023 [D.I. Nos. 207-209, 214-215] (collectively, the "<u>Motions</u>").

## I.    <u>INTRODUCTION</u>

The Trustee seeks to hold Defendants—former directors and officers of Nobilis—liable for breaching their fiduciary duties by cooking the books to conceal Nobilis's deteriorating financial state while borrowing $50 million to complete an acquisition. Simply stated, there are disputes as to genuine issues of material fact concerning each Defendant's breach of fiduciary duty, the cause of the Company's collapse, and the resulting damages.

Prior to the third quarter of 2017, Nobilis's standard practice was to write receivables aged over 365 days ("<u>365+ AR</u>") down to $0. This policy was memorialized in a business process narrative effective in December 2016, which all of Nobilis's financial and accounting personnel were instructed to follow. However, there is ample evidence demonstrating that, in the third quarter of 2017, Nobilis's management disregarded the policy and instead included 365+ AR in Nobilis's revenue estimates and assets—thereby falsely inflating revenue and assets and disguising a covenant breach under the Company's loan documents. Each Defendant was either a direct

1

participant in this scheme or knew about it but failed to take necessary action to stop the resulting material misstatements in public filings.  Eventually the Company wrote down nearly $72 million in uncollectable receivables, failed to make public filings, was delisted, and collapsed into bankruptcy. Defendants' record falls woefully short of establishing any entitlement to summary judgment and instead merely highlights issues over which the parties have material factual disputes.[2]

## II.    COUNTERSTATEMENT OF THE FACTS

### A.    Nobilis Was a Publicly Traded Healthcare Company That Experienced Substantial Growth Through Acquisitions

Before its demise, Debtor Nobilis Health Corp. ("Nobilis" or the "Company") was a publicly-traded healthcare company that had two business segments: (i) the Medical Segment ("Medical Segment") which owned and managed a portfolio of specialty surgical hospitals ("Nobilis Hospitals"), ambulatory surgical centers ("ASCs"), and multi-specialty clinics at more than 30 locations in Texas and Arizona; and (ii) the Marketing Segment ("Marketing Segment"), which provided marketing services to the Medical Segment and third-parties.  *See* Trustee Opposition Appendix ("Opp. App.") Ex. 2, at pp. 7, 32-33 (Nobilis Health Corp. Form 10-K For

---

[2]       Fleming opens his brief with a series of baseless criticisms of the Trustee which are disconnected from his arguments. Fleming's insinuation that the Trustee's role as a fiduciary compels him to dismiss the claims against Fleming is ridiculous.  The Trustee has meticulously acted to marshal estate assets for distribution to creditors on a *pro rata* basis, which includes pursuing estate claims such as breach of fiduciary duty. The Court held at the motion to dismiss stage that the Trustee's breach of fiduciary duty claims were sufficiently stated and, as set forth herein, there is substantial evidence supporting them.  Fleming's dissatisfaction with the Court's prior rulings, with having not been included among other directors who the Trustee dismissed, or with having to abide by the same procedural rules and summary judgment standards as any other litigant provide no support for his Motion.  Nor does BBVA's suspicious assignment of its claim to Fleming, Young, and Moreno obligate the Trustee to dismiss claims in this lawsuit—particularly since the Trustee seeks to equitably subordinate those assigned claims in a related lawsuit. *See Giuliano v. Fleming, et al.*, Adv. No. 23-50486 (CTG) (Complaint filed August 21, 2023, seeking equitable subordination pursuant to 11 U.S.C. § 510(c)).

the fiscal year ended December 31, 2017).[3]   Mainly through acquisitions, Nobilis's revenue

increased from approximately $31 million in fiscal year ended December 31, 2013, to $300 million

in fiscal year ended December 31, 2017, allocated approximately $282 million to the Medical

Segment and $18 million to the Marketing Segment.  *Id.* at pp. 30, 35-37.

Nobilis was primarily an "out-of-network" provider:

> The Medical Segment depends primarily upon third-party
> reimbursement from private insurers to pay for substantially all of
> the services rendered to [the Company's] patients.  The majority of
> the revenues attributable to the Medical Segment are from
> reimbursement to the Nobilis Hospitals and Nobilis ASCs as 'out-
> of-network' providers. This means, the Nobilis Facilities are not
> contracted with a major medical insurer as an 'in-network'
> participant.

*Id.* at p. 34.

B.   **Defendants' Roles Within the Company**

Defendant Fleming was Nobilis's Chief Executive Officer ("CEO") from January 2016

until December 31, 2018, and had previously served as Nobilis's Executive Chairman from April

2015 to January 2016, as President from July 2014 to April 2015, and as CFO from March 2013

to July 2014.  *See* Fleming Answer to the Complaint [D.I. 85], at ¶ 13.  Fleming was also a member

and the Chairman of the Board of Nobilis's Board of Directors (the "Board") from November 16,

---

[3]   The Trustee Opposition Appendix is attached to the Coren Declaration, filed
contemporaneously herewith. In addition to the testimonial and documentary evidence cited in his
Opposition Appendix, the Trustee relies upon two expert reports of Harris L. Devor, CPA, a
partner in the worldwide accounting firm of Marcum LLP.  *See* Opp. App. Exs. 83 and 86.  Mr.
Devor is nationally recognized as an audit practitioner and forensic/litigation support specialist,
having provided expert testimony in the United States and internationally.  Mr. Devor's
professional career spans more than 50 years and has concentrated on applying generally accepted
accounting principles ("GAAP"), generally accepted auditing standards ("GAAS"), and U.S.
Securities and Exchange Commission ("SEC") requirements.  Mr. Devor has served as the
accounting and auditing expert in some of the most high-profile securities fraud cases of the last
several decades and is a recognized expert in matters involving financial reporting, including
compliance with GAAP, GAAS, and SEC requirements.

2017 until the Debtors' bankruptcy filings,[4] and had previously served as a member of Nobilis's Board from 2010 until June 2016.  *See id.*

Defendant Efird was Nobilis's President from July 2016 until September 13, 2019, and prior to that had been Nobilis's Executive Vice President and Chief Operating Officer since January 2016.  *See* Efird Answer to the Complaint [D.I. 84], at ¶ 16.

Defendant Young was Nobilis's Chief Financial Officer ("CFO") from February 2017 until September 2018.  *See* Young Answer to the Complaint [D.I. 83], at ¶ 14.

Defendant Moreno was Nobilis's Senior Vice President of Finance from January 2016 until January 2019, and then served as Nobilis's CFO from January 2019 until September 6, 2019.  *See* Moreno Answer to the Complaint [D.I. 86], at ¶ 15.  Moreno had previously been Nobilis's Associate Vice President of Finance from September 2014 until January 2016.  *See id.*

Defendant Rodriguez was Nobilis's Chief Accounting Officer ("CAO") from May 2016 until May 2018.  *See* Rodriguez Answer to the Complaint [D.I. 78], at ¶ 24.[5]

Defendant Ozonian was a member of Nobilis's Board from April 2015 to September 2019. *See* Ozonian Answer to the Complaint [D.I. 80], at ¶ 19.  Ozonian also served as Chairman of the Board's Audit Committee during the relevant time period.  *See id.*; *see also, e.g.*, Opp. App. Ex. 126 (Schedule 14A filed May 1, 2017), at pp. 22, 29 (identifying Ozonian as Chairman of Audit Committee); Opp. App. Ex. 87 (Schedule 14A filed April 30, 2018), at pp. 22, 31 (same).[6]  The

---

[4]     Debtors filed for bankruptcy on October 21, 2019 (the "Petition Date").

[5]     Defendants Young, Moreno, Efird, and Rodriguez are referred to collectively as the "Officer Defendants."  Although both an officer (the CEO) and a director (the Chairman of the Board), Defendant Fleming is referred to separately and not grouped within the Officer Defendants.

[6]     Ozonian testified that in late 2018 or 2019 he stopped serving as the Chair of the Audit Committee due to health issues but continued to serve on the Board.  *See* Opp. App. Ex. 52 (Ozonian Dep. Tr. at pp. 15-17, 52, 60-61); *see also* Opp. App. Ex. 125 (Form 8-K for 9/30/19). Ozonian also testified that, due to these health issues, there were extended periods when he was

Audit Committee's primary responsibilities included "assist[ing] [the] Board with oversight of . . . the quality and integrity of [Nobilis's] financial statements and its related internal controls over financial reporting" and "assist[ing] [the] Board in fulfilling its oversight responsibilities regarding finance, accounting, and legal compliance." Opp. App. Ex. 126 (Schedule 14A filed May 1, 2017), at p. 31. The Company considered Ozonian an "audit committee financial expert as defined by Item 407 of Regulation S-K." *See id.* at p. 29.

### C. The Nobilis—BBVA Lending Relationship

On October 28, 2016, the Company entered into the "BBVA Credit Agreement," with BBVA Compass Bank as Administrative Agent for a lending group, which included "Term Loan A" in the principal amount of $52.5 million and a $30 million revolving credit facility. Opp. App. Ex. 2, at p. 43. The BBVA Credit Agreement contained "customary events of default" including the violation of specified covenants and "the making of a materially false or misleading representation." *Id.*

On November 15, 2017, the BBVA Credit Agreement was amended to provide an additional $50 million term loan (known as the "Term B Loan") earmarked to finance the Elite acquisition—Nobilis's purchase of majority ownership interests in Elite Hospital Management, LLC and three Elite affiliates (collectively, "Elite"), which managed ambulatory surgical centers and a specialty surgical hospital in Houston, Texas. *See id.* at pp. 7, 44.

In Fleming's view, the Company's stock was undervalued and the Elite acquisition would enhance Nobilis's in-network revenue. *See* Opp. App. Ex 4 (Fleming Dep. Tr. I at pp. 47-48);

---

unable to be "present" for many matters relating to his Board duties. Opp. App. Ex. 52 (Ozonian Dep. at p. 17) ("[I]n '18 . . . into '19 . . . I was not able to be fully present for things."); *id.* at p. 52 (in reference to the third/fourth quarters of 2018, "That was a period where I was not present for many things.").

Opp. App. Ex. 75 (Fleming Dep. Tr. II at pp. 79-81).  Fleming viewed the acquisition as "critical" to the Company's business plan because "institutional shareholders and the bankers and our coverage out there from the analysts were looking very hard at Nobilis' payor mix. They wanted in-network contracts, in-network revenue, in-network EBIDTA."  Opp. App. Ex 4 (Fleming Dep. Tr. I at pp. 47-48); *see also* Opp. App. Ex. 3; Opp. App. Ex. 5.[7]

### D.    Nobilis's Financial Reporting and Critical Accounting Policies

The Company's financial statements were to be prepared pursuant to the rules and regulations of the SEC for financial information.  Opp. App. Ex. 6, at p. 86/158 (Nobilis Health Corp. Form 10-K For the fiscal year ended December 31, 2016, Note 2).  Accordingly, they must include all information and notes required by accounting principles generally accepted in the United States (U.S. GAAP) for complete financial statements.  *Id*.  Nobilis reported that the "[e]stimates most consequential to our consolidated financial statements are in the area of revenue recognition," and that "[o]ther significant estimates include estimates of fair values which management formulates in connection with valuation of assets and liabilities . . . as well as realizable amounts of accounts receivable...."  Opp. App. Ex. 6 at pp. 86-88/158 (Form 10-K For the fiscal year ended December 31, 2016, Note 2).

### 1.    Sarbanes-Oxley (SOX) Act of 2002 – Nobilis's SOX Initiatives

Defendants were on notice to be ever vigilant concerning internal controls over financial reporting because the Company had restated its 2014 financials due to auditor-identified material weaknesses in internal controls and GAAP violations.  Opp. App. Ex. 7, at pp. 3/78, 24-25/78 (Nobilis Health Corp. Form 10-K/A, Amendment No. 1, For the fiscal year ended December 31, 2014, filed January 12, 2016, signed by Defendant Fleming as CEO and Director, and Defendant

---

[7]    Fleming owned several million dollars of Nobilis stock at the time.  *See* Opp. App. Ex. 75 (Fleming Dep. Tr. II at pp. 145-46).

Ozonian as then-Chairman of the Board and Director).  As part of the remediation efforts, the Company hired PricewaterhouseCoopers ("PwC") to assist in developing and establishing SOX compliance procedures.  *See* Opp. App. Ex. 8 (7/7/2016 email from Rodriguez to the other Defendants and others in Nobilis's accounting and reporting functions).  Ozonian testified that the Audit Committee had significant involvement in that effort.  *See* Opp. App. Ex. 52 (Ozonian Dep. Tr. at p. 31).

PwC was engaged to "draft detailed business process narratives that incorporate applicable accounting policies, provide a high-level overview of the process and identify internal control activities. For example, the revenue recognition and billing process will describe how revenue is recorded including all significant transactional and internal control elements…." Opp. App. Ex. 9, NOB.EML_00137662_000004 (5/26/2016 email from Rodriguez to Ozonian, copying Fleming and Ken Klein, with attached Financial Reporting and SOX Project Plans).

Under PwC's guidance, the Company developed SOX procedures (sometimes referred to as narratives).  *See* Opp. App. Ex. 10, at Nobilis_00257232 (10/31/2016 email from Rodriguez to Ozonian, copying Fleming and Efird, circulating draft SOX documentation).  The new SOX procedures had to be approved by the Audit Committee—and Ozonian, as chair, approved them. *See id.* at Nobilis_00257231; Opp. App. Ex. 11, at NOB.EML_00464698 (11/17/2016 email chain between Rodriguez, Ozonian, Fleming, Efird, and others confirming Ozonian's approval of the SOX documentation); *see also* Opp. App. Ex. 54 (Rodriguez Dep. Tr. II at pp. 42-43).

On December 5, 2016, a widely distributed email with the Subject: "Management News Blast: Internal Controls and Business Processes" was "Sent on behalf of the Chief Accounting Officer [Defendant Rodriguez)]," circulating the Company's newly adopted SOX Business Process Internal Controls:

EXHIBIT

Exhibit 191

| From: | HR Communication [donotreply@nobilishealth.com] |
|---|---|
| Sent: | 12/5/2016 9:28:45 AM |
| To: | Todd Lorenz [tlorenz@nobilishealth.com]; Annette Conley [aconley@nobilishealth.com]; Robert Rogers [RoRogers@nobilishealth.com]; Kimberli Hunter [khunter@nobilishealth.com]; Ranny Watson [rwatson@nobilishealth.com]; Valerie Rodriguez [vrodriguez@nobilishealth.com]; Rita Juarez [rjuarez@nobilishealth.com]; Agnes Yau [myau@nobilishealth.com]; Adam Arnette [aarnette@nobilishealth.com]; Chance McElhaney [cmcelhaney@nobilishealth.com]; Nick Lloyd [nlloyd@nobilishealth.com]; Jay Lindsey [jlindsey@nobilishealth.com]; Cathy Woodard [cwoodard@nobilishealth.com]; Eunice Price [euprice@nobilishealth.com]; Rebekah Wilhelm [rwilhelm@nobilishealth.com]; Karen Bonamase [kbonamase@nobilishealth.com]; David Selman [dselman@nobilishealth.com]; 'Duane' [dscholer@azvascular.com]; 'Debra Cooper' [debra@azvascular.com]; 'Rochelle York' [rochelle@azvascular.com]; David Kreye [dkreye@nobilishealth.com]; Nicole Walker [nwalker@nobilishealth.com]; Patrick Yoder [PYoder@nobilishealth.com]; Kristen Burton [kburton@nobilishealth.com]; Brandon Moreno [bmoreno@nobilishealth.com]; Randy Stein [rstein@nobilishealth.com]; Marcos Rodriguez [mrodriguez@nobilishealth.com]; Michael Nelson [mnelson@nobilishealth.com]; Matt Maruca [mmaruca@nobilishealth.com]; Marissa Arreola [marreola@nobilishealth.com]; Lee McMillian [lmcmillian@nobilishealth.com]; Thomas Paget [tpaget@nobilishealth.com]; Blake Edwards [bedwards@nobilishealth.com]; Kelly Dickens [kdickens@nobilishealth.com]; Diana Dooley [ddooley@nobilishealth.com]; Virginia Henry [vhenry@nobilishealth.com]; Christy Perez [cperez@nobilishealth.com]; 'Dr. Phil Wall' [drphilwall@azvascular.com]; Harry Fleming [hfleming@nobilishealth.com]; Ken Klein [kklein@nobilishealth.com]; Scott Paget [spaget@nobilishealth.com]; Sam Palermo [spalermo@nobilishealth.com]; Tuan Tran [ttran@nobilishealth.com] |
| CC: | Yvonne Pieprzyca [ypieprzyca@nobilishealth.com]; Cathy Morin [cmorin@nobilishealth.com]; Susan Mallek [smallek@nobilishealth.com] |
| Subject: | Management News Blast: Internal Controls and Business Processes |
| Attachments: | IV. Business Process Internal Controls.zip; 3.2 Delegation of Authority (DOA).pdf |



Nobilis Health    Management News

*Sent on behalf of the Chief Accounting Officer.*

Dear Leaders-

In Q3, Nobilis Health hired PriceWaterhouseCoopers, LLP (PwC) to perform a Sarbanes-Oxley Act (SOX) risk assessment and scoping activities and completed this project in September. Since then, we have incorporated their findings into our current SOX Internal Control documentation. **The rollout of all business narratives and related controls is effective immediately**.

Management requests that all business leaders and employees follow the processes as documented and follow the control activities specified in each respective business process, as applicable.

[. . .]

The business process narratives include documents for:

- Monthly Close and Financial Reporting

. . . [and]

- Medical Revenue. . .

A complete file of process narratives is attached. You can also request these from the Accounting Team when needed.

Please cascade this information to your direct reports, as appropriate. . . .

Opp. App. Ex. 12, at NOB.EML_00131530_0001-02 (emphasis added).[8]

### 2.    The Company's Policy of Writing Down to $0 365+ AR

The SOX Business Process Internal Controls circulated by Defendant Rodriguez on December 5, 2016 (and made effective as of that date) included, *inter alia*, a business process narrative entitled "Revenue to Cash – ASCs and Hospitals," which concerned revenue recognition policies for medical revenue. *See id.* at NOB.EML_00131548_0001-07 (referred to herein as the "SOX Revenue Recognition Narrative"). The SOX Revenue Recognition Narrative sets forth a clear rule that accounts receivable that have not been collected within one year were to be written down to $0 (*i.e.*, written-off):

> **Any receivables amounts that have not been collected on after a year will be written down to $0. The amounts will be written off directly to revenue, and are approved by the VP of Finance.**

*Id.* at NOB.EML_00131548_0007 (emphasis added).[9] This rule is referred to herein as the "365+ AR Policy."

On March 31, 2017, the SOX Revenue Recognition Narrative for medical revenue was updated—and the 365+ AR Policy remained unchanged and in effect:

---

[8]    Defendants Fleming and Moreno, along with then-CFO Ken Klein, were among the email recipients.

[9]    *See also* Opp. App. Ex. 10, at Nobilis_00257686 (Rodriguez email seeking Audit Committee's approval of 365+ AR Policy, as part of SOX documentation); Opp. App. Ex. 11, at NOB.EML_00464698 (Ozonian providing same, as chair of Audit Committee).

> **Any receivables amounts that have not been collected on after a
> year will be written down to $0. The amounts will be written off
> directly to revenue, and are approved by the VP of Finance.**

Opp. App. Ex. 13, at Nobilis_0222818 (version 1.1 of the SOX Revenue Recognition Narrative)

(emphasis added).[10]   The SOX documentation confirms that it was approved by Defendant

Rodriguez, and that Defendant Moreno was among "[p]ersonnel involved in updating the latest

version[s] of this Process Narrative."   Opp. App. Ex. 12, at NOB.EML_00131548_0001, 0007;

Opp. App. Ex. 13, at Nobilis_0222812, 0222818.

### 3.  Nobilis's Policy of Writing Down to $0 365+ AR Was Well-Known to Nobilis's Auditor and Management

#### a.  The Auditors Knew the Policy

Crowe Horwath LLP ("Crowe") served as the Company's auditors.  In the second quarter

of 2017, Laura Edwards became the Crowe engagement partner on the Company's account.  Opp.

App. Ex. 15 (Edwards Dep. Tr. I at p. 20).  As engagement partner, Edwards was the highest-

ranking member of the Crowe team. *Id.* Edwards testified



---

[10]     From an accounting/financial reporting perspective, the write-down to $0 of 365+ AR,
impacted Nobilis's income statement (by reducing revenue in the amount of the write-down) and
Nobilis's balance sheet (by reducing accounts receivable in the amount of the write-down). *See,
e.g.*, Opp. App. Ex. 14 (Moreno Dep. Tr. I at p. 58).



*Id.* at pp. 130-31 (referring to Opp. App. Ex. 16, a work paper prepared in connection with Crowe's audit of Nobilis's financial statements for the year ending December 31, 2017).

Amanda Lockhart joined Crowe in August 2015 and began working on the audit engagement team for Nobilis in September 2015. Opp. App. Ex. 17 (Lockhart Dep. Tr. at pp. 7-8). Lockhart remained on the Nobilis audit engagement team from September 2015 through September 2018. *Id.* at pp. 8-9. Regarding the Company's policy of writing off 365+ AR, Lockhart testified:





*Id.* at pp. 18-20 (referring to Opp. App. Ex. 18, a memo prepared by her in connection with Crowe's

Nobilis audit engagement) (Objections omitted).

### b.    Management—Including Defendants—Knew the Policy

Prior to the third quarter of 2017, the Company's historical policy and standard practice

was to write down to $0 365+ AR.  The widely distributed SOX Narratives made that accounting

policy crystal clear, and Defendant Moreno's deposition testimony further confirms the point:

> Q. … So the company's general process was to do what with AR
> that aged past 365 days?
>
> A. Reserve it fully.
>
> Q. What do you mean by reserve it fully?
>
> A. As I mentioned, there's a difference between the AR we represent
> on our financial statements versus what the CBO would see in the
> patient systems….
>
> Q. So the CBO would keep working those accounts, right?
>
> A. Yes.
>
> Q. And then what would happen to those balances on the financial
> statements?
>
> A. Generally, we would reserve for them fully.
>
> Q. So it would be deducted from AR?
>
> A. Yes.

> Q. And would a corresponding amount be deducted from net revenue?
>
> A. Yes.

Opp. App. Ex. 14 (Moreno Dep. Tr. I at pp. 65-66).

Defendant Young, who replaced Ken Klein as CFO in early 2017, testified that Nobilis changed its "general practice" in the third quarter of 2017:

> Q. … Now, prior to the third quarter of 2017, Nobilis, according to your testimony, reserved against 365-day+ AR, correct?
>
> A. I did say that.  I'm not certain – after you asked the question, I'm not certain if it was a reserve or if it was just a change in the population.  I don't recall exactly how we accounted for those.
>
> Q. … Fair enough.  And by change in the population, do you mean that perhaps the 365-day+ AR was simply not included in the revenue estimate?
>
> A.  That's what I'm saying. I don't recall.
>
> Q.  … But whichever way it was done, whether it was reserved against or not included in the population as you said, a change was made in the third quarter of 2017 in how Nobilis treated the 365-day+ AR, correct?
>
> A.  No.
>
> Q. Nobilis kept doing exactly the same thing in the third quarter of 2017 with respect to 365-day+ AR that it was always doing?
>
> A. **We had a general practice that we had followed and we did not follow that practice in the third quarter.  We changed that practice.**
>
> […]
>
> Q. How did you change it?
>
> A. In the past, we had not really assessed the collectability of those receivables and we had simply excluded them – I'm pretty sure, excluded them from the population.  In the third quarter, we included

13

them in the population.  It wasn't the first time that we had done that, but we took a broader look at it in that quarter.

[…]

Q. Okay.  And now, **what did Nobilis do with respect to those claims in the third quarter of 2017 that was different from prior practice?**

**A. Prior practice was for a receivable that had gone over 365 days would be excluded from the receivables.**

**Q. And now they were going to be included; is that right?**

**A. Now they were going to be included.**

Opp. App. Ex. 1 (Young Dep. Tr. I at pp. 75-78) (Objections omitted).  When asked "Who made the decision to change the prior practice with respect to the treatment of 365+ AR, Young testified that it was a "management decision."  *Id.* at p. 84.  When pressed as to who in management made the decision, Young testified that "management" included Efird, Moreno and himself.  *Id.*  As to Defendant Fleming, Young testified that Fleming was informed of the decision and "had no objections."  *Id.* at p. 85.

Defendant Rodriguez similarly admitted that Nobilis had made a change in the third quarter of 2017 as to the Company's treatment of 365+ AR, yet he quibbled over whether the change was to an accounting "policy" or an accounting "estimate."  Opp. App. Ex. 63 (Rodriguez Dep Tr. I at pp. 116-19); *see also* Opp. App. Ex. 14 (Moreno Dep. Tr. I at p. 196) (Moreno's testimony that he viewed it as "a change in estimate").

Neither Rodriguez nor Ozonian could recall any new SOX documentation changing the policy or point to any written direction from the Audit Committee, the CEO, the CAO, or anyone else at the Company suspending or reversing the policy.  *See* Opp. App. Ex. 54 (Rodriguez Dep. Tr. II at pp. 48-50); Opp. App. Ex. 52 (Ozonian Dep. Tr. at pp. 49-50).

**E.    Defendant Fleming Formed a Revenue Recognition Committee to Manage a Critical Accounting Function, yet Defendants Abdicated Their Collective Responsibilities to Implement and Monitor That Function**

By email dated February 28, 2017, Defendant Fleming announced the immediate formation of a "Revenue Recognition Committee" (the "RRC") initially consisting of Efird, Moreno, Young, Patrick Yoder, Ken Klein, and Tuhin Pankaj:

> Team, I am forming a Revenue Recognition Committee effective immediately. Each of you will participate and you will collectively decide how you will operate and interface with management and Crowe (or any other auditor). **For some time now I've been considering how we manage this extremely important function for the company. I have been seriously concerned that we have been putting this function on one person's shoulders.** This new committee will report to the CFO. You will adopt your own rules and procedures as well as pick a chair person to run the meetings. **This new committee will set the company's future policies on revenue recognition and will make all decisions as a group. The CEO will not participate in this process. The CFO's participation will be up to the CFO.** Ken will set the first meeting for tomorrow morning. **I will expect the newly elected chairman to report to me on the committee's progress.** Each of you has been chosen as initial members because of your background and skill set. I'd like to see the process take shape asap.

Opp. App. Ex. 20 (emphasis added).

The RRC kept minutes for meetings that occurred on March 1, 2017, March 2, 2017, March 20, 2017, April 6, 2017, April 12, 2017, May 3, 2017, May 8, 2017, and July 6, 2017. *See* Opp. App. Ex. 21 (email attaching meeting minutes).[11] The Agenda on "03.01.2017" indicates that

---

[11]    In December 2018, after the Company had written off $72 million in AR and Nobilis failed to file its Form 10-Q for the quarter ending September 30, 2018, Nobilis's Chief Compliance Officer investigated the Company's revenue recognition procedures. His email to Moreno on December 17, 2018, requested, "all meeting minutes" of the RRC (referred to in the email chain as Rev. Cycle Committee meetings). Moreno responded, "I don't believe we kept minutes," but a follow up email to Renee Li and others resulted in minutes for the meeting dates referenced above. *See* Opp. App. Ex. 21.

Defendant Efird was elected "Committee Chair" and there were "5 voting members, 3 standing membership-Anna, Renee Li, David [Young]." *Id.*, at DEFENDANTS_00004749.

No further RRC meeting minutes appear to have been prepared after July 6, 2017—indeed, it is unclear whether subsequent meetings occurred at all. In any event, it is clear that the RRC abdicated its charge to "set the [C]ompany's future policies on revenue recognition and . . . make all decisions as a group,"[12] and Defendants abdicated their responsibilities to implement and monitor that critical accounting function.

The testimony of Efird (the Chair of the RRC) confirms that the committee as a whole abdicated its responsibilities:

- His responsibilities as Chair were no different from anyone in the group and he recalled no "rigid form or protocol or deliverable….";

- The RRC did *not* set the Company's future policies on revenue recognition, and that "was not a topic of [the RRC's] discussion";

- He does not know who did set such policies;

- He cannot explain why the RRC did not set such policies;

- While he "believe[s]" the RRC met after July 6, 2017, he does not know if minutes of any such meetings were kept;

- He recalls no discussions of the RRC's purposes or the scope of its efforts;

- He recalls no discussions at an RRC meeting about the "recalculation of AR";

- He recalls no discussions about the RRC's decision-making authority;

- As chairman, he did not designate someone to take minutes and did not even remember minutes being taken;

- When asked if he had "any involvement in determining how Nobilis would recognize revenue," he responded, "No. It was not my – that was not my lane if you will";

---

[12]     Opp. App. Ex. 20.

- He acknowledged that the RRC was part of the Company's 2017 strategic plan, but stated his view that "I wouldn't consider that vital to the company, you know, or something that's remarkable"[13];

- He did not recall discussions of "revisions to revenue estimates" by the RRC; and

- He did not know whether the RRC ever made decisions concerning whether a revision to the Company's revenue estimate should or should  not be made.

Opp. App. Ex. 22 (Efird Dep. Tr. I at pp. 23-26, 28-30, 32, 38, 45-46, 78); *see also* Opp. App. Ex. 74 (Efird Dep. Tr. II at pp. 17, 19).

Defendant Moreno, a member of the RRC, testified that:

- He did not know who the Chair of the RRC was;

- He did not know if the RRC chair ever reported to Fleming;

- He did not know if there were minutes taken of every meeting;

- He did not know who kept the minutes;

- He was not aware of any recommendations made by the RRC to the CEO;

- He did not know whether the change to include 365+ AR in Nobilis revenue estimates was discussed with the Board's audit committee; and

- He recalled no vote by the RRC to approve the change as to 365+ AR and recalled no discussions by the RRC on the subject.

Opp. App. Ex. 14 (Moreno Dep. Tr. I at pp. 79-80, 82, 84-86).

Defendant Young, a member of the RRC, similarly testified that:

- The RRC "was a group formed to ensure the accuracy of [the Company's] estimating," but he had no recollection of decisions or discussions as to the treatment of 365+ AR;

- He does not know if there are minutes of RRC meetings after July 6, 2017; and

---

[13]     *See* Opp. App. Ex. 23 (Email to Fleming dated March 17, 2017, attaching 2016 synopsis and 2017 strategic plan, which was prepared for presentation to the Board).

- He does not recall who suggested that the Company change its practice as to 365+ AR.

Opp App. Ex. 1 (Young Dep. Tr. I at pp. 89, 93, 100).

Defendant Fleming also abdicated his responsibility to ensure that the RRC performed its critical financial function.  Although Fleming purportedly formed the RRC for the purpose of managing the "extremely important function" of revenue recognition (*see* Opp. App. Ex. 20), he testified that:

- His answer to Interrogatory no. 6 (served in the BBVA Action) that he "is neither aware of the specific process for Nobilis' adoption of the 365+ A/R change, nor when that decision was made, nor what documents were relied upon for making the change" is accurate;

- He "was not involved in the process for adopting a change to the 365-plus AR, and, therefore, did not make the decision to change Nobilis' accounting practices related to 365-plus AR";

- He does not know when the decision was made;

- He did not participate in any conversations with Crowe regarding the accounting practices related to 365+ AR;

- He did not know whether the RRC made "specific decisions around revenue" or set the Company's future policies on revenue recognition;

- He recalls conversations with RRC Chair Efird as to whether Nobilis would hit target revenues, but no conversations around RRC decisions as to revenue recognition policy;

- No one on the RRC ever told him that the committee was setting policies on revenue recognition, and he never asked anyone if the committee in fact did that;

- He has never seen any document suggesting the RRC set policies on revenue recognition; and

- Even though the most consequential estimates for the Company's financial statements were in the area of revenue recognition, he did "nothing specific" to ensure the RRC performed the work for which it was designated.

18

Opp App. Ex. 4 (Fleming Dep. Tr. I at pp. 123-26, 128, 133-34); Opp. App. Ex. 75 (Fleming Dep.

Tr. II at pp. 26, 123-24, 127); *see also* Opp. App. Ex. 24 at p. 9 (Fleming's interrogatory answers).

### F.    In the Face of Poor 2017 Q2 Financial Results, Defendants Cook the Books to Avoid Reporting a Loss Before Closing the Term B Loan

Nobilis missed its 2017 Q2 internal revenue projections by $8.1 million. *See* Opp. App.

Ex. 25, at NOB.EML_00191851 (Management Report for the week of 8/16/2017) (the "August

2017 Report"). In the month of July 2017, revenue cratered—and the Company missed its internal

revenue projections by almost $10 million. *Id.* And by mid-August 2017, monthly revenue was

off almost $16 million. *Id.*

On August 10, 2017, Moreno sent a "sub cash analysis on our Q1 2017 AR with a

comparison to our 2016 AR" to Young and others, which showed Nobilis was "behind the mark."

Opp. App. Ex. 26. Young responded, "How alarmed about this should I be?" and then responded

again 5 minutes later: "So for the record, I'm very concerned. Can we please discuss first thing

tomorrow morning? I'm open to any comments that might come in tonight too. I would like to

be able to sleep, if just a little bit." *Id.* Ten days later, on August 20, 2017, Young forwarded the

August 2017 Report to Efird, Moreno, and others asking: "Guys – curious about your thoughts on

the attached. How realistic is it?" *See* Opp. App. Ex. 25.

The August 2017 Report itself, issued before Hurricane Harvey hit Houston on the evening

of August 25, 2017, painted an increasingly bleak picture of Nobilis's financial performance. The

Company's estimated August revenues were $15,939,205 below budget. *Id.*, at

NOB.EML_00191851.[14]

---

[14]    In an email to Young on September 28, 2017—two days before the close of Q3—Moreno lamented: "End of the day, lowest volumes all year and we were heading that way before any hurricane hit. Only difference this Q is collections weren't strong so we couldn't bank on as large

In a September 5, 2017 email to Ken Klein (former CFO and then CFO for Operations), Young expressed his frustration as to Nobilis's "terrible" numbers: "I am out of ideas here. I can really use your help about what to do to figure out if we have an issue and how to turn this around. These numbers have been terrible for the past two weeks and we don't have good answers, much less a solution.  Can you help?"  Opp. App. Ex. 28, at DEFENDANTS_00001844.  Klein's response was not comforting: "Yes…I've been getting sick each day I open the file.…numbers 'seem bad'.  Let me gather some thoughts and send you some comments."  *Id.* at DEFENDANTS_00001843.  In reply, Young suggested:

> I think there is a real possibility that what has happened is that they are turning the current receivables faster but the aged amounts are not getting addressed. As a result, DSO [Days Sales Outstanding] doesn't change but collections drop because the volumes were lower in April/May and they have now been collected and they aren't collecting the older balances.  That is the best conclusion I can reach from the data they have provided. I will send you a deck they sent me.

*Id.*  The deck to which Young referred laid blame for the collection shortfall on reduced payments from insurance companies—an explanation that in Young's view "doesn't hold water for a variety of reasons…."  Opp. App. Ex. 76, at NOB.EML_00191686 (forwarding slide deck to Klein).

The Management Report for the week of September 21, 2017 was circulated the next day to Defendants Moreno, Young, Fleming, Efird and Rodriguez, reporting an estimated budget shortfall of approximately $16.4 million for the last month of Q3.  *See* Opp. App. Ex. 30, at DEFENDANTS_00008039.  On September 25, 2017, Young forwarded the report to Patrick Yoder (the Company's Chief Revenue Officer) and Efird, copying Moreno: **"Do we believe these numbers?  Looks bad."**  *Id.*, at DEFENDANTS_00008037 (emphasis added).

---

of adjustments as last time."  Young forwarded Moreno's comments to Efird.  Opp. App. Ex. 27, at DEFENDANTS_00000907.

As Q3 was ending and the closing dated for the Term B Loan was approaching, Defendants panicked.  On September 28, 2017, Will Simpson, Nobilis's Director of Finance, circulated his updated revenue estimate spreadsheet to Young and Moreno (and others):

> See attached. This should be more indicative of where we anticipate to land for the Q. I have us around $59.4M.
>
> I was conservative on anticipated AR adj's ($1-1.5M) based on the cash collected to date in comparison to same time last month.

Opp. App. Ex. 31, at DEFENDANTS_00000899.[15]

Approximately three hours later, Young forwarded Simpson's updated Q3 revenue estimate to Moreno with a question: "Brandon – can you comment on this? Just curious what you think."  Opp. App. Ex. 27, at DEFENDANTS_00000907.

Moreno's response both confirmed the bad news and hatched the plan to cook the books— that is, using accounting tricks to make Nobilis's financial results look better than they really were through manipulating the value of aging AR:

> I was talking it through with Will before he dug in.  Unfortunately I think it's going to come close to this.
>
> [. . .]
>
> All this being said, I think we may be able to stretch it 60 but before that's official, I want to dig in deep to DSO [Days Sales Outstanding] at each facility and the individual agings to see what % of total AR is over 150-180-210 etc.
>
> End of the day, lowest volumes all year and we were heading that way before any hurricane hit. Only difference this Q is collections weren't strong so we couldn't bank on as large of adjustments as last time.

---

[15]    Under the Company's SOX Narratives, ████████████████████████████████
████████████████████████. *See* Opp. App. Ex. 32, at Nobilis_00222818; Opp. App. Ex. 33 (Simpson Dep. Tr. at p. 31).

*Id.*[16]

Shortly after 10 p.m. the same evening, Young sent the revenue estimates and analyses to Efird with the bad news that, based on the estimates, the Company would have to report negative EBIDTA for Q3, but indicated that he would continue to "work with Brandon [Moreno] on this." Opp. App. Ex. 31, at DEFENDANTS_00000899.  At 11:14 p.m., Yoder confirmed that "Without adjustments, we're close to $60MM for Q."  Opp. App. Ex. 35, at DEFENDANTS_00008070.

Young and Yoder met on October 3, 2017 to review the revenue estimates.  *See id.* at DEFENDANTS_00008072 (9/28/2017 email indicating Young and Yoder "are meeting on Tuesday [10/3/2017] to review Q3 and project revenue for Q4").  That same day, a revised spreadsheet containing materially upsized revenue estimates for Q3 and Q4 revenue projections was emailed among Young, Efird, and Yoder, as well as printed out and delivered to Fleming in his office.  *See* Opp. App. Ex. 36 (Email from Yoder to Young sent 10/3/2017 at 2:04 PM, Subject "Q4 Revenue Projections.xlsx," attaching a spreadsheet containing the original Q3 revenue estimates, the upsized Q3 revenue estimates, and Q4 revenue projections); Opp. App. Ex. 37 (Email from Efird to Fleming's executive assistant, Ashley Gillaspia, sent 10/3/2017 at 2:58 PM, forwarding a spreadsheet containing the original Q3 revenue estimates, the upsized Q3 revenue estimates, and Q4 revenue projections, with direction to "Pp [please print] all tabs and bring to Harry's office"); Opp. App. Ex. 38 (Gillaspia reply email to Efird confirming that the materials were printed and given to Defendant Fleming).[17]

---

[16]  DSO was a metric to monitor accounts receivable collections.  *See* Opp. App. Ex. 1 (Young Dep. Tr. I at pp. 154, 158).  The metric "tells you how many days it takes to get paid based off date of service."  Opp App. Ex. 34 (Klein Dep. Tr. at p. 34).  If a service was performed on January 1 and payment was received on February 1, the days sales outstanding would be 31 days.  *Id.*

[17]  As CEO, Fleming received financial reports from his team on a regular basis and his "focus" was on top-line revenues, EBITDA, the "bottom line," and other metrics.  Opp. App. Ex. 4 (Fleming Dep. Tr. I at pp. 79, 81-82).

A comparison of Simpson's original Q3 revenue estimate with that of the revised Q3 upsized revenue estimate reveals a material revenue estimate increase from $59,419,270 to $65,000,000. *See* Opp. App. Ex. 36, at NOB.EML_00113580_000001. The $65,000,000 is an arbitrarily invented number that was dropped into the revised revenue estimates in the line titled "AR Adjustments." *Id.*; *see also* Opp. App. Ex. 37, at DEFENDANTS_00000934. The $65 million revenue estimate was phony and contrived, as was Defendants' post-hoc reliance on the inclusion of 365+ AR to goose-up reported revenue.

The following shows the comparison of the original revenue estimate of $59,419,270 to the upsized revenue estimate of $65,000,000:

### ORIGINAL REVENUE ESTIMATE

|  | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 |  |  |  |  |  |  |  |  |
| 2 |  |  |  |  |  |  |  |  |
| 3 |  | Est. Q3 2017 | Contribution % |  |  |  |  |  |
| 4 | SOURCE |  |  |  |  |  |  |  |
| 5 | PHYSICIAN CONTRACTING | 22,803,640 | 38.4% |  |  |  |  |  |
| 6 | LRM | - | 0.0% |  |  |  |  |  |
| 7 | EXTERNAL MARKETING | 3,373,528 | 5.7% |  |  |  |  |  |
| 8 | DTC | 16,568,106 | 27.9% |  |  |  |  |  |
| 9 | PARTNER | 6,059,060 | 10.2% |  |  |  |  |  |
| 10 | ATHAS-ANCILLARY | 3,031,493 | 5.1% |  |  |  |  |  |
| 11 | PARTNER-ANCILLARY | 753,634 | 1.3% |  |  |  |  |  |
| 12 | CLINIC | 6,829,810 | 11.5% |  |  |  |  |  |
| 13 |  |  |  |  |  |  |  |  |
| 14 | Total | 59,419,270 | 100.0% |  |  |  |  |  |
| 15 |  |  |  |  |  |  |  |  |
| 16 | *based on cash collected MTD Sept in comparison to prior months, est. AR adjustments for Sept. from $1-1.5M* |  |  |  |  |  |  |  |

Opp. App. Ex. 31, at DEFENDANTS_00000902.

**UPSIZED REVENUE ESTIMATE**

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | |
| 2 | | | | | | | | | | | |
| 3 | | Est. Q3 2017 | Contribution % | | | | | | | | |
| 4 | SOURCE | | | | | | | | | | |
| 5 | PHYSICIAN CONTRACTING | 22,803,640 | 38.4% | | | | | | | | |
| 6 | LRM | - | 0.0% | | | | | | | | |
| 7 | EXTERNAL MARKETING | 3,373,528 | 5.7% | | | | | | | | |
| 8 | DTC | 16,568,106 | 27.9% | | | | | | | | |
| 9 | PARTNER | 6,059,060 | 10.2% | | | | | | | | |
| 10 | ATHAS-ANCILLARY | 3,031,493 | 5.1% | | | | | | | | |
| 11 | PARTNER-ANCILLARY | 753,634 | 1.3% | | | | | | | | |
| 12 | CLINIC | 6,829,810 | 11.5% | | | | | | | | |
| 13 | | | | | | | | | | | |
| 14 | Total | 59,419,270 | 100.0% | | | | | | | | |
| 15 | | | | | | | | | | | |
| 16 | *based on cash collected MTD Sept in comparison to prior months, est. AR adjustments for Sept. from $1-15M | | | | | | | | | | |
| 17 | | | | | | | | | | | |
| 18 | SOURCE | Est Q3 | Q4 Baseline Growth | | Contribution % | | Q1 | Q2 | Q3 | Q4 | 2017 |
| 19 | | | | | | | 68 | 76.9 | 65 | 102 | 311.9 |
| 20 | PHYSICIAN CONTRACTING | 22,803,640 | 50% | 34,205,459.42 | 40.9% | | | | | | |
| 21 | LRM | - | | | | | | | | | |
| 22 | EXTERNAL MARKETING | 3,373,528 | 20% | 4,048,233.33 | 4.8% | | | | | | |
| 23 | DTC | 16,568,106 | 45% | 24,023,753.64 | 28.7% | | | | | | |
| 24 | PARTNER | 6,059,060 | 30% | 7,876,778.19 | 9.4% | | | | | | |
| 25 | ATHAS-ANCILLARY | 3,031,493 | 20% | 3,637,791.58 | 4.4% | | | | | | |
| 26 | PARTNER-ANCILLARY | 753,634 | 20% | 904,360.57 | 1.1% | | | | | | |
| 27 | CLINIC | 6,829,810 | 30% | 8,878,752.46 | 10.6% | | | | | | |
| 28 | | | | | | | | | | | |
| 29 | Total | 59,419,270 | | 83,575,129.18 | 100.0% | | | | | | |
| 30 | AR Adjustments* | 65,000,000.00 | | $ 90,000,000.00 | | | | | | | |
| 31 | New Sales | | | | | | | | | | |
| 32 | Houston | | | $ 3,637,500.00 | | | | | | | |
| 33 | Dallas | | | $ 1,562,300.00 | | | | | | | |
| 34 | Arizona | | | $ 2,456,980.00 | | | | | | | |
| 35 | | | | | | | | | | | |
| 36 | New Initiatives | | | $ 11,659,000.00 | | | | | | | |
| 37 | | Q3 | | Q4 | | | | | | | |
| 38 | | 65,000,000.00 | | $ 109,315,780.00 | 174,315,780.00 | | | | | | |
| 39 | | | | | | | | | | | |

Opp. App. Ex. 37, at DEFENDANTS_00000934 (Highlighting added).

Undermining the credibility of the prior day's $65,000,000 Q3 revenue estimate, Simpson emailed an "update" to Moreno on October 4, 2017, commenting "I think we'll be lucky to get to just above 60M.  I have concerns around BSH as I had to push just to reduce a negative adjustment."  Opp. App. Ex. 80.  Moreno forwarded the update to Young, whose response suggested that he would not let the financial facts get in the way of reporting better numbers: "Just to you.  Not looking good but still work to do. More to come."  Opp. App. Ex. 41.

Needing to reverse engineer $65 million in Q3 revenue, Defendants turned to accounting chicanery—in particular, including 365+ AR instead of writing it off in accordance with the SOX Narratives and Company policy.  Two weeks earlier, on September 20, 2017, Young had emailed

Yoder criticizing Nobilis's outside collection agency ASD and considering whether to include, rather than to write off 365+ AR:

> See below for the receivable aging.  You will note that ½ of the receivables (~$5MM) are over 150 days old. Of this amount, $3.8MM is over 240 days or 8 months. As these amounts go over 360 days we will need to evaluate their collectability and make a decision on whether to drop them from our calculations.  The first window of that is $893K.
>
> …We simply cannot afford for them to ignore $4MM that is 8 months old.

Opp. App. Ex. 42, at DEFENDANTS_00008769.  This email was forwarded to Moreno on October 5, 2017.  *See id.* at DEFENDANTS_00008768-69.

On October 6, 2017, Moreno emailed Young, Efird, and others an upsized "Q3 Revenue and AR Summary (10.6.17).xlsx"—which magically reported Q3 revenues of "$64.8MM."  Opp. App. Ex. 43, at NOB.EML_00191339.  To contrive the $65 million that avoided reporting negative EBIDTA for Q3, Moreno relied on "AR Adjustments"—and it was no coincidence that the $64.8 million revenue number in Moreno's October 6 spreadsheet came within a hair of the $65 million revenue number presented to Fleming on October 3.  *See* Opp. App. Ex. 37.  It was also no coincidence that Moreno's October 6 revenue figure of $64.8 million is within a hair of the $64.652 million of revenue reported by Nobilis in its Form 10-Q For the quarter ended September 30, 2017, which was filed on November 6, 2017 and certified by Young as CFO and Fleming as CEO.  *See* Opp. App. Ex. 55, at p. 12.

Moreno's upsized revenue estimate achieved the target by including more than $11 million of 365+ AR in the revenue calculation, which increased net income and EBITDA (and the reported value of AR).  A comparison of Nobilis's Form 10-Q for the period ending September 30, 2017 (Q3), with a Company-prepared AR aging report (covering six quarters ending March 31, 2017 to

June 30, 2018) establishes that Defendants included $11,568,877 of 365+ AR in its financial statements for 2017 Q3. Specifically, the Company's 10-Q for 2017 Q3 reported "Trade accounts receivable" in the rounded amount of $112,402,000. *See id.* at pp. 3, 14. However, an "Accounts Receivable Aging" report prepared by the Company as of June 30, 2018—███████████████

████████████████████████████████████████████████

███████████████████



Opp. App. Ex. 45, at Nobilis_00407947 ████████████████████████

██████████████████████████████; *see also* Opp. App. Ex. 77, at Nobilis_00456202 (10/26/18 email from Moreno to BBVA Executive VP Jason Consoli and others, with attachment indicating same).[18]

Rather than following Nobilis's historical practice and SOX Narrative of writing down to

---

[18]    The AR aging report was provided by the Company to BBVA in the fall of 2018 as part of Nobilis's efforts to borrow more money. ████████████████████████████████

████████████ Opp. App. Ex. 45, at Nobilis_00407945. Consoli's email further described how Nobilis's management misled BBVA about the reasons for the "accounting move" and the collectability of the 365+ AR—which turned out to be false, given that the 365+ AR was uncollectable and needed to be written down. *See id.*

$0 365+ AR, the Company's 2017 Q3 financials, its 2017 Form 10-K financials and subsequent financials and public filings included 365+ AR and assumed that, on average, the Company would collect 75% of these old receivables. *See, e.g.*, Opp. App. Ex. 1 (Young Dep. Tr. I at pp. 78-80); Opp. App. Ex. 46, at DEFENDANTS_0000724 (Edwards email dated 3/3/2018, "Looking forward into Q1 and Q2, 2018, since the Company changed their accounts receivable /revenue estimate to include over 365 day claims then you should re-visit the discount rate because it currently stops at 25% at the 365 mark."). In reality, the Company had no historical experience to support any such assumption, and ample experience to establish the opposite. *See, e.g.*, *id.* (discussing lack of support for the 365+ AR policy); Opp. App. Ex. 47], at DEFENDANTS_00004762 (email dated 2/26/18 from Crowe National Partner Todd Spaanstra to Young, Moreno, and Crowe partners, "The cash waterfall does not entirely support the company's premise that it has had 'success' in collecting these old amounts. I see generally 1% to 3% of revenue collected beyond 1 year for these 4 [hospitals reporting $13.6M of 365+ AR]"); *see also* Opp. App. Ex. 1 (Young Dep. Tr. I at pp. 181-182) (Young testimony that he is not aware of any data sets submitted to Crowe showing a collection rate higher than 1% to 3%).

Nor was the AR adjustment informed contemporaneously with any analysis which would support reversal of the historical (and SOX Narrative) policy requiring the write down to $0 of 365+ AR. The critical accounting policy change was made in the third quarter of 2017,[19] yet there was no analysis, analytics, or testing supported by data that was performed contemporaneously to support that change. *See, e.g.*, Opp. App. Ex. 78 (Moreno Dep. Tr. II at p. 98 ("Q. And you . . . can't identify any documentation that you may have prepared back in connection with the third

---

[19]     *See, e.g.*, Opp. App. Ex. 1 (Young Dep. Tr. I at pp. 70, 75-76); Opp. App. Ex. 14 (Moreno Dep. Tr. I at p. 75).

quarter of 2017, correct?    A.  To my recollection, no, nothing comes to mind."); *see also* Opp.

App. Ex. 14 (Moreno Dep. Tr. I at p. 101). ██████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████████████. *See* Opp. App. Ex. 81 (February 2018 Memo); Opp. App. Ex. 78 (Moreno

Dep. Tr. II at pp. 96-98) (Moreno's testimony confirming that the February 2018 memo was

prepared at Crowe's request).  Since the February 2018 Memo discusses ██████████████

████████████████████████████████████████████████████████████████████████████████

██████████. *See, e.g.*, Opp. App. Ex. 81, at pp. 2, 5, 7.  It is clear that management made the

change without support, and then five months later searched for support to defend it.[20]  By the time

Defendant Moreno updated the February 2018 Memo for the third quarter of 2018, it indicated in

the "Resolution" section at the end of the memorandum that Nobilis would be returning to the

policy of reducing significantly aged receivables to a net zero-dollar value—further confirming

that there was no basis to change the policy in the first place.  *See* Opp. App. Ex. 29, at

DEFENDANTS_00004927 (updated memo dated October 31, 2018, concluding that Nobilis

would return to the policy of reducing significantly aged receivables to a net zero-dollar value).

The cooked financials not only misled the public, who relied on them to transact business

---

[20] ████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████. *See* Opp. App. Ex. 83 (Devor Report), at

¶¶ 92-95. ███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████). *Id.* at ¶ 95.

with the Company, they were used effectively to dupe BBVA into closing the Term B Loan. On October 16, 2017, Moreno sent BBVA Nobilis Q3 2017 financial statements that included $11.5 million in 365+ AR, but failed to disclose the reversal of the Company's critical accounting policy and historical practice of writing down to $0 365+ AR. *See* Opp. App. Ex. 48, at BBVA_00036252, BBVA_00036253_000001-02 (reporting $112,402,000 in trade accounts receivable and $64,652,000 of total revenue, the same numbers reported in the Company's Form 10-Q for Q3 2017).[21]

Adding in the 365+ AR avoided a covenant breach under the applicable Credit Agreement. *See, e.g.*, Opp. App. Ex. 49 (Younger Dep. Tr. at p. 40) (testimony of BBVA's Director for Corporate and Syndicated Finance that █████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████; Opp. App. Ex. 51 (McCurdy Dep. Tr. at pp. 449-50) (testimony of BBVA Senior Vice President that "if they had omitted their over 365 AR, they would have been in default for the third quarter of 2017 under both [the fixed charge coverage ratio and leverage ratio]" under the credit facility). ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████,

---

[21] Two days after Moreno sent these financials to BBVA, Fleming was touting the Company's stellar financial performance to third parties as compared to 2016 Q3, using the phony 2017 Q3 financials. Opp. App. Ex. 53 (10/18/2017 email from Fleming, "We are just finalizing our Q3 numbers (ebitda up 45% over Q3 2016).").

[22] Once operations were back to normal, Nobilis's management expected to capture this revenue in 2017 Q4, as nearly all of the impacted appointments and procedures were rescheduled. *See infra* Section II.J.3.

████████████████████████████████████████████████

*See* Opp. App. Ex. 84, at Item 4 █████████████████ Opp. App. Ex. 85, at p. 1

██████████████████████████████████████ Opp. App. Ex. 77, at

Nobilis_00456202 █████████████████████ *see also* Opp. App. Ex. 86 (Devor

Rebuttal Report), at ¶¶ 13-14.[23]

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████ *See* Opp. App. Ex. 49 (Younger Dep. Tr. at

pp. 31-36, 40); Opp. App. Ex. 50 (Consoli Dep. Tr. at pp. 29, 43-44, 53-54, 74-76, 112-114, 120-

123) (testimony of BBVA Executive Vice President); Opp. App. Ex. 51 (McCurdy Dep. Tr. at pp.

113-115, 447-450, 507).

### G. Material Misstatements and False Certifications Made In Connection With Nobilis's Financial Statements

The critical accounting policy change concerning 365+ AR was not disclosed in the

Company's Form 10-Q for 2017 Q3:

> Q. ...Can we agree that the company's financial statements for the third quarter of 2017 retained a portion of 365 plus AR for certain facilities?
>
> A. Yes, sir.
>
> **Q. And can we agree that the company's 10-Q for the third quarter of 2017 did not disclose that there had been a change as to how the company dealt with 365 plus AR?**
>
> **A. That's correct.**

---

[23] ████████████████████████████████████████████

████████████████████ *See* Opp. App. Ex. 86 (Devor Rebuttal Report), at ¶ 15; Opp. App. Ex. 85, at p. 1 ██████████████████████████ Opp. App. Ex. 77, at Nobilis_00456202 ██████████████████████████████

Opp. App. Ex. 78 (Moreno Dep. Tr. II at p. 72) (emphasis added). The Form 10-Q and the publicly filed financial statements were false and misleading in material respects because the inclusion of 365+ AR resulted in material misstatements of revenue, income, and the value of accounts receivable. *See* Opp. App. Ex. 83 (Devor Report), at ¶ 111 ("[A]ny adjustments Nobilis made to the carrying value of accounts receivable reported on its balance sheet . . . would also directly impact reported revenue. . . . Accordingly, as a result of . . . failing to write-down the net realizable value of 365+ AR to a net zero-dollar value, there was a direct impact on the amount of revenue reported. . ."). Moreover, "Note 2—Summary of Significant Accounting Policies" of the Form 10-Q falsely represented that "There have been no material changes to the Company's critical accounting policies or estimates from those disclosed in the 2016 Annual Report." Opp. App. Ex. 55, at p. 7.

Indeed, *all* financial statements included in Nobilis's quarterly Forms 10-Q and annual Form 10-K filed during the period November 6, 2017 through August 3, 2018 were materially misstated because they overstated the net realizable value of 365+ AR. *See* Opp. App. Ex. 83 (Devor Report), at ¶¶ 8(a)-(e), 112. Nobilis should have restated its Forms 10-Q for 2017 Q3, 2018 Q1, and 2018 Q2, as well as its Form 10-K for 2017—but no such restatements were ever filed. *See id.* at ¶¶ 104, 119; *infra* Section II.I.

## 1.    Third Quarter 2017 Form 10-Q

In the Form 10-Q for the third quarter of 2017 (filed November 6, 2017), Nobilis improperly included approximately $11.6 million of 365+ AR in reported accounts receivable as of September 30, 2017. *See* Opp. App. Ex. 55, at pp. 3, 14 (Form 10-Q for 2017 Q3, reporting $112.4 million in trade accounts receivable); *see also, e.g.*, Opp. App. Ex. 77, at Nobilis_00456202 (document confirming ███████████████████████████████████████

By doing so, Nobilis failed to comply with U.S. GAAP and materially misstated its

financial statements for the nine-month and three-month periods ending September 30, 2017:

> Specifically, (1) accounts receivable was overstated by 10%, (2) patient and net professional fee revenue for the nine-months ended September 30, 2017, was overstated by 6.1%, (3) total revenue for the nine-months ended September 30, 2017 was overstated by 5.7% and (4) Nobilis improperly reported approximately $1.7 million of income before taxes and noncontrolling interest for the nine-months ended September 30, 2017 instead of **loss** of approximately $9.9 million.

Opp. App. Ex. 83 (Devor Report), at ¶ 113; *see also id.* at ¶ 113 n. 105 (setting forth misstatements

for three-month period ending September 30, 2017).

In February 2018, during Crowe's 2017 audit, Lockhart informed Nobilis's management

that the change to include 365+ AR should  have been disclosed in the Form 10-Q for 2017 Q3,

as well as in the 2017 Form 10-K (which at that point had not been filed yet).  *See* Opp. App. Ex.

19, at DEFENDANTS_00008794 (2/28/18 email to Young and Moreno, "We need to discuss

why the policy change and the impact wasn't disclosed in Q3 and also that these items should be

disclosed in the 10K.").  Young forward the email to Rodriguez and Moreno, asking "I thought

we did talk to them about this in Q3? Or is she referencing a disclosure in the 10Q?" *Id.*  Moreno

replied, "[Lockhart] said it should've been disclosed in Q3 that we extended our date range

('policy change') and surely need to have a disclosure in our 10k.  Similar to last year's disclosure,

it should cover what changed, why it changed and the impact of the change."  *Id.* at

DEFENDANTS_00008793.   The failure to disclose the material accounting policy change

concerning 365+ AR in the Form 10-Q for 2017 Q3 violated applicable SEC regulations—

specifically, Item 303 of Regulation S-K.  Opp. App. Ex. 83 (Devor Report), at ¶¶ 119-20.[24]

---

[24]     In his expert report, Mr. Devor explains that the adjustments concerning 365+ AR were an error, *not* a "change in estimate" as some of the Defendants have asserted.  *See* Opp. App. Ex. 83

### 2.    2017 Form 10-K

In Nobilis's Form 10-K for 2017 (filed March 12, 2018), Nobilis improperly included approximately $21.3 million of 365+ AR in reported accounts receivable as of December 31, 2017. *See* Opp. App. Ex. 2, at p. 43 (2017 Form 10-K, reporting "Accounts receivable as of December 31, 2017, totaled $144.5 million..."); Opp. App. Ex. 77, at Nobilis_00456202 (AR aging report, ██████████████████████████.[25]  By doing so, Nobilis failed to comply with U.S. GAAP and materially misstated its financial statements as of and for the year ended December 31, 2017:

> Specifically, (1) accounts receivable was overstated by 15%, (2) patient and net professional fee revenue for 2017 were overstated by 8.1%, (3) total revenue for 2017 was overstated by 7.6% and (4) income before taxes and noncontrolling interest for 2017 was overstated by 1053%.

Opp. App. Ex. 83 (Devor Report), at ¶ 114.  "This $21.3 million of 365+AR was also material because it reflected an increase of approximately 84% from the 365+AR outstanding as of September 30, 2017."  *Id.* at ¶¶ 114-15; *see also* Opp. App. Ex. 47, at DEFENDANTS_00004762 (2/26/18 email from Spaanstra concerning 365+ AR, "These are big numbers, on top of an accounting policy change – so lots to consider in a short period of time.")

---

(Devor Report), at ¶¶ 46, 104, 119.  However, even if the policy change is considered a "change in estimate" as defined by GAAP, then it was still required to be disclosed under GAAP (specifically, ASC-250-10-50-4) because it had material effects on income from continuing operations, net income, and per share amounts. *See id.* at ¶ 119.

[25]    The Audit Committee signed off on the financial statements in the 2017 Form 10-K. *See* Opp. App. Ex. 87 (Schedule 14A filed 4/30/2018), at pp. 33-35 (Report of the Audit Committee, stating "Based on its review, the Audit Committee recommended to the Board that the audited financial statements for the Company's year ended December 31, 2017 be included in our Annual Report on Form 10-K for the year ended December 31, 2017...which was filed on March 12, 2018.") (submitted by all committee members, including Ozonian as Chairman).

The Form 10-K for 2017 contained a footnote called "Summary of Significant Accounting Policies" which, in a purported effort to disclose the change in accounting policy, stated:

> On a periodic basis, we evaluate receivables based on the age of the receivable, history of past collections and current credit and economic conditions and adjust the carrying amount accordingly. An account is written off when it is determined that all collection efforts have been exhausted. . . . An allowance for uncollectible patient receivables balances, including receivables from non-partner surgeons, is maintained at a level which the Company believes is adequate to absorb probable credit losses.

Opp. App. Ex. 2, at p. 53.  However, this disclosure was still false and inaccurate, because it does not faithfully represent how management was evaluating the collectability of receivables and continues to fail to disclose, in violation of GAAP, the material change in how it accounted for 365+ AR.[26]  It also fails to properly describe, in violation of Item 303 of Regulation S-K, that a significant component of revenue resulted from the change in accounting policy.  *See* Opp. App. Ex. 83 (Devor Report), at ¶¶ 125-26.

### 3.    First Quarter 2018 Form 10-Q

In the Form 10-Q for the first quarter of 2018 (filed May 8, 2018), Nobilis improperly included approximately $32.1 million of 365+ AR in reported accounts receivable as of March 31, 2018.  *See* Opp. App. Ex. 88, at p. 3, 13 (Form 10-Q for 2018 Q1, reporting trade accounts

---

[26]    Management was not analyzing age, collection history, current conditions, or other factors in deciding whether to continue carrying receivables; rather, they were applying a blanket 25% discount which, as Crowe pointed out just days before the 2017 Form 10-K was filed, was unsupported by historical data.  *See* Opp. App. Ex. 47, at DEFENDANTS_00004762 (2/26/18 email from Spaanstra to Young, Moreno, and others, discussing lack of historical data showing old amount were collectible, and noting "the old methodology appeared to working effectively and not understating revenue"); Opp. App. Ex. 46, at DEFENDANTS_00000724 (3/3/18 email from Edwards Moreno, Young, Rodriguez, and others, discussing lack of historical data and advising management to rethink their current 25% discount rate).  Furthermore, continuing to carry 365+ AR on the books violated the SOX Revenue Recognition Narrative requiring they be written down to $0—a policy which remained in effect and had not been suspended or reversed by the Audit Committee.  *See* Opp. App. Ex. 52 (Ozonian Dep. Tr. at pp. 49-50).

receivable totaling $133,362,000); Opp. App. Ex. 77, at Nobilis_00456202 (AR aging report,

██████████████████████████████████ By doing so, Nobilis failed to comply with

U.S. GAAP and materially misstated its financial statements as of and for three-months ended

March 31, 2018:

> Specifically, (1) accounts receivable were overstated by 24%, (2)
> patient and net professional fee revenue for the three-months
> ended March 31, 2018, were overstated by 102.4%, (3) total
> revenue for the three-months ended March 31, 2018, was
> overstated by 99.4% and (4) the **loss** before taxes and
> noncontrolling interest for the three-months ended March 31,
> 2018, was understated by 836%.

Opp. App. Ex. 83 (Devor Report), at ¶ 116. The $32.1 million of 365+ AR was material because

it reflected a 51% increase over 2017 Q4, and a 178% increase over 2017 Q3. *Id.*

The Form 10-Q for 2018 Q1 states that "There have been no material changes to the

Company's critical accounting policies or estimates from those disclosed in the 2017 Annual

Report." Opp. App. Ex. 88, at p. 6. This disclosure was false and misleading, since the

disclosures in the 2017 Form 10-K annual report continued to be false and misleading. *See* Opp.

App. Ex. 83 (Devor Report), at ¶¶ 127-28.

### 4.    Second Quarter 2018 Form 10-Q

In the Form 10-Q for the second quarter of 2018 (filed August 3, 2018), Nobilis

improperly included approximately $38.75 million of 365+ AR in reported accounts

receivable as of June 30, 2018. *See* Opp. App. Ex. 79, at pp. 3, 14 (Form 10-Q for 2018 Q2,

reporting trade accounts receivable totaling $143,699,000); Opp. App. Ex. 77, at

Nobilis_00456202 (AR aging report, ██████████████████████ By doing

so, Nobilis failed to comply with U.S. GAAP and materially misstated its financial statements

as of and for three months ended June 30, 2018:

35

> Specifically, (1) patient and net professional fee revenue for the three-months ended June 30, 2018, was overstated by 150.6%, [2] total revenue for the three-months ended June 30, 2018 was overstated by 127.3% and [3] reported income before taxes and noncontrolling interest for the three-months ended June 30, 2018 of $2.2 million should have been a **loss** of approximately $36.5 million.

Opp. App. Ex. 83 (Devor Report), at ¶ 117.  The $38.75 million of 365+ AR was material because it represented an increase of 21% over 2018 Q1, 82% over 2017 Q4, and 235% over 2017 Q3.  *Id.*

The Form 10-Q for the second quarter of 2018 again states that "There have been no material changes to the Company's critical accounting policies or estimates from those disclosed in the 2017 Annual Report."  Opp. App. Ex. 79, at p. 7.  This disclosure was false and misleading, since the disclosures in the 2017 Form 10-K annual report continued to be false and misleading. *See* Opp. App. Ex. 83 (Devor Report), at ¶¶ 130-31.

### 5.      False SOX Certifications Provided By Fleming and Young

Defendants Fleming and Young provided false SOX certifications for the Forms 10-Q for 2017 Q3, 2018 Q1, and 2018 Q2, and the Form 10-K for 2017.  In this regard, Fleming (as CEO) and Young (as CFO) certified for each filing that Nobilis had designed and maintained effective "disclosure controls and procedures" and "internal control over financial reporting," that Nobilis's financial reporting was reliable and accurate, and that the financial statements were prepared in accordance with U.S. GAAP.  *See*:

- 2017 Q3 Form 10-Q filed 11/6/2017: Opp. App. Ex. 55, at Exhibits 31.1 and 32.1 (Fleming certifications) and Exhibits 31.2 and 32.2 (Young certifications);

- 2017 Form 10-K filed 3/12/2018: Opp. App. Ex. 2, at Exhibits 31.1 and 32.1 (Fleming certifications) and Exhibits 31.2 and 32.2 (Young certifications);

- <u>2018 Q1 Form 10-Q filed 5/8/2018</u>: Opp. App. Ex. 88, at Exhibits 31.1 and 32.1 (Fleming certifications) and Exhibits 31.2 and 32.2 (Young certifications); and

- <u>2018 Q2 Form 10-Q filed 8/3/2018</u>: Opp. App. Ex. 79, at Exhibits 31.1 and 32.1 (Fleming certifications) and Exhibits 31.2 and 32.2 (Young certifications).

Given the material misstatements and omissions, these sworn certifications were false.  *See* Opp. App. Ex. 83 (Devor Report), at ¶¶ 132-34.

> **H.**    **Deficiencies in Crowe's Quarterly Review Procedures and Audits**

Edwards testified that she learned about the reversal of the critical accounting policy and historical practice of writing down to zero 365+ AR for purposes of the Company's financial statements public filings when it began work on the audit for Nobilis's Form 10-K for 2017, which was filed March 12, 2018.  *See* Opp. App. Ex. 89 (Edwards Dep. Tr. II at pp. 37-43) (Edwards testimony that ████████████████████████████████████████████ ████; *see also* Opp. App. Ex. 17 (Lockhart Dep. Tr. at pp. 31-32, 57) (Lockhart testimony that █████████████████████████████████████████████; Opp. App. Ex. 47, at DEFENDANTS_00004762 (2/26/18 email from Spaanstra discussing 365+ AR, "These are big numbers, on top of an accounting policy change . . . Obviously this is a new concept and we were just made aware of this just a little while ago.").

*However*, Crowe had received aging schedules earlier than that—during its 2017 Q3 quarterly review—which indicated that 365+ AR was being included in the financials.  *See, e.g.*, Opp. App. Ex. 90 (Q3 AR analysis ████████████████████████████████ And Edwards also testified ██████████████████████████████████████ ████████████████████████████████████.  *See* Opp. App. Ex. 15 (Edwards Dep. Tr. I at p. 50-51).

The Trustee's expert examined Crowe's workpapers pertaining to its quarterly reviews and

2017 audit ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████  *See* Opp. App. Ex. 83 (Devor Report), at ¶ 135.  ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

*See id.*; *see also, e.g.*, Opp. App. Ex. 65, at CROWE0002636, Items 15 and 17 (2017 Q3 client

inquiry workpaper ████████████████████████████████████████████

█████████████████████████████; Opp. App. Ex. 82 (concerning 2017 Q3 review testing,

█████████████████████████████; Opp. App. Ex. 91 (Summary and Evaluation of

Deficiencies workpaper for 2017 Year End, ████████████████████████████████

For Crowe's 2017 year-end audit, ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████. *See* Opp. App. Ex. 83

(Devor Report), at ¶ 135; *see also* Opp. App. Ex. 18 (Lockhart memo to file re: "AFDA and

Lookback Analysis," ███████████████████████████████████████

██████████████████  As collections further deteriorated in the first and second quarters of

2018, █████████████████████████████████████████ █████████████████

---

[27]    *See* Opp. App. Ex. 83 (Devor Report), at ¶ 135. ██████████████████████████████
████████   ████████   ███   ███   ████████   ████████   ████████ (*see* Opp. App. Ex. 81, at
DEFENDANTS_00004875), but purposely left it out of his April 2018 update to the memo

███████████████████████████████████████████████████████

███████████████████████████████████████████████. *See*

Opp. App. Ex. 83 (Devor Report), at ¶ 135 (discussing Opp. App. Exs. 92 and 93).

The meeting minutes of an Audit Committee meeting held on March 7, 2018██████

███████████████████████████████████████████████████████

*See* Opp. App. Ex. 95 (Minutes of Audit Committee Meeting Held March 7, 2018, the attendees

of which included, *inter alia*, Ozonian, Fleming, Young, Rodriguez, Moreno, Lockhart, and

Edwards; ████████████████████████████████████████████

███████████████████████████ (emphasis added).  The meeting minutes of the

Audit Committee's May 7, 2018 ████████████████████████████████

████████████████████████████. *See* Opp. App. Ex. 92 (Minutes of Audit

Committee Meeting Held May 7, 2018, the attendees of which included, *inter alia*, Ozonian as

"Chair" and Edwards, Lockhart, and Spaanstra from Crowe).  The "Auditor Report" from Crowe

reflected in the minutes included the following:



---

because the results were unfavorable.  *See* Opp. App. Ex. 94 (4/25/18 email from Moreno to Young
attaching draft of updated memo and noting "I didn't include a sub-cash update as it turned
unfavorable due to recoups at NHSC-S (currently negative 350k on 2016 AR)").

████████████████████████████████
███████████████████████████████.

*Id.* Despite this information, there is no evidence that Ozonian took action to ensure compliance with the policy requiring 365+ AR be written down to $0, and the Company continued to issue public filings—such as the 10-Q for 2018 Q2, filed in August 2018—containing misstatements as to 365+ AR.

In addition to these deficiencies and/or red flags identified above, Nobilis's management had an acrimonious relationship with Crowe. For example, in a board presentation regarding the Company's 2016 Key Accomplishments and the 2017 Strategic Plan, Fleming reported that he had "[b]attled with Crowe" to release 2016 third quarter numbers and in fact threatened Crowe with litigation to get them to "implicitly" approve the results. *See* Opp. App. Ex. 57, at NOB.EML_00138209 (listing as the first "Corporate/Management Highlight[]": "Battled with Crowe to release Q3: had to threaten Crowe with a lawsuit to release the Q3 results. By getting Crowe to formally comment on our 8K report . . . they implicitly approved the Q3 results so we quickly filed our 8K which put them in an untenable position to withhold the financials, forcing them to agree to the release"). At one point, Nobilis wanted to change auditors, but Crowe would not sign off on the change, and the Company decided it was not worth the time and cost to obtain a shareholder vote to change auditors. *See* Opp. App. Ex. 4 (Fleming Dep. Tr. I at pp. 135-36).

Nobilis's management regularly questioned Crowe's competency. For example, in a March 4, 2017 email discussing an upcoming meeting with Crowe, Defendant Rodriguez bragged:

> . . . I wish I had video taped our meeting with Crowe Audit Partner and Senior Manager. We blasted them on how terrible their team was, unprofessional "worst client service ever" and how their results are unfounded.
>
> It will be my pleasure to go Round 2 on them but if I can't go I'm confident Clayton [Kamin, Nobilis's Director of Internal Audit]

will make them his bitch.

Opp. App. Ex. 59, at NOB.EML_00455945_0001.   In another email concerning Crowe's

assessment of the Company's internal controls relating to revenue cycle controls and evaluation

of doubtful accounts, Rodriguez attacked Crowe's competence, expressed that the Crowe partners

working on the matter "d[id] not have the expertise or intelligence to conclude on [SOX

compliance] issues," and described a plan "to embarrass [Crowe] and make them our bitches."

Opp. App. Ex. 58, at DEFENDANTS_00005865 (3/12/17 email from Rodriguez to Young,

copying Kamin).[28]

### I.     **The Company's Collapse**

Collections were dismal throughout 2018 and 365+ AR increased.[29]   The Company missed

the filing deadline for its Form 10-Q for the third quarter of 2018.   *See, e.g.*, Opp. App. Ex. 96

(Form 8-K for 11/15/2018).   It filed a request for additional time and a Press Release reporting that

the Company and its auditor needed additional time to complete their review of the Company's

financial statements for the period.   *See* Opp. App. Ex. 66 (Form 8-K for 11/9/2018); Opp. App.

Ex. 67 (Press Release dated same).   The Press Release stated that "[t]he Company is re-evaluating

the Net Realizable Value on its Accounts Receivable and intends to make a significant adjustment

to the carrying value of accounts receivable, primarily on out of network claims greater than 365

days old….We are  deeply disappointed by the slow pace of our collection efforts that have

---

[28]     In June 2017, Young asked Crowe to resign, but ultimately kept Crowe as auditors after
Crowe refused to resign, because firing Crowe would have resulted in unpleasant SEC disclosures.
*See* Opp. App. Ex. 60, at NOB.EML_00133254_001-04 (June-July 2017 email discussion between
Young and Laura Edwards and Tom Jones of Crowe).
[29]     Nobilis's 365+ AR went from $11.6 million as of September 30, 2017 (10% of total AR)
to $20.4 million as of December 31, 2017 (14% of total AR), and then continued to grow through
2018, with 365+ AR totaling $26.2 million (20% of total AR) as of March 31, 2018, and $38.8
million (27% of total AR) as of June 30, 2018.  *See* Opp. App. Ex. 88 (2018 Q1 Form 10-Q), at p.
13; Opp. App. Ex. 79 (2018 Q2 Form 10-Q), at p. 14; Opp. App. Ex. 45, at Nobilis_00407947.

resulted in this impact to our receivables, which will have a significant negative impact on our financial results for 2018." *Id.*

By January 2019, Nobilis had identified ***$71.9 million*** in total accounts receivable which needed to be written off, pertaining to claims from 2016 ($22.3 million), 2017 ($37.05 million), and 2018 ($12.5 million).[30]  *See* Opp. App. Ex. 99, at NOB.EML_00094324_0038 (email dated 1/23/19 from Moreno to Daniel Wiggins, attaching presentation identifying $71.9 million in total AR write-down, with break down by year and footnote stating "AR policy changed made [sic] late 2017 whereby we no longer reserve at 100% AR >365 days is the primary drive of AR adjustment"); *see also* Opp. App. Ex. 100 (email dated 1/22/19 from Moreno to Wiggins stating that $49.6 million of the $71.9 million write down was "Due to change in > 365 policy"); Opp. App. Ex. 70, at DEFENDANTS_00003063 (BBVA Approval Request Memorandum dated 3/28/2019, attaching, *inter alia*, "Accounts Receivable Write-Off Summary").

In November 2018, Crowe had required Nobilis to hire a third-party to perform an "assessment on the change in estimate/error and views on fraud to ensure the timing of the proposed write offs are reflected in the appropriate period." Opp. App. Ex. 101 (11/30/2018 email from Edwards to Ken Klein, copying Moreno and others); Opp. App. Ex. 102 (11/29/2018 email from Klein to Ozonian, Fleming, Efird, Moreno, and others).  Nobilis retained Garcia & Longoria, and Joseph Longoria (Accountant) performed the assessment.  *See* Opp. App. Ex. 103 (Longoria Dep. Tr. at pp. 11-15); Opp. App. Ex. 104  (Engagement letter).  During the course of his work, Mr. Longoria shared various memoranda with Defendant Moreno which suggested, among other

---

[30]     At BBVA's insistence, the Company had engaged MorrisAnderson, a consulting and restructuring firm, in November 2018 to perform an assessment of Nobilis's financial condition and business enterprises.  *See* Opp. App. Ex. 97 (Wiggins Dep. Tr. at pp. 11-15). ██████████
████████████████████████

things, that there were errors in previously-filed financial statements and that a material weakness existed resulting in the revision to the 365+ AR Policy. *See* Opp. App. Ex. 105 (1/9/2019 email from Longoria to Nobilis's VP of Accounting Daniel Ramsier, copying Moreno and Klein and attaching "three draft memos for review"). For example, one of the memorandums prepared by Mr. Longoria concluded as follows:

### Conclusion

Management did not have an adequate history of collections of accounts > 365 days to use as a basis to develop a reasonable estimate of the net realizable value of the AR > 365 days. Besides a lack of quantitative history/experience, the Company, at December 31, 2017, did not factor the significant aging of receivables into the determination of the adjustment to net realizable value under the new policy. Generally, as claims get older, they are more difficult to collect, including working denials or finding data needed to clear denials with third-party payors. Additionally, with the move of the CBO in-house, there was no consideration related to issues or delays caused by the transition, which are encountered with such a significant change. Management at the time used collection rates on accounts receivable less than 365 days to estimate the net realizable value of the accounts receivable >365 days. Based on the information evaluated by Nobilis (quantitative and qualitative), collection of the >365 could not be reasonably assured at December 31, 2017. Therefore, there was a misapplication of revenue recognition by Nobilis at December 31, 2017 which resulted in an error in the financial statements.

Nobilis concludes therefore, to restate its December 31, 2017 financial statements and 10-K filing. This restatement is to reflect an appropriate estimate of the net realizable value of the accounts receivable > 365 days. Given the lack of basis for establishing the collectability at December 31, 2017, Management will adjust the net realizable value of these accounts receivable to zero and establish a policy that requires this going forward, until such time as an adequate basis to establish collectability can be determined. This policy will also be applied to any 2018 financial statements and SEC filings issued.

*Id.* at LONGORIA0000549.4 (Conclusion of Memo "Re: Identification of an Error and Accounting Treatment"). Another memorandum prepared by Mr. Longoria, concerning the

assessment of internal controls, concluded that a restatement of Nobilis's 2017 Form 10-K and

Forms 10-Q for 2018 Q1 and 2018 Q2 was necessary.  *See id.* at LONGORIA0000555.1-555.4.[31]

Concerning the internal controls, Mr. Longoria's memorandum stated the following:

### Control Failure

Nobilis changed its estimate process and reserve policy for accounts receivable >365 days at December 31, 2017.  There are three control failures that contributed to the error.

First, the process to evaluate this estimate failed to consider the valuation assertion as it relates to estimating the net realizable value of accounts receivable.  Nobilis utilized the same process it used for accounts receivable less than 365 days and did not design the process appropriately.   There should have been appropriate documentation of the change and approval by appropriate levels of management.

Secondly, the financial reporting process did not evaluate the change in policy / estimate under GAAP.  There should have been a control to identify the change in policy / estimate and to evaluate to ensure appropriate GAAP was applied.

Finally, the financial reporting process did not identify the requirement to disclose in the 10K the material change in policies/estimates under ASC 250.  The disclosure checklist was completed but this item was not identified.  The control was designed appropriately but the individuals performing the control and reviewing the control were not adequate.

*Id.* at LONGORIA0000555.2-555.3.  Mr. Longoria never completed the work contemplated in his

memoranda and was never asked to finalize any documents.  *See* Opp. App. Ex. 103 (Longoria

Dep. Tr. at pp. 12-13).  Rather, in or around March 2019, Moreno told him to stop working on the

project.  *See id.* at p. 42 (Longoria: "Brandon asked me to stop working on this. . . . [T]hey were

---

[31]     This memo is mistakenly titled "Fraud Memo related to Identification of an Error and Restatement of Financial Statements," but the substance of the memo and Longoria's testimony confirms that it concerns internal controls.  *See* Opp. App. Ex. 103 (Longoria Dep. Tr. at pp. 26-27).

working on closing the books. They were working on multiple potential buyers. And the priority just dropped.").

The Company never made the 2018 Q3 Form 10-Q filing and made no further SEC filings before being delisted from the stock exchange and filing for bankruptcy. *See* Opp. App. Ex. 68 (Form 8-K for 9/3/2019); Opp. App. Ex. 69 (Form 8-K for 5/30/2019); Opp. App. Ex. 106 (Form 25 filed 9/12/2019 by NYSE American LLC, Notification of Removal from Listing and/or Registration).

In a last-ditch effort to survive, the Company negotiated with potential capital providers and sought a "Super Priority ('Pre-Dip') Facility" from the BBVA bank group to bridge the gap. *See* Opp. App. Ex. 70, at DEFENDANTS_00003009.  BBVA's Approval Request Memorandum sets forth a comprehensive Overview of Nobilis's financial condition and the causes of Nobilis's ultimate demise—which included, among other things, liquidity problems, collection issues, A/R write-downs, failed acquisitions, and cash burn.  *See id.* at DEFENDANTS_00003012-13, DEFENDANTS_00003030.

The Company defaulted under its credit facility and entered into a series of forbearance agreements, with the forbearance period under the Fourth Forbearance Agreement expiring as of August 30, 2019.  *See* Opp. App. Ex. 107 (Form 8-K for 9/24/2019), at Item 2.04.  Shortly after, on September 24, 2019, BBVA delivered a notice of acceleration to the Company declaring that, as a result of various defaults under the credit agreement and the termination of the forbearance period, all of the obligations under the Company's credit facility were immediately due and payable—amounting to $123,206,250, plus interest, fees, and other obligations under the relevant

agreements. *Id.*[32]  Debtors filed for bankruptcy on October 21, 2019.

### J.   By Cooking the Books, Defendants Caused the Company's Demise

#### 1.   Consequences of the 365+ AR Policy Change and Adjustment

There are a number of direct, as well as indirect, consequences associated with Nobilis's management filing misstated financial statements and, in the end, having to write off huge 365+ AR balances.   As the Trustee's expert opined, these consequences "demonstrate that these misstatements were indeed the cause of the Company's loss of value and its eventual bankruptcy." Opp. App. Ex. 86 (Devor Rebuttal Report), at ¶ 26.  These consequences to the Company included:

- Needing to hire MorrisAnderson (as required by BBVA) to evaluate and improve operations and financial performance[33];

- Needing to hire Garcia & Longoria (as required by Crowe) to perform accounting and fraud assessments;

- Inability to file required Forms 10-Q or 10-K from 2018 Q3 forward caused by reassessment of the 365+ AR policy change;

- Covenant violations under the Credit Agreement, which could not be cured and required Nobilis to enter into at least four Limited Waivers with BBVA[34];

- Inability to pay principal and interest payments due under the Credit

---

[32]    The same day, the 44th Judicial District Court of Dallas County, Texas, entered an order appointing Howard Marc Spector as the temporary Receiver for all of the assets of Nobilis, Northstar Healthcare Acquisitions, L.L.C., and certain subsidiaries of the Company, as guarantors, under the Company's Credit Agreement dated October 28, 2016 (as amended) and the Company's Super Priority Credit Agreement dated May 22, 2019, with BBVA and other lenders.  *See* Opp. App. Ex. 107 (Form 8-K for 9/24/2019), at Item 1.03.

[33]    Daniel Wiggins of MorrisAnderson eventually became the Company's Chief Restructuring Officer.  *See* Opp. App. Ex. 97 (Wiggins Dep. Tr. at pp. 19, 90).

[34]    *See* Opp. App. Exs. 108 through 111  (Limited Waiver[s] to Credit Agreement, ███████

Agreement, causing BBVA, as Administrative Agent, to declare Nobilis in default and necessitating multiple forbearance agreements[35];

- Masking of the Company's true liquidity and financial condition, as the eventual write-down meant substantially lower cash flow than originally reported; and

- Concerns from investors related to the growing 365+ AR balances.[36]

Opp. App. Ex. 86 (Devor Rebuttal Report), at ¶¶ 26-32. These type of events are "known to contribute to the demise of public companies" and caused the eventual bankruptcy of Nobilis. *Id.* at ¶ 32.

### 2.  Damages Suffered By Nobilis

The Trustee's expert calculated the damages resulting from Defendants' breaches of fiduciary duty as approximately $250.3 million. *See* Opp. App. Ex. 83 (Devor Report), at ¶¶ 147-48; Opp. App. Ex. 86 (Devor Rebuttal Report), at ¶ 41. Devor reached this amount by calculating the enterprise value of Nobilis as of June 30, 2017—the quarter-end prior to when the materially misstated financial statements were first filed—and subtracting Nobilis's liquidation proceeds from that amount. *See* Opp. App. Ex. 83 (Devor Report), at ¶ 145 ("[A] reasonable method for

---

[35]      *See, e.g.*, Opp. App. Exs. 112 and 113 (Limited Conditional Forbereance Agreements, ██████████████████████████████████████████.

[36]      For example, on August 20, 2018, Robert Gibson, Head of Research at PI Financial Corp., emailed Young, Moreno, and Cole Stevens (Nobilis Investor Relations Manager) the following: "I continue to get calls on your trade accounts receivable greater than 365 days. Going from $20.4 million Dec/17, to $26.2 million March/18, then jumping to $38.8 million June/18. Especially because bad debt expense last year was $0. How much of this is ASC 606? Any colour would be helpful. Also, any public information you could provide on this amount would certainly provide comfort to shareholders and help the share price." Opp. App. Ex. 124. When Young proposed several talking points that could be provided in response, Stevens noted that Young's points were "very similar to what we have provided investors, whom have reached out to discuss our current A/R position as of 6/30." *Id.*

determining damages to the Company is to estimate the enterprise's value prior to any purported financial misstatement by management and compare that value to Nobilis' financial condition and liquidation value, as measured by the liquidation proceeds and value of unliquidated assets."); *see also id.* at ¶¶ 141-57 (describing Devor's methodology); Opp. App. Ex. 86 (Devor Rebuttal Report), at ¶ 41 (reaching $250.3 million by deducting $34.7 million of liquidation proceeds from Nobilis's $285 million enterprise value).[37]

### 3.    Hurricane Harvey Did Not Cause the Company's Collapse

Attempting to divert attention from the well-known devastating impact to public companies from the filing of false financial statements, Defendants halfheartedly blame Nobilis's demise on Hurricane Harvey, which hit Houston on August 25, 2017.  But the evidence demonstrates that although Hurricane Harvey caused a temporary shutdown, it did *not* have a lasting material impact on Nobilis's operations.  The August 2017 Report was issued before Hurricane Harvey hit and painted a bleak picture of Nobilis's financial performance—with estimated revenues $15.9 million below budget.  *See* Opp. App. Ex. 25, at NOB.EML_00191851 (report as of 8/20/2017).  In an email dated on September 28, 2017 about the 2017 Q3 finances, Moreno told Young, "[L]owest volumes all year *and we were heading that way before any hurricane hit*."  Opp. App. Ex. 27, at DEFENDANTS_00000907 (emphasis added).

---

[37]     Devor's Rebuttal Report also offers alternative calculations using: (i) a market value date of November 8, 2018, which results in a *greater* enterprise value of $307 million and damages amount of $272.3 million; and (ii) an enterprise value calculation that only includes interest-bearing debt, which results in an enterprise value of $236 million and a damages amount of $201.3 million.  *See* Opp. App. Ex. 86 (Devor Rebuttal Report), at ¶¶ 36-38, 41 n.36.  Devor offered these alternative calculations in response to certain criticisms lodged by Defendants' expert Steven Wolf, but, as described in the Rebuttal Report, these criticisms are wrong and, in any event, do not change that there are over $200 million of damages at issue.

Hurricane Harvey caused Nobilis's Houston area healthcare facilities to be shut down for

one week, ███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████  *See* Opp. App. Ex. 114, at

CROWE0017685.  However, an internal memorandum dated October 26, 2017 from Defendant

Rodriguez to the Accounting Files ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

███████████████████████████.  *See Id.* at CROWE0017688.  The internal memorandum goes on

to state █████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ ██ █████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████  *Id.* at CROWE0017685.[39]

---

[38]     The internal memorandum also states ███████████████████████████████████
█████████████████  *See* Opp. App. Ex. 114, at CROWE0017688.

[39]     Defendants also blame Nobilis's demise on insurers decreasing out-of-network
reimbursements, but ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████  Opp. App.
Ex. 115, at pp. 3-4.  Additionally, █████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████  Opp. App. Ex. 116, at pp. 8-9, 12; *see also* Opp.
App. Ex. 86 (Devor Rebuttal Report), at ¶ 23.

III.    **LEGAL STANDARDS**

Pursuant to Federal Rule of Civil Procedure 56, applicable to this adversary proceeding through Federal Rule of Bankruptcy Procedure 7056, a party "may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought," and the Court shall grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); FED. R. BANKR. P. 7056. An issue is considered "genuine" if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and a factual dispute is considered "material" if it "might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Of course, the Court must view all facts and draw all reasonable inferences in favor of the non-moving party. *In re Maxus Energy Corp.*, 615 B.R. 62, 69 (Bankr. D. Del. 2020).

IV.    **ARGUMENT**

Under Delaware law, corporate directors and officers owe the fiduciary duties of care and loyalty to the corporation they serve. *See* Memorandum Opinion dated July 27, 2022 [D.I 75] ("MTD Opinion"), at pp. 8-9; *see also Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009) (officers owe the same fiduciary duties as directors). The duty of care requires fiduciaries to manage the company with the "care which ordinarily careful and prudent men would use in similar circumstances" and not act with gross negligence. *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006). Gross negligence is defined as "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." *In re DSI Renal Holdings, LLC*, 574 B.R. 446, 470 (Bankr. D. Del.

50

2017).

"[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director [or] officer . . . and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). The duty to act in good faith is subsumed within the duty of loyalty. *Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 370 (Del. 2006) ("[T]he requirement to act in good faith is a subsidiary element, i.e., a condition, of the fundamental duty of loyalty.") (internal quotation marks omitted). Thus, "the fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest." *Id.* The duty of loyalty is also breached when fiduciaries fail to act in the face of a known duty to act, or act in bad faith. *See id.*; *In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1, 32-33 (Del. Ch. 2014).

For claims that a fiduciary failed to adequately oversee or supervise corporate operations (referred to as *Caremark* claims), a plaintiff must prove that either (i) "directors utterly failed to implement any reporting or information system or controls," or (ii) "having implemented such a system or controls, consciously failed to monitor or oversee its operations, thus disabling themselves from being informed of risks or problems requiring managerial attention." *See* MTD Opinion [D.I. 75], at p. 10 (citing, *inter alia*, *In re Caremark Intern. Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996)); *see also In re McDonald's Corp. S'holder Derivative Litig.*, 289 A.3d 343, 349-50 (Del. Ch. 2023) (officers also have a duty of oversight, for matters within their area of responsibility).

There are genuine issues of material fact with respect to each Defendant's breach of his fiduciary duties and the resultant damage to Nobilis.

A.    **There Are Genuine Issues of Material Fact Concerning Whether Defendants Moreno, Young, Fleming, Efird, and Rodriguez Breached Their Fiduciary Duties In Relation to Material Misstatements**

Defendants Moreno, Young, Fleming, Efird, and Rodriguez participated in and were aware of the effort to disregard the 365+ AR Policy for the purpose of creating upsized revenues and falsely positive financial reports to avoid reporting a loss and torpedoing the Term B Loan and Elite acquisition.[40]  The evidence demonstrates that:

- The 365+ AR Policy was implemented in December 2016 as part of remediation efforts with PwC incident to prior false financial reporting and weak internal controls.  *See supra* Section II.D.

- All Defendants were aware of the 365+ AR Policy.  It was the general practice at the Company before 2017 Q3.  *See supra* Section II.D.3.

- The policy changed in 2017 Q3, to instead include 365+ AR in revenue estimates and assets reported on the Company's balance sheet.  All Defendants knew about the change.  *See supra* Sections II.D.3.b and II.F.

- Moreno and Young came up with the idea to manipulate aging AR to make Nobilis's financial results present better than they actually were.  *See supra* Section II.F.

- Moreno, Young, and Efird were instrumental in contriving the phony $64.652 million revenue number and materially inflated trade accounts receivable value that were ultimately reported in Nobilis's public filings.  Those phony numbers were provided to Fleming and he blessed them.  *See supra* Section II.F.

- No contemporaneous analysis was prepared to support the critical accounting change.  *See*

---

[40]    While not directly involved in the effort to cook the books, Defendant Ozonian breached his oversight duties by failing to ensure compliance with the policy.  *See infra* Section IV.C.

*supra* Section II.F.

- In violation of its charge, the RRC did not participate as a committee in the decision to change the 365+ AR Policy and the Defendants knew it.  *See supra* Section II.E; *see also infra* Section IV.B (discussing breaches of fiduciary duty relating to the RRC).

- The accounting policy change caused material misstatements in Nobilis's Form 10-Qs for 2017 Q3, 2018 Q1, and 2018 Q2, and Nobilis's Form 10-K for 2017.  *See supra* Section II.G.

- Young and Fleming signed false certifications relating to those filings.  *See supra* Section II.G.5.[41]

- The $11.6 million of improperly added 365+ AR in Q3 2017 inflated revenues to disguise a default under the Credit Agreement.  *See supra* Section II.F.

- Representatives of BBVA testified that the Term B Loan (and thereby the Elite transaction) would not have closed if BBVA had known about the accounting policy change.  *See supra* Section II.F.

- By January 2019, Nobilis had to write down $71.9 million in total accounts receivable, at least $49.6 million of which was 365+ AR.  By that time, the Company had ceased making

---

[41]     Young and Fleming each cite *Behrmann v. Brandt*, 2020 WL 4432536, at *15 (D. Del. July 31, 2020) for the proposition that "approving public filings or signing a Registration Statement is not enough," but they omitted the crucial second part of that *Behrmann* holding: "approving public filings or signing a Registration Statement is not enough . . . ***absent specific allegations of the [] Defendants' direct role in preparing such disclosures***."  *Id.* (emphasis added) (finding that allegations against directors were insufficient to plead demand futility under Delaware's stringent Rule 23.1 standard).  Here, the Trustee has set forth specific facts from which a jury could conclude that Young and Fleming (who signed the Certifications in their capacity as CFO and CEO, respectively) played a direct role in preparing the false and misleading disclosures—Young was one of the main architects of the plan to manipulate aging AR, and there are facts (including Young's testimony) showing that Fleming knew about and approved the plan.  *See supra* Section II.F; Opp. App. Ex. 1 (Young Dep. Tr. I at pp. 84-85).

any public filings due to the unresolved 365+ AR issues.  *See supra* Section II.I.

These facts demonstrate genuine issues of material fact concerning breaches of the duty of care (by disregarding an established accounting policy without analysis and for the purpose of inflating revenues and assets) as well as breaches of the duty of loyalty (by causing material misstatements against the company's interests and in bad faith).  *See, e.g.*, *Palmer v. Reali*, 21 F. Supp. 3d 655, 666-68 (D. Del. 2016) (facts showing officers created sham financial forecasts that lacked a reasonable basis would, if proven, constitute a breach of the duty of care); *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998) ("knowingly disseminating to the stockholders false information about the financial condition of the company" is a breach of the duty of loyalty and good faith).[42]  The Officer Defendants and Fleming have failed to establish any basis for summary judgment.

### 1.    The "Extensive and Thorough" Analysis the Officer Defendants Rely On Is a Sham

The Officer Defendants maintain that they only made the decision to include 365+ AR in the financial statements after "an extensive and thorough data-driven analysis" and thus had "good faith reasons" for doing so.  Officer Defs. Br. [D.I. 214] at pp. 1, 29.  These arguments are baseless and, in any event, implicate numerous disputed issues of material fact.

There was no "extensive" or "data-driven" analysis performed before the decision to include 365+ AR was made for 2017 Q3.[43]  In fact, there was no contemporaneous analysis at all.

---

[42]    The Officer Defendants incorrectly assert that, because the Trustee's claims are not based on self-interested transactions, only the duty of care is at issue.  But it is well-established under Delaware law that the duty of care also encompasses a duty of good faith.  *See, e.g.*, *Stone*, 911 A.2d at 370.  As such, a duty of loyalty claim exists, as it does here, when a fiduciary "failed to pursue the best interests of the corporation and its stockholders and therefore failed to act in good faith."  *Orchard Enters.*, 88 A.3d at 33; *see also Stone*, 911 A.2d at 370 ("[B]ecause a showing of bad faith conduct . . . is essential to establish director oversight liability, the fiduciary duty violated by that conduct is the duty of loyalty.").

[43]    Despite having testified that Nobilis changed its general practice of writing down 365+ AR in 2017 Q3, the Officer Defendants dispute in their Motion whether Nobilis ever followed such a

*See supra* Section II.F (setting forth evidence concerning February 2018 Memo, which was the first documentary analysis prepared); *see also, e.g.*, Opp. App. Ex. 81  (February 2018 Memo); Opp. App. Ex. 78 (Moreno Dep. Tr. II at p. 96) (Moreno's testimony that he could not identify any contemporaneous documentation).  The February 2018 Memo was prepared almost five months after the close of 2017 Q3, and only after Crowe requested it.  *See id.* at pp. 96-98.  Notably, the only support that the Officer Defendants cite for their assertions that they engaged in a thorough investigation "during Q3 2017" are: (i) the belated February 2018 Memo; (ii) a memo dated February 1, *2019* concerning revenue cycle issues; (iii) an email chain dated February 21, 2018 concerning collection procedures; and (iv) self-serving deposition testimony from Defendants which is unsupported and refuted by relevant documentary evidence.  *See* Officer Defs. Br. [D.I. 214] at pp. 7-10 and nn. 38-56.[44]

Rather than support the existence of any "data-driven" investigation in 2017 Q3, these documents demonstrate the opposite.  In the February 21, 2018 email chain (which was clearly sent as part of Moreno's efforts to prepare the February 2018 Memo), for example, Moreno asked

---

practice.  *See* Officer Defs. Br. [D.I. 214] at p. 21.  Certainly, testimony from the Officer Defendants themselves is sufficient to create a genuine issue of material fact concerning this issue. *See supra* Section II.D.3.b.

[44]     According to the Officer Defendants, their investigative efforts included "closely analyzing" data for all 365+ AR claims, "gathering information" on each claim from the relevant facilities, "interviewing employees and vendors responsible for collection"—but the only citation for these assertions is two lines of testimony from Moreno saying he discovered "several factors" after an undescribed investigation, with no reference whatsoever to the efforts alleged in the Officer Defendants' brief.  *See* Officer Defs. Br. [D.I. 214] at p. 8 and n. 40 (citing Ex. A-1, Moreno 3/23/22 Dep. at 83:24-84:2).  Furthermore, it is clear from Defendants' emails at the time that the decision to add 365+ AR in 2017 Q3 was made in a matter of days, once it was clear the Company would have to report negative EBITDA for the quarter.  *See supra* Section II.F (discussing contemporaneous emails, and comparing original revenue estimate prepared September 28, 2017 (Opp. App. Ex. 31) to upsized revenue estimate prepared October 3, 2017 (Opp. App. Ex. 37)). The suggestion that Defendants engaged in a thorough investigation of $11.6 million of 365+ AR claims, including interviewing and gathering information from third parties, in that matter of time is not credible.

Suman Smith (a member of the revenue cycle team) whether, for the Company's major payers, there was a "statute of limitations on how long I have to work/collect the account?" and explained that he needed to know at what point "a payer can say the claim is no longer valid." *See* Officer Defs. Appendix [D.I. 215] at Ex. A-23, at NOB.EML_00073828_0002. Smith replied that as long as the claim was timely filed, the claim does not expire. *Id.* at NOB.EML_00073828_0001. Moreno then forwarded this explanation to Young, to inform him that claims do not expire. *Id.* The fact that in February 2018 Moreno and Young apparently were not aware and needed to ask how long claims can even *possibly* be collected beyond one year, or whether they "expire" and end up barred by a "statute of limitations," demonstrates that they had absolutely no legitimate basis for adding in all of Nobilis's 365+ AR amounts as a lump sum in the third quarter of 2017. Apparently, for all they knew at the time, large portions of those claims might have been "expired."

Defendants are not entitled to summary judgment based on the business judgment rule. *First*, the business judgment rule does not apply "where a loss results from director inaction," as is the case with *Caremark* violations. *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 569 (Bankr. D. Del. 2008) (citing *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 748 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006)). Because the Trustee has shown genuine disputes of material fact concerning breaches of Defendants' oversight duties, summary judgment on the basis of the business judgment rule can be denied for that reason alone. *See infra* Sections IV.A.5, IV.B. *Second*, evidence that a fiduciary breached any one of the triad of fiduciary duties—good faith, loyalty, or due care—rebuts the business judgment rule. *See McMullin v. Beran*, 765 A.2d 910, 916 (Del. 2000). For example, the business judgment rule is negated when there is evidence of gross negligence. *See, e.g.*, *Bridgeport*, 388 B.R. at 572 (citing *McMullin*, 765 A.2d at 919-22). Based on the evidence detailed by the Trustee, a jury could reasonably find that it is grossly

negligent to juice up the Company's numbers by adding in aged receivables, in violation of the Company's standard practice and SOX Narratives, and without investigating or having any idea if those receivables are actually collectible. *See In re Fedders N. Am., Inc.*, 405 B.R. 527, 539 (Bankr. D. Del. 2009) (gross negligence includes failure to inform oneself fully and in a deliberate manner). Defendants' *post hoc* justifications do not satisfy the business judgment rule as they are contradicted by other evidence—including, most importantly, the contemporaneous evidence reflecting what actually happened.

### 2. Summary Judgment Is Not Warranted Based On Crowe's Audit and Interim Reviews

The Officer Defendants and Fleming contend that Crowe's sign off of the challenged annual report and quarterly reports demonstrates that their decision to include 365+ AR in Nobilis's revenue estimates was reasonable and in good faith. The argument fails because (i) Delaware's reliance on experts defense potentially protects only directors, (ii) the preparation of materially accurate and complete financial statements is management's responsibility, and (iii) there are disputed issues of fact concerning deficiencies in Crowe's reviews and Defendants' purported good faith reliance on them.

While Defendants do not expressly invoke Delaware's reliance on experts defense (Section 141(e) of the Delaware General Corporation Law), their argument essentially invokes the defense. It fails as a matter of law because the defense is not available to officers:

> A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care

by or on behalf of the corporation.

8 Del. C. § 141(e); *see also Brehm v. Eisner*, 746 A.2d 244, 262 (Del. 2000) (discussing circumstances that would rebut the Section 141(e) defense).

By its plain terms, the defense is available only to directors. *See Cirillo Fam. Tr. v. Moezinia*, 2018 WL 3388398, at *18 (Del. Ch. July 11, 2018), *aff'd*, 220 A.3d 912 (Del. 2019) (holding that defendants "would not be shielded from liability under Section 141(e) for actions they took as officers because the plain terms of that statute only shield directors, and not officers"); *see also McDonald's*, 289 A.3d at 367 (discussing that officers owe duty of oversight for their area of responsibility, but noting "[t]he ability of directors to rely on reports from an officer [per Section 141(e)]" is a distinction between directors and officers).

Moreover, even if such a defense was potentially available, the Officer Defendants and Fleming are not entitled to invoke it. They made the decision to disregard the 365+ AR Policy on their own—before talking to Crowe about it or advising Crowe they had done it. That Crowe belatedly reviewed or "approved" the financials after the fact does not absolve the Officer Defendants or Fleming of including materially inflated revenues and assets in the financial statements in the first place. *See Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732, 751 (Del. Ch. 2007) (post-trial opinion holding that, where consultant's report was predicated on "substantially inflated values" provided by the fiduciary, "it would have been unreasonable for [the fiduciary] to rely on that report as an expert opinion").

The responsibility for the preparation of materially accurate and complete financial statements that comport with GAAP and related SEC requirements lies with management. *See* Opp. App. Ex. 83 (Devor Report), at ¶¶ 60-61, 63 (discussing Auditing Standard (AU) 110 promulgated by the Public Company Accounting Oversight Board (PCAOB)); *see also* AU

110.03, *available at* https://pcaobus.org/oversight/standards/archived-standards/pre-reorganized-auditing-standards-interpretations/details/AU110.  During the yearly audit, "the auditor relies on management representations" and its responsibility for the financial statements "is confined to the expression of an opinion on those financial statements."  Opp. App. Ex. 83 (Devor Report), at ¶ 64.  Interim financial reviews (such as that performed in connection with quarterly reports) are more limited in scope than audits and consist primarily of performing analytical procedures and making inquiries of management.  *Id.* at ¶ 65.  "The purpose of an audit or review of a public company's financial statements is **not** . . . to provide comfort to the company's management, who were responsible for preparing those financial statements."  Opp. App. Ex. 86 (Devor Rebuttal Report), at ¶ 4 (emphasis added).  Auditors do not provide guarantees regarding the accuracy of the client's financial statements.  *Id.* at ¶¶ 5-6.

In fact, ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████  *See* Opp. App. Ex. 117, at pp. 1, 5 (letter concerning 2017 Q3 quarterly review, signed by Defendants Fleming, Young, and Rodriguez); Opp. App. Ex. 118, at pp. 1, 5 (letter concerning 2018 Q1 quarterly review, signed by Defendants Fleming, Young, and Rodriguez); Opp. App. Ex. 119, at pp. 1, 5 (letter concerning 2018 Q2 quarterly review, signed by Defendants Fleming and Young, and the Corporate Controller); *see also* Opp. App. Ex. 120, at pp. 1. 9 (letter concerning 2017 audit signed by Defendants Fleming, Young, and Rodriguez,

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████

Finally, there are genuine disputes of material fact concerning whether management's reliance on Crowe was reasonable and in good faith. ████████████████

████████████████████████████████████████

████████████████████████. *See supra* Section II.H; Opp. App. Ex. 83 (Devor Report), at ¶ 135. Nobilis's management had also previously questioned Crowe's competence—with Defendant Rodriguez noting that the Crowe team was "terrible" and lacked the "expertise or intelligence" to deal with SOX compliance issues. *See supra* Section II.H; Opp. App. Ex. 59, at NOB.EML_00455945_0001; Opp. App. Ex. 58, at DEFENDANTS_00005865. Coupled with the fact that management was indisputably responsible for the accuracy of the financial statements, these facts demonstrate disputed issues of material fact concerning whether it was reasonable for any of the Defendants to rely on Crowe for retroactive "approval" of their decision to include 365+ AR in the Company's financial statements in violation of the SOX Narratives and surreptitiously reverse a publicly disclosed critical accounting policy without public disclosure, contemporaneous data analysis or support—to avoid reporting a loss and bank covenant violation which would have torpedoed the Term B Loan and Elite acquisition.

### 3. The So-Called "Layers of Review" Trumpeted By Fleming Were Illusory And Belie Summary Judgment

Defendant Fleming maintains that he fulfilled his fiduciary duties by relying on numerous "layers of review" for Nobilis's financials. *See* Fleming Br. [D.I. 182] at pp. 17-18, 31. Fleming lists "nine" of these purported layers: "the revenue cycle team, the Revenue Recognition Committee, the finance department, in-house and outside counsel, management, Crowe, the Audit Committee, the Board of Directors, and Fleming." *Id.* at p. 31. But the evidence demonstrates

that, except for perhaps the first layer (the revenue cycle team), these layers of review either failed or were not involved in the revenue estimates and material misstatements at issue in this case. The evidence is abundantly clear that the RRC abdicated its responsibilities—it did not even keep minutes (or possibly even meet at all) after July 6, 2017, did not actually set policies on revenue recognition (despite being charged to do so), and did not discuss treatment of 365+ AR. *See supra* Section II.E; *infra* Section IV.B. As for the "finance department," that department was led by Moreno and Young, who hatched the plan to cook the books in the first place. The same is true with respect to the "management" category, which includes all of the Officer Defendants—as well as Fleming himself, as CEO.[45] With respect to "in-house and outside counsel," there is no evidence they had anything to do with revenue estimates or preparation of financial statements; the fact that they may have reviewed public filings for legal compliance is irrelevant. As for the Audit Committee and the Board—those entities too included Defendants in this case (Ozonian, for both, and Fleming, for the Board) and there are genuine issues of material fact concerning whether they breached their fiduciary duties in those capacities. *See infra* Section IV.C (discussing Ozonian's breaches). With respect to Crowe, the reasons why Fleming and the other Officer Defendants cannot escape liability by saying they relied on Crowe are discussed at length above. *See supra* Section IV.A.2.

Finally, as Fleming admits with respect to his certifications for public filings, he simply signed whatever was presented to him, in reliance on Crowe and the financial team. *See* Opp App. Ex. 4 (Fleming Dep. Tr. I at p. 101). But here there is evidence Fleming *knew* that 365+ AR was

---

[45]     It is unclear why Fleming places himself at the very top of his "layers of review," even over the Board of Directors, given that he was a member of management and of the Board of Directors. Additionally, Fleming signed the false certifications *in his capacity as CEO*, not in his capacity as a Board member, so his attempt to set himself apart from management with respect to his certifications should be rejected. *See supra* Section II.G.5.

improperly included—he knew about the 365+ AR Policy, received revenue projections with 365+ AR added in violation of the policy, and, according to Young, "was informed" of the decision to add it and "had no objections."  Opp. App. Ex. 1 (Young Dep. Tr. I at p. 85).  Accordingly, there are genuine issues of material fact concerning Fleming's knowledge and good faith when he signed those certifications—as well as when he made representations to BBVA concerning Nobilis's financial condition.[46]

### 4.    The Breaches At Issue Fell Within The Scope of Efird and Rodriguez's Fiduciary Duties

With respect to Efird and Rodriguez, the Officer Defendants argue that they "did not have authority over the primary breaches alleged by Plaintiff."  Officer Defs. Br. [D.I. 214] at p. 26.  The evidence demonstrates otherwise.

Defendant Efird was Nobilis's President during the relevant time period.  *See* Efird Answer to the Complaint [D.I. 84], at ¶ 16.  He was aware of the SOX procedures, was regularly involved in discussions of the financials, and was informed that Moreno intended to manipulate aging AR to improve Nobilis's financial results.  *See, e.g.*, Opp. App. Ex. 10; Opp. App. Ex. 25 (August 2017 Report being forwarded to Efird and others, with a request for feedback); Opp. App. Ex. 30 (same, with respect to September 2017 report); Opp. App. Ex. 31, at DEFENDANTS_00000899 (Young informing Efird on 9/28/17 that the Company would have to report negative EBITDA for 2017 Q3 but that he would continue to work with Moreno on it); Opp. App. Ex. 27 (Young

---

[46]    Fleming claims that none of the BBVA representatives who were deposed  testified that he lied to them.  *See* Fleming Br. [D.I. 182] at p. 42.  That is not true.  Cara Younger, BBVA's Director for Corporate and Syndicated Finance, testified that ███████████████████ ████████████████████    Opp. App. Ex. 49 (Younger Dep. Tr. at pp. 31-36); *see also* Opp. App. Ex. 51 (McCurdy Dep. Tr. at pp. 113-115, 447-450) (testimony of Jonathan McCurdy, BBVA Senior Vice President, that Fleming gave them false information).

forwarding to Efird the 9/28/17 email wherein Moreno hatched the plan to manipulate aging AR

to make Nobilis's financial results look better).   On October 3, 2017, Efird received the "Q4

Revenue Projections.xlsx" spreadsheet containing the upsized $65 million revenue estimate—

indeed, Efird was the one who then provided those projections to Fleming.  Opp. App. Ex. 37; *see*

*also* Opp. App. Ex. 43 (Moreno sends "Q3 Revenue and AR summary" to Efird and others,

containing $64.8 million revenue number); *supra* Section II.F. [47]   And, Young specifically

identified Efird as part of the management group that made the decision to change Nobilis's prior

practice with respect to treatment of 365+ AR:

> Q. Who made the decision to change the prior practice with respect
> to the treatment of 365-day+ AR?
>
> A. It would have been a management decision.
>
> Q. Again, when you say it would have been, was it?
>
> A. It was a management decision, yes, absolutely.
>
> Q. Okay. **And who are you referring to when you say**
> **management?**
>
> A. It would have been -- or **it was Ken Efird, Brandon [Moreno],**
> **Kenny Klein. Those are the people I recall right now.**
>
> [. . .]
>
> Q. Were you involved?
>
> A. Yes.

Opp. App. Ex. 1 (Young Dep. Tr. I at p. 84) (emphasis added; objections omitted).  This evidence

refutes the Officer Defendants' contention that Efird's duties as President were limited solely to

---

[47]    Efird was also the chair of the RRC, which was specifically charged with setting Company
policies on revenue recognition (which would have included issues like internal controls relating
to aged receivables).  *See supra* Section II.E.

operations.

As for Defendant Rodriguez, he was Nobilis's Chief Accounting Officer during the relevant time period. *See* Rodriguez Answer to the Complaint [D.I. 78], at ¶ 24. The breaches at issue implicate internal controls over financial reporting plainly within the scope of the CAO's duties. Indeed, the 365+ AR Policy at issue was developed and put in place under Rodriguez's direction. *See supra* Section II.D.1 and II.D.2; *see also, e.g.*, Opp. App. Ex. 12. The Officer Defendants' argument that he should be off the hook because he did not actually calculate the estimates (only reported them) should be rejected. Rodriguez clearly knew about the 365+ AR Policy—and he also clearly knew that the other Defendants had decided to disregard the policy and include 365+ AR in the revenue estimates anyway, because he participated in the efforts to justify that change to Crowe. *See, e.g.*, Opp. App. Ex. 19.[48]

The facts accordingly demonstrate genuine issues of material fact concerning the involvement of Efird and Rodriguez in the breaches alleged by the Trustee, and their Motion should be denied.

**5.      The Evidence Demonstrates "Red Flags" and *Caremark* Violations**

Fiduciaries breach their fiduciary duties not only by engaging in direct conduct that violates those duties, but also when they observe "red flags" concerning accounting chicanery and deficient internal controls but knowingly disregard them. MTD Opinion [D.I. 75], at pp. 10-11. The same policies embodied by the duty of oversight for directors "apply equally, if not to a greater degree,

---

[48]      The Officer Defendants cite to Rodriguez's deposition testimony as support for their arguments that they had Crowe's approval to disregard the policy. *See, e.g.*, Officer Defs. Br. [D.I. 214] at p. 12 n. 70 (citing, *inter alia*, Ex. A-4, Rodriguez 4/13/22 Tr. at 117:19-22, which states "We discussed this with our auditors, and we collectively, as a group, both management and the auditors, decided what disclosures to include in our Qs and Ks."). The Officer Defendants cannot have it both ways—arguing that the alleged breaches had nothing to do with Rodriguez's duties, while also relying on events he was directly involved in to justify those breaches.

to officers." *McDonald's*, 289 A.3d at 349.  Indeed, "[a]s the day-to-day managers of the entity,

the officers are optimally positioned to identify red flags and either address them or report upward

to more senior officers or to the board." *Id.* at 362.  Here, even in the event the Court determines

that the Officer Defendants or Fleming did not engage in direct breaches of fiduciary duty, there

were ample red flags observed—but knowingly disregarded—by these Defendants, which

supports *Caremark* claims against them for permitting 365+ AR to be included in Nobilis's

financial statements.

a.    **Previously-restated 2014 financials, material weaknesses, and PwC's remediation efforts.**

The 365+ AR Policy originated from remediation efforts following the Company's

restatement of its 2014 financials, which was necessary due to material weaknesses in internal

controls and GAAP violations.  The Company hired PwC to develop detailed business process

narratives that would correct deficient internal controls and assist with SOX compliance.  The

resulting SOX business process narratives—which included the 365+ AR Policy—were made

effective in December 2016.  *See supra* Sections II.D.1 and II.D.2.  Defendants were aware of the

policy, and the Company did in fact write down 365+ AR to $0 as its standard practice until 2017

Q3.  *See supra* Section II.D.3.  Knowing that the 365+ AR Policy was enacted to prevent material

weaknesses in financial reporting should have alerted Defendants to the risks of disregarding the

policy in 2017 Q3.[49]  And, in fact, disregarding the policy *did* result in material misstatements in

---

[49]    The Officer Defendants and Fleming argue that the restatement of the 2014 financials
cannot be a red flag because those issues were mitigated (*see, e.g.*, Fleming Br. [D.I. 182] at p.
31), but these arguments miss the point.  The significance of the restatement and subsequent
remediation efforts is that it shows the importance of the 365+ AR Policy to the Company's
internal controls—and being aware of that, Defendants should have known that disregarding the
policy without appropriate analysis (which as discussed herein, did not occur) would risk *further*
material weaknesses or restatements.

multiple filings, and the Company's eventual inability to make any further public filings at all, delisting from the stock exchange, and bankruptcy. *See supra* Sections II.G and II.I; *see also*, *e.g.*, Opp. App. Ex. 105, at LONGORIA0000549.4, LONGORIA0000555.2-555.3 (Longoria memoranda).

Defendants' hollow attempt to downplay the significance of the SOX business process narratives deserves short shrift. Defendants certainly considered the SOX business process narratives important when they hired PwC to help develop them, approved them, made them effective, and told Nobilis's accounting and financial personnel to follow them. *See supra* Section II.D.1; Opp. App. Ex. 12. With respect to the 365+ AR Policy specifically, the Company followed it as standard practice *right up until* poor financial results in 2017 Q3 threatened to derail the Term B Loan and Elite transaction. *See, e.g.*, Opp. App. Ex. 45, at Nobilis_00407947; Opp. App. Ex. 1 (Young Dep. Tr. I at pp. 75-78, 84-85). Defendants' attempts to now paint the SOX narratives as unimportant and something that could be ignored are not credible—and are undermined by the evidence presented by the Trustee. *See Weaver v. Mobile Diagnostech, Inc.*, 2007 WL 1830712, at *1 (W.D. Pa. June 25, 2007) (credibility determinations concerning defendants' justifications for their actions and their knowledge/intent were material questions of fact that could not be resolved on summary judgment).

> **b.      Substantial increases in DSO and 365+ AR, and substantial billing and collection backlogs.**

Additional red flags included substantial increases in DSO (Days Sales Outstanding, a metric for monitoring the pace at which accounts receivable were collected),[50] rapid and

---

[50]      *See* Opp. App. Ex. 121 (10/6/2017 email chain between Moreno and Efird, copying Young and others, referencing increase of DSO from 110 in 2016 Q3 to 156 in 2017 Q3; Opp. App. Ex. 122 (Young Dep. Tr. II at pp. 95-99, 103) (Young's testimony that the increase in DSO was a

precipitous growth in 365+ AR,[51] and substantial billing and collection backlogs that resulted in decreased collections. *See* Opp. App. Ex. 18, at pp. 1-2 (Lockhart memo discussing ███████

████████████████████████████████████████████████████████████

███ ███ ███ ██████ ███ █████ ███ [52] ; Opp. App. Ex. 70, at DEFENDANTS_00003017-18. [53] Substantial billing and collection issues that were causing decreased collections (and, in turn, alarming increases in relevant metrics) should have alerted Defendants that, by including 365+ AR, they were adding receivables which may not actually be collectible and thereby artificially inflating Nobilis's revenue and assets in the financial statements.

Fleming and the Officer Defendants argue that none of these collection metrics or issues can be red flags because Nobilis publicly disclosed that it was subject to risks related to out-of-network payors. *See* Fleming Br. [D.I 182] at p. 32 (citing 2015 Form 10-K, Fleming Ex. A-5); Officer Defs. Br. [D.I. 214] at p. 22 (citing same). But these vague risk disclosures do not disclose the issues above (nor could they, given they pertain to 2015)—and the Defendants cannot point to any relevant disclosures advising shareholders that millions of dollars' worth of previously written-off receivables were being included in Nobilis's estimates during 2017 and 2018. The case they cite, *Butorin v. Blount*, 2018 WL 4700217 (D. Del. Sept. 30, 2018), is distinguishable. In

---

"negative trend" and a "concern," and that as CFO he was aware of that negative trend in real time).

[51]    *See supra* Section II.I.

[52]    While Lockhart's memo states that the Company expected improvements in these issues to "c[o]me to fruition in Q4 2017," they did not—as 365+ AR continued to grow unabated through Q4 and beyond. *See, e.g.*, Opp. App. Ex. 79 (2018 Q2 Form 10-Q), at p. 14 (showing 365+ AR increased from $20.4 million at the end of 2017 to $38.8 million by June 30, 2018).

[53]    *See also* Opp. App. Ex. 72 (Pankaj Dep. Tr. at pp. 65-66) (testimony from Nobilis's Vice President of Revenue Cycle Management concerning turnover issues in Nobilis's Central Business Office); Opp. App. Ex. 71 (discussing issues with the staffing company and outside vendors used to perform the billing and collection functions); Opp. App. Ex. 73 (June 2017 report from Senior Director of Revenue Cycle discussing Company procedures).

*Butorin*, the court found the plaintiff failed to plead red flags relating to "failures with cost estimates" because the company's public filings disclosed the process they used and the failures alleged were within the realm of the disclosed risks. *Id.* at *6. The plaintiff had not alleged that the company had changed or used a different process—simply that the disclosed process did not work. *Id.* But here, the Trustee's claims are not based simply on a disagreement with whether the estimates were accurate. Rather, the Trustee alleges—and the evidence supports—that Defendants artificially inflated the estimates by changing the way they treated 365+ AR, without any basis to do so and without disclosing the change. Considering the facts presented by the Trustee, knowledge of collectability issues would plainly be a red flag in making decisions about whether or not to include aged receivables in revenue estimates and assets. Further disputes over whether Defendants reasonably believed collections were improving or that certain issues had been handled cannot be resolved at summary judgment.

### B.    There Are Genuine Issues of Material Fact Concerning Whether Defendants Fleming, Efird, Moreno, and Young Breached Their Fiduciary Duties In Relation To The RRC

#### 1.    Fleming Violated His *Caremark* Duties By Failing to Monitor or Oversee the RRC

A fiduciary violates his *Caremark* duty to adequately oversee or supervise corporate operations when "having implemented such a system or controls, consciously fail[s] to monitor or oversee its operations, thus disabling [himself] from being informed of risks or problems requiring managerial attention." MTD Opinion [D.I. 75], at p. 10; *see also Marchand v. Barnhill*, 212 A.3d 805, 821 (Del. 2019) ("[T]o satisfy their duty of loyalty, directors must make a good faith effort to implement an oversight system and *then monitor it*.") (emphasis added). Fleming owed *Caremark* duties in his capacity as a director *and* in his capacity as CEO. *See McDonald's*, 289 A.3d at 350 ("[T]he duty of oversight applies equally to officers . . . Some officers, like the CEO,

have a company-wide remit.").

Despite creating the RRC, Fleming did nothing to ensure that it performed its critical financial function.  Fleming was aware of red flags concerning how the Company made decisions concerning revenue recognition—indeed, he was "seriously concerned" about the issue.  *See* Opp. App. Ex. 20 ("For some time now I've been considering how we manage this extremely important function for the company.  I have been seriously concerned that we have been putting this function on one person's shoulders.").  The express purpose of the committee was to "**set the company's future policies on revenue recognition**."  *Id.* (emphasis added).

Yet, Fleming testified that he had no idea whether the RRC in fact set policies on revenue recognition, never saw a document or any other information suggesting they did, and never discussed the issue with Efird, the RRC Chair.  *See, e.g.*, Opp App. Ex. 4 (Fleming Dep. Tr. I at pp. 133-34); Opp. App. Ex. 75 (Fleming Dep. Tr. II at pp. 123-24).  Fleming maintains that at some point he discussed revenue targets generally with Efird, but that was not the RRC's task or the issue that Fleming purportedly created it to handle.  Fleming admits that he did "nothing specific" to ensure the RRC carried out its actual function.  *Id.*  The members of the RRC confirmed that they did *not* set policies on revenue recognition—indeed, Efird was "not sure" who at the Company did.  *See supra* Section II.E; Opp. App. Ex. 22 (Efird Dep. Tr. I at p. 24).

Accordingly, there are facts demonstrating that, despite Fleming's observation of "seriously concern[ing]" red flags that led him to create the RRC,[54] he then consciously failed to monitor or oversee the performance of the RRC's function.  This caused Fleming to be uninformed about the Company's revenue recognition policies—even though those were the most consequential estimates for the Company's financial statements.  *See* Opp App. Ex. 4 (Fleming

---

[54]    Opp. App. Ex. 20.

Dep. Tr. I at pp. 124, 134); Opp. App. Ex. 75 (Fleming Dep. Tr. II at p. 26) ("Q. And can we agree that estimates most consequential to the company's financial statements were in the area of revenue recognition?  A. That's correct.).  "Facts demonstrating that a director or officer observed certain 'red flags' but knowingly disregarded them such that they completely disabled themselves from being informed of risks or problems are generally deemed sufficient for the purposes of a *Caremark* claim."  MTD Opinion [D.I. 75], at pp. 10-11.

### 2.    Efird, Moreno, and Young Abdicated Their Responsibilities as Members of the RRC

Defendant Efird was the Chair of the RRC and Defendants Moreno and Young were members.  Yet, it is undisputed that these Defendants abdicated their charge to set the Company's policies on revenue recognition as part of the committee.  Efird confirmed that the RRC did *not* set (or even discuss) the Company's policies on revenue recognition and testified that *he did not know who did*.  *See* Opp. App. Ex. 22 (Efird Dep. Tr. I at pp. 24-25).  Moreno and Young likewise testified that they had no memory of the RRC discussing the treatment of 365 + AR.  *See* Opp. App. Ex. 14 (Moreno Dep. Tr. I at p. 85); Opp. App. Ex. 1 (Young Dep. Tr. I at pp. 89, 93).  The evidence further demonstrates that the RRC failed to even keep minutes after July 6, 2017—indeed, it is unclear whether they met at all after that point.  *See supra* Section II.E.

Efird, Moreno, and Young argue that the RRC was merely a "forum" for collaboration and discussion and had no real importance for Nobilis's revenue recognition processes or controls.[55] But Fleming's email forming the committee establishes otherwise: "This new committee **will set the company's future policies on revenue recognition** and will make all decisions as a group." Opp. App. Ex. 20 (emphasis added).  To the extent Defendants argue that the RRC's charge was

---

[55]    *See* Officer Defs. Br. [D.I. 214] at pp. 36-37.

something different or that they were justified in ignoring that charge, that demonstrates the existence of disputed issues of fact that must be resolved by the factfinder, not a basis for summary judgment.

Defendants Efird, Moreno, and Young further argue that it does not matter whether the RRC fulfilled its purpose, but the case they cite for this proposition is inapposite. *See* Officer Defs. Br. [D.I. 214] at p. 37 (citing *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 135 (Del. Ch. 2009)). *Citigroup* found that claims against members of an "ARM Committee," which was charged with reviewing and ensuring accuracy of financial statements, were insufficiently pled under Delaware's strict pleading standard for shareholder derivative actions because the complaint contained no allegations concerning committee members' knowledge or bad faith (and instead relied only on conclusory allegations about the committee's purpose and their membership on it). *Citigroup*, 964 A.2d at 134-35. That is not comparable to the evidence relating to the RRC which exists in this case—wherein Efird, Moreno, and Young (as well as Fleming) all readily admit that the RRC did not fulfill the charge to set revenue recognition policies.

Furthermore, the court in *Citigroup* did not say that internal documents concerning a company's oversight procedures are irrelevant; it merely said that legal liability is not measured by them. *Id.* at 135. Here, the Trustee is not presenting Fleming's email forming the RRC as the relevant measure of liability—he is presenting it as evidence that Efird, Young, and Moreno (all of whom were officers of Nobilis) were specifically tasked by the CEO with setting the company's future policies on revenue recognition as part of the RRC, but failed to do so.[56] That failure

---

[56] Fleming explicitly relies on the RRC as a purported "layer of review" that, in his view, insulates him from liability in this case. *See, e.g.*, Fleming Br. [D.I. 182] at pp. 17-18. This is at odds with the Officer Defendants' position that the RRC was unimportant and had no real significance for the Company's revenue recognition policies.

constituted reckless indifference and deliberate disregard of an issue that was undisputedly critical to the Company's success (amounting to a breach of the duty of care), as well a lack of good faith for purposes of the duty of loyalty.  These breaches were not inconsequential—the improper reversal of the 365+ AR Policy, the material misstatements resulting therefrom, and the subsequent write-down of 365+ AR were all matters within the purview of the RRC, had its members taken their role seriously.

C.    **There Are Genuine Issues of Material Fact Concerning Whether Defendant Ozonian Violated His *Caremark* Duties By Failing to Monitor the Company's Compliance With The 365+ AR Policy**

"When directors fail to act in the face of a known duty to do so, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith."  MTD Opinion [D.I. 75], at p. 9; *see also Hughes v. Xiaoming Hu*, No. CV 2019-0112-JTL, 2020 WL 1987029, at *14 (Del. Ch. Apr. 27, 2020) (an audit committee which has "clear notice of irregularities" but "consciously turn[s] a blind eye to their continuation" fails to satisfy its fiduciary duties).  Here, there are genuine disputes of material fact concerning whether Ozonian, in his capacity as a Board member and Chair of the Audit Committee, satisfied his fiduciary duty to ensure Nobilis's compliance with the 365+ AR Policy, as required by the Company's SOX business process narratives.

"[C]ompliance with . . . securities-related laws, rules or regulations" was "the responsibility of the Audit Committee," as was oversight of the "quality and integrity of [Nobilis's] financial statements," "internal controls over financial reporting," and "finance, accounting, and legal compliance."  Opp. App. Ex. 87 (Schedule 14A filed 4/30/18), at pp. 31-33.  Ozonian was well aware of the fact that Nobilis had to restate its 2014 financials due to material weaknesses in

internal controls and GAAP violations,[57] and testified that the Audit Committee "sanctioned and helped put in place" the PwC remediation efforts which followed. *See* Opp. App. Ex. 52 (Ozonian Dep. Tr. at p. 31). The SOX business process narratives developed as a result of PwC's efforts— which included the 365+AR Policy—were approved by Defendant Ozonian, as chair of the Audit Committee. *See* Opp. App. Ex. 10, at Nobilis_00257686; Opp. App. Ex. 11, at NOB.EML_00464698.

However, the evidence shows no further efforts by Ozonian or the Audit Committee to ensure that 365+ AR amounts were actually being written to down to $0 as required by the SOX business process narratives. Nor does the evidence show any involvement by Ozonian or the Audit Committee in the decision in 2017 Q3 to disregard the 365+ AR Policy and include 365+ AR in the financials anyway.

Thus, despite having approved the 365+ AR Policy as part of the SOX business process narratives—which Ozonian knew were critical to avoiding further restatements of the Company's financials—Ozonian failed to "make a good faith effort to . . . then monitor it." *Marchand*, 212 A.3d at 821. Indeed, as chair of the Audit Committee, he signed off on financials which contained misstatements as a result of the inclusion of 365+ AR. *See* Opp. App. Ex. 87 (Schedule 14A filed 4/30/18), at pp. 33-35 ("Based on its review, the Audit Committee recommended to the Board that the audited financial statements for the Company's year ended December 31, 2017 be included in our Annual Report on Form 10-K for the year ended December 31, 2017...which was filed on March 12, 2018.") (submitted by all committee members, including Ozonian as Chairman); *see also* Opp. App. Ex. 83 (Devor Report), at ¶¶ 114-15 (discussing misstatements contained in 2017

---

[57]     *See* Opp. App. Ex. 7, at p. 3/78, 77/78 (Form 10-K/A, Amendment No. 1, For the fiscal year ended December 31, 2014, filed January 12, 2016, signed by, *inter alia*, Ozonian as then-Chairman of the Board and Director);

Form 10-K). Had Ozonian made efforts to monitor compliance with the SOX business process narratives that the Audit Committee "sanctioned and helped put in place,"[58] the misstatements contained in Nobilis's 2017 Form 10-K and other public filings could have been avoided.

Ozonian was aware by, at the latest, March 2018 that the 365+ AR Policy was not being followed. The March 7, 2018 Audit Committee Meeting Minutes ████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ Opp. App. Ex. 95.[59] ████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████ *See* Opp. App. Ex. 92. Ozonian obviously knew about the 365+ AR Policy—he had approved it. Ozonian also knew that there had previously been material weaknesses in internal controls and GAAP violations, and that the SOX business process narratives were adopted to correct those weaknesses. But the meeting minutes do not reflect an effort by Ozonian to ensure the ever-increasing 365+ AR amounts were written down to $0 as required by those narratives.[60]

Defendant Ozonian points to discussions concerning 365+ AR generally, including calls and emails which occurred after it was already clear a massive write down of wrongfully included 365+ AR would be necessary, and argues that these demonstrate that Ozonian fulfilled his duties.

---

[58]    Opp. App. Ex. 52 (Ozonian Dep. Tr. at p. 31).

[59]    In addition to Ozonian, Defendants Fleming, Young, Rodriguez, and Moreno attended this meeting. *See* Opp. App. Ex. 95.

[60]    During this period, the Company continued to issue public filings containing misstatements as to 365+ AR. *See, e.g.*, *See* Opp. App. Ex. 88 (2018 Q1 Form 10-Q); Opp. App. Ex. 79 (2018 Q2 Form 10-Q); Opp. App. Ex. 83 (Devor Report), at ¶¶ 116-17, 127-31 (discussing misstatements in same).

However, none of those discussions concern compliance with the SOX procedures. The fact that Ozonian was well aware of serious issues faced by the Company concerning 365+ AR only heightened—not lessened—his duty to ensure that the Company's internal controls relating to that issue were followed. His knowledge of growing 365+ AR was a red flag that should have alerted him that it was more important than ever to follow the internal controls concerning the reporting of those receivables.

Plaintiff's claim against Ozonian is not based solely on the fact that he was on the Audit Committee or on an assertion that he had the same responsibilities as management—rather it is based on evidence that he had "clear notice" of an irregularity (*i.e.*, that the 365+ AR Policy was not being followed, to the detriment of the Company), but "consciously turned a blind eye" to its continuation in violation of his oversight duties under *Caremark*. *See Hughes*, 2020 WL 1987029, at *14. By November 2018, there were *$71.9 million* in total accounts receivable that needed to be written off—at least $49.6 million of which would have never been included in the financial statements in the first place had the 365+ AR Policy been followed. *See* Opp. App. Ex. 99, at NOB.EML_00094324_0038; Opp. App. Ex. 100.

Ozonian attempts to handwave away the 365+ AR Policy based on the fact that it was "on the 94th of 105 pages" of the SOX documentation. Ozonian Br. [D.I. 212] at p. 25. This argument should be rejected out of hand. The importance of the 365+ AR Policy is not lessened simply because it is contained within a larger document or was among a set of multiple business process narratives. Nobilis's management and Audit Committee clearly saw fit to hire PwC to develop the SOX Revenue Recognition Narrative and to include the 365+ AR Policy in the initial and revised versions of it. *See* Opp. App. Ex. 12, at NOB.EML_00131548_0007; Opp. App. Ex. 13, at Nobilis_0222818. Furthermore, when Defendant Rodriguez circulated the approved SOX

business process narratives to Nobilis's accounting and financial reporting staff, he advised them that the "rollout of all business narratives and related controls is effective immediately," that "[m]anagement requests that all business leaders and employees follow the processes as documented and follow the control activities specified in each respective business process," and that the process narratives should be provided to all of the recipients' direct reports. Opp. App. Ex. 12, at NOB.EML_00131530_0001-02.    This evidence directly contradicts Ozonian's suggestion that the SOX business process narratives were simply "goals" that could be ignored if convenient.[61]  It also demonstrates genuine issues of material fact concerning the significance of the SOX business process narratives and the scope of Ozonian's duty to act upon learning they were not being followed.

Ozonian cannot assert as a defense that he relied on Crowe or on the Company's management.  *See* 8 Del. C. § 141(e) (defense permitting directors to rely in good faith on management or advisors).  Directors will not be protected by this defense if "their reliance was not in good faith" or "the subject matter ... that was material and reasonably available was so obvious that the board's failure to consider it was grossly negligent regardless of the expert's advice or lack of advice." *Brehm*, 746 A.2d at 262.  Here, the existence and significance of the 365+ AR Policy in relation to the Company's financial statements was material and known to Ozonian—yet he did not question Crowe or management about it upon learning that it was not being followed.[62]

---

[61]    *See, e.g.*, Ozonian Br. [D.I. 212] at p. 7 (Ozonian's brief characterizing the SOX business process narratives as merely "goals").

[62]    Ozonian testified that there were extended periods of time during late 2018 and 2019 when he was unable to be "present" for many matters relating to his Board duties due to health issues. *See* Opp. App. Ex. 52 (Ozonian Dep. Tr. at p. 17) ("[I]n '18 . . . into '19 . . . I was not able to be fully present for things."); *Id.* at p. 52 (in reference to the third/fourth quarters of 2018, "That was a period where I was not present for many things.").  While understandable, Ozonian's inability to fully attend to his Board duties for extended periods of time—during which the Company was experiencing serious financial problems and on a path to bankruptcy—demonstrates that he no

**D.      Plaintiff Has Presented Substantial Evidence of Causation and Damages, About Which There Are Disputed Issues of Material Fact**

**1.      Plaintiff Can Prove Causation and Damages**

The Delaware Chancery Court recently explained a plaintiff's burden concerning damages and causation for a breach of fiduciary duty claim under Delaware law:

> To obtain a meaningful remedy for a breach of duty, a plaintiff must establish by a preponderance of the evidence either that the plaintiff suffered harm or that the fiduciary wrongfully received a benefit. A plaintiff also must prove by a preponderance of the evidence that a sufficient causal linkage exists between the breach of duty and the remedy sought to make the remedy an apt means of addressing the breach.
>
> Although the plaintiff must make both showings by a preponderance of the evidence, plaintiff-friendly principles come into play. Through these principles, the proven breach of duty operates as a solvent to loosen the normally stringent requirements of causation and damages.
>
> One plaintiff-friendly principle is the maxim that once a breach of duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer. Another is the proposition that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly. It remains true that damages must be logically and reasonably related to the harm or injury for which compensation is being awarded. But as long as that connection exists, the law does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack mathematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages.

*Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 859 (Del. Ch. 2022) (citations omitted); *see also, e.g.*, *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996).

The evidence offered by the Trustee, including the expert opinions of Harris Devor and

---

longer had the capacity to meet his fiduciary obligations and should have resigned from the Board. It does not exonerate him.

supporting documentation,[63] is more than sufficient to create genuine issues of material fact concerning damages and causation—the requirements for which are "loosened" in light of the substantial evidence concerning Defendants' breaches.  The Trustee has set forth damages that are "logically and reasonably related" to the harms caused by cooking Nobilis's books and provided a "responsible estimate[]" of the amount of those damages.  *Metro Storage*, 275 A.3d at 859.  As Devor explains, "a reasonable method for determining damages to the Company is to estimate the enterprise's value prior to any purported financial misstatement by management and compare that value to Nobilis' financial condition and liquidation value, as measured by the liquidation proceeds and value of unliquidated assets."  Opp. App. Ex. 83 (Devor Report), at ¶ 145.  Damages based on lost enterprise value are a permissible form of damages for breach of fiduciary duty.  *See, e.g.*, *In re PMTS Liquidating Corp.*, 526 B.R. 536, 547 (D. Del. 2014) (holding that "an unbroken chain of events, starting with [defendant's] breach and leading to [debtor's] loss of enterprise value" would, if proven, "demonstrat[e] damages proximately caused by [defendant's] breach of fiduciary duty").[64]

    To the extent that Defendants dispute what actually caused Nobilis's demise, the amount or manner of calculation of appropriate damages, or how damages should be apportioned, those are matters for trial.  Moreover, "an action for breach of fiduciary duty is a prophylactic rule intended to remove all incentive to breach—not simply to compensate for damages in the event of a breach."  *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994) (cited

---

[63]    *See supra* Section II.J.

[64]    *See also In re Scott Acquisition Corp.*, 344 B.R. 283, 290 (Bankr. D. Del. 2006) (holding trustee had standing to recover for injuries in form of debtor's "substantially diminished" enterprise value, as result of breaches of fiduciary duty); *In re Refco Inc. Sec. Litig.*, 2014 WL 2514719, at *3 (S.D.N.Y. May 2, 2014) (special master's recommendation that damages based on lost enterprise value be awarded), *report and recommendation adopted* 2014 WL 2465261 (S.D.N.Y. June 2, 2014).

favorably by Delaware Supreme Court in *Thorpe*, 676 A.2d at 444-45).    Thus the factual

determinations necessary to award damages in this case, under Delaware's liberal standards for

damages flowing from breaches of fiduciary duty, cannot be made on summary judgment.

### 2.    Fleming's Trivial Criticisms of Devor's Opinions Are Meritless

Fleming offers trivial criticisms of Devor's opinions, none of which have merit or provide

any basis for summary judgment.    First, Fleming criticizes Devor for "estimat[ing] damages . . .

assuming liability."    Fleming Supp. Br. [D.I. 202] at p. 2 (quoting Devor Testimony, Ex. B-1 at

22:5-20, 23:4-21).    But "[a]ll damages expert opinions are dependent . . . on the assumption that

liability has been proven."    *Dorman Prod., Inc. v. Paccar, Inc.*, 201 F. Supp. 3d 663, 690 (E.D.

Pa. 2016); *see also U.S. Accu-Measurements, LLC v. Ruby Tuesday, Inc.*, 2013 WL 1792463, at

*8 (D.N.J. Apr. 26, 2013) ("Expert opinions on damages commonly assume liability, which must

be established independently.").

Next, Fleming argues that Devor fails to show causation because his initial Report does not

use the literal words "cause" or "causation."    Fleming Supp. Br. [D.I. 202] at p. 4.    This argument

is frivolous, as Devor's initial Report and his Rebuttal Report both make clear his opinion that

Defendants' conduct caused the economic damages sustained by Nobilis.    *See* Opp. App. Ex. 83

(Devor Report), at ¶¶ 141-43, 145, 148; Opp. App. Ex. 86 (Devor Rebuttal Report), at ¶¶ 20, 26-

32 (discussing direct and indirect consequences associated with the material misstatements and

subsequent write-off).    These opinions are not, as Fleming argues, based on facts from other cases

or only the "*ipse dixit*" of the expert.    Devor's experience with the devastating effects of accounting

misstatements and manipulation are directly relevant to his qualifications to opine as an expert on

that topic, but that does not mean that he considered Nobilis identical to other collapsed entities or

based his damages conclusions on facts relating to those entities; rather, his Reports identify the

specific facts from this case that his conclusions as to Nobilis's damages are based on. *See* Opp. App. Ex. 83 (Devor Report), at ¶ 143; Opp. App. Ex. 86 (Devor Rebuttal Report), at ¶¶ 26-31 (citing relevant facts and documents). Expert testimony is "not *ipse dixit* testimony" when it is "based on [the expert's] experience and adequate facts." *Del. Display Group LLC v. VIZIO, Inc.*, 2017 WL 784988, at *6 (D. Del. Mar. 1, 2017); *see also Allscripts Healthcare, LLC v. Andor Health, LLC*, 2022 WL 3021560, at *25 (D. Del. July 29, 2022) (expert's opinions were "not *ipse dixit*" where they were "grounded in his industry experience").

Finally, Fleming argues that Devor should have opined as to Fleming's state of mind and knowledge of red flags. Fleming Supp. Br. [D.I. 202] at pp. 10-11. But those are not matters within the proper scope of expert testimony. *See, e.g.*, *Wolfe v. McNeil-PPC, Inc.*, 881 F. Supp. 2d 650, 661-62 (E.D. Pa. 2012) (holding that expert could not testify concerning defendant's state of mind or render legal opinions); *Robinson v. Hartzell Propeller Inc.*, 326 F. Supp. 2d 631, 648 (E.D. Pa. 2004) ("[I]ntent is not a proper subject for expert testimony."). Devor's testimony that these matters were not within the scope of his expert opinion does nothing to "foreclose[]" the Trustee's claims, as Fleming contends,[65] and instead was entirely appropriate. Devor's opinions concerning red flags properly focus on Crowe's audit and reviews because whether or not an auditor's work complies with professional standards is a proper focus of expert testimony. *See Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Sup. 3d 466, 497-98 (D. Del. 2019) (expert could testify about the competency of professional's work and about what a reasonable professional would do, but he could not offer explicit credibility determinations as to intent, motive, or state of mind). Further determinations concerning Defendants' knowledge, state of mind, or culpability are questions for the factfinder based on the evidence, not questions about which the Trustee's

---

[65]    Fleming Supp. Br. [D.I. 202] at p. 11.

expert should opine.  *See Wolfe*, 881 F. Supp. 2d at 662.

### 3. Defendants' Arguments Concerning Supposed Alternative Causes for Nobilis's Demise Are Not a Basis For Summary Judgment

Defendants point to various "alternative causes" that they contend led to Nobilis's collapse and argue that (i) Devor's damage model is flawed for not accounting for these alternative causes, and (ii) Plaintiff therefore cannot prove damages.  Officer Defs. Br. [D.I. 214] at p. 40; Fleming Supp. Br. [D.I. 202] at p. 7.  Defendants are not entitled to summary judgment on the basis of these disputed facts.  There is ample evidence in the record demonstrating genuine issues of material fact concerning the purported "alternative" causes raised by Defendants.

With respect to Hurricane Harvey, the Company's own records demonstrate that, despite causing a temporary shutdown, Hurricane Harvey did not have a lasting impact on Nobilis's operations and was not the cause of Nobilis's collapse.  *See supra* Section II.J.3.  ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████" Opp. App. Ex. 114, at CROWE0017688.  ████████████████████

██ ██ ████ ██ ███ █ ████ ████ ███ ██ ████ ████ ███ *Id.* at CROWE0017685.  And the financial woes which caused Defendants to reverse the 365+ AR Policy in the first place were occurring "before any hurricane hit."  Opp. App. Ex. 27, at DEFENDANTS_00000907 (email from Moreno to Young).

Defendants also blame insurers for Nobilis's demise, asserting that insurers "unexpectedly and substantially changed" how out-of-network claims were paid.  Fleming Br. [D.I. 182] at p. 46 (citing testimony from Consoli); *see also* Officer Defs. Br. [D.I. 214] at p. 40.  However, changes in how insurers paid out-of-network claims had long been one of the "complexities" of Nobilis's business.  *See* Opp. App. Ex. 123 (Form 10-K 2015), at p. 11/75.  Nobilis's Form 10-K for 2015—

a time when Nobilis's percentage of out-of-network claims was much higher—stated that:

> At December 31, 2015, approximately 87.2% of our cases were on an 'out of network' basis, without any reimbursement rate protection or consistent in-network patient enrollments typically seen from an in-network agreement. Accordingly, we are susceptible to changes in reimbursement policies and procedures by third-party insurers and patients' preference of using their out of network benefits which could have an adverse effect on our business, results of operations and financial condition.

*Id.*  Furthermore, 

."  Opp. App. Ex. 115, at pp. 3-4; *see also* Opp. App. Ex. 116, at pp. 8-9, 12 (May 2019 confidential information memorandum, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

Defendants further speculate that perhaps BBVA's "refus[al] to approve" outside offers to buy Nobilis or generalized difficulties in the industry contributed to Nobilis's difficulties.[66]  These arguments are supported by little more than conjecture—for instance, there are no specifics provided concerning BBVA's reasons for not approving particular offers or whether those reasons were justified,[67] and there are no specifics provided to substantiate the idea that other companies

---

[66]    Fleming Br. [D.I. 182] at p. 46; Officer Defs. Br. [D.I. 214] at p. 41.

[67]    The testimony cited by the Officer Defendants suggests that Nobilis's management was eager to rush through a transaction before providing all of the information necessary for BBVA's approval.  *See* Officer Defs. Appendix [D.I. 215] at Ex. A-8, at p. 128 (Wiggins: "[BBVA] would want more information and . . . I'm not saying they didn't deserve more, but they would say we need more information. Our side was is it takes time to get that information and we're running out of time here.").  Fleming testified that, with respect to the potential Trive Capital deal, the Company's "deteriorating revenues" and possible inability to stay afloat for another 60-90 days until closing were a major sticking point in the ability to close the deal.  *See id.* at Ex. A-12, at pp. 17-18.

in Nobilis's industry suffered a comparable collapse during the relevant time period.[68] Even if these factors were substantiated, disputes concerning the extent to which they contributed to Nobilis's demise or can be causally linked to Nobilis's damages would be for the factfinder to decide.

Finally, the Officer Defendants' argument that Nobilis benefitted from having materially misstated financial statements fails as a matter of law. "'[A]s a matter of law . . . a knowing, secretive, fraudulent misstatement of corporate financial information' is not 'of benefit to a company.'" *Off. Comm. of Unsecured of Allegheny Health, Educ. & Rsch. Found. v. PricewaterhouseCoopers, LLP*, 607 F.3d 346, 355 (3d Cir. 2010) (quoting *Off. Comm. of Unsecured Creditors of Allegheny Health Educ. & Rsch. Found. v. PriceWaterhouseCoopers, LLP*, 989 A.2d 313, 338 (Pa. 2010)) (applying Pennsylvania law, in context of *in pari delicto* defense). The fact that materially misstated financial statements caused a temporary and illusory inflation in Nobilis's revenue figures does nothing to negate the massive losses that followed.

Furthermore, with respect to Devor's conclusions concerning causation and damages, it is well established that criticisms of the facts relied on by an expert in reaching a conclusion are properly the subject of cross examination—*not* a basis to exclude testimony entirely or grant summary judgment for the opposing party. "Determinations regarding the weight to be accorded, and the sufficiency of, the evidence relied upon by the proffered expert are within the sole province of the jury." *Robinson*, 326 F. Supp. 2d at 649 (quoting *Walker v. Gordon*, 46 F. App'x 691, 695 (3d Cir. 2002)). Thus, insofar as Defendants criticize Devor for not affording greater weight to certain facts or documents, they are free to cross-examine Devor on those issues at trial but they

---

[68] ████████████████████████████████████████████████████

████████████████████████████████████████ *See* Opp. App. Ex. 116, at pp. 8-9; *see also* Opp. App. Ex. 86 (Devor Rebuttal Report), at ¶ 23.

are not entitled to summary judgment.

Because Defendants' "alternative cause" arguments merely highlight the existence of disputed issues of fact, their Motions should be denied.

## V.   **<u>CONCLUSION</u>**

Plaintiff respectfully submits that Defendants' Motions should be denied.


Dated: November 6, 2023                     Respectfully submitted,
Wilmington, Delaware
                                            **COZEN O'CONNOR**


                                            /s/ John T. Carroll, III
                                            John T. Carroll, III  (DE No. 4060)
                                            1201 North Market Street
                                            Suite 1001
                                            Wilmington, Delaware 19801
                                            Telephone: (302) 295-2028
                                            Email: jcarroll@cozen.com

                                                    -and-

                                            Steven M. Coren, Esq. (*pro hac vice*)
                                            Benjamin M. Mather, Esq. (*pro hac vice*)
                                            Janice D. Felix, Esq. (*pro hac vice*)
                                            **COREN & RESS, P.C.**
                                            Two Commerce Square
                                            2001 Market Street, Suite 3900
                                            Philadelphia, PA 19103
                                            (215) 735-8700
                                            scoren@kcr-law.com
                                            bmather@kcr-law.com
                                            jfelix@kcr-law.com

                                            *Counsel for Plaintiff*
                                            *Alfred T. Giuliano, Ch. 7 Trustee*